IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
*   *   *   *   *   *   *   *   *   *   *   *
                                            *
DANIEL P. LIEBER,                           *
                                            *
            Plaintiff,                      *
                                            *   Docket No.
v.                                          *   1:21-cv-968-JL
                                            *
MARQUIS MANAGEMENT, LLC                     *
and SELECT DEMO SERVICES, LLC,              *
                                            *
            Defendants.                     *
                                            *
*   *   *   *   *   *   *   *   *   *   *   *
```

**CERTIFIED ORIGINAL**

DEPOSITION OF RYAN DENVER

Zoom deposition taken by agreement of counsel on

Monday, January 30, 2023, commencing at 9:38 a.m.

Court Reporter:  (Via Zoom)

Michele M. Allison, LCR, RPR, CRR
LCR #93 (RSA 310-A:161-181)

```
1   APPEARANCES:

2
    For the Plaintiff:
3
    UPTON & HATFIELD, L.L.P.
4   By:  Heather M. Burns, Esq.,
    Lauren S. Irwin, Esq.,
5   and Brooke Lovett Shilo, Esq.
    10 Centre Street
6   Concord, NH  03302
    603-716-9777
7   hburns@uptonhatfield.com
    lirwin@uptonhatfield.com
8   bshilo@uptonhatfield.com

9
10  For the Defendants:

11  HINCKLEY, ALLEN & SNYDER, L.L.P.
    By:  Christopher H.M. Carter, Esq.
12  650 Elm Street, 5th floor
    Manchester, NH  03101
13  603-545-6104
    ccarter@hinckleyallen.com
14

15
16  Also Present:  Scott Watkins

17

18

19

20

21

22

23
```

1                    I N D E X

2

3   WITNESS:     Ryan Denver

4

5

6   EXAMINATION:                                    PAGE

7             By Ms. Shilo                          4

8

9

10   EXHIBITS FOR IDENTIFICATION:

11   PLAINTIFF'S   DESCRIPTION                       PAGE

12   EXHIBIT 17   12/26/18-12/27/18 email string    119

13   EXHIBIT 20   10/28/19 email string              83

14   EXHIBIT 31   7/14/20-7/20/20 email string      128

15   EXHIBIT 65   10/27/20-10/28/20 email string    112

16   EXHIBIT 66   10/27/20-10/28/20 email string    113

17   EXHIBIT 115  12/1/20-12/4/20 Lieber/Denver text message 105

18

19   (Exhibits electronically marked by reporter and provided to
     all parties.)
20

21

22

23

<pre>
 1                        RYAN DENVER

 2            having been duly sworn by Ms. Allison,

 3         under RSA 310-A:181, Limited Notarial Function,

 4             was deposed and testified as follows:

 5                        EXAMINATION

 6   BY MS. SHILO:

 7       Q.    Good morning, Mr. Denver.  My name is Brooke Shilo.

 8   I'm with the law firm of Upton & Hatfield, and I'm here with

 9   my colleagues today, Lauren Irwin and Heather Burns, and we

10   represent Daniel Lieber in litigation against Marquis.

11            I'm just going to read a couple of proposed

12   stipulations into the record:  The parties agree that the

13   video deposition will be conducted remotely by Zoom

14   videoconference and the oath will be administered remotely.

15            The parties agree that video recording through the

16   Zoom app will take place of in-person video recording in an

17   effort to increase social distancing.

18            All participants agree that no handwritten notes,

19   digital messages, or other communications will be provided to

20   the witness out of sight or hearing of the other participants

21   unless counsel for the other parties is notified and assents.

22            The intent of this stipulation is to recreate the

23   circumstances of a live deposition where those present are
</pre>

1 able to observe whether any communications are occurring with

2 the witness during questioning.

3          The standard New Hampshire deposition stipulations

4 will apply.

5          The witness will have 30 days to read and sign the

6 deposition once the transcript is made available.  Electronic

7 signature is permitted.  And if the deposition is not signed

8 within 30 days, the signature will be deemed waived.

9          Mr. Denver, where are you this morning?

10     A.   I am at Hinckley Allen's office in Manchester,

11 New Hampshire.

12     Q.   And is there anyone with you in the room where

13 you're sitting?

14     A.   Yes.

15     Q.   And who is in the room?

16     A.   Attorney Chris Carter and HR for Marquis

17 Management, Scott Watkins.

18          MS. SHILO:  Okay.  And I'm guessing, Mr. Watkins,

19 because you're sitting in the same room, we probably want

20 your video on too.

21          And Michele, just let me know if that creates a

22 problem, and we can work through that.  We've just been

23 having some trouble with Internet connectivity when there's

1  too many people on video.

2        MR. WATKINS:  Yes.

3        MS. SHILO:  Thank you, Mr. Watkins.

4        MR. CARTER:  I just want to turn his volume up a

5  little bit.

6        MS. SHILO:  Sure, no problem.  Let me know if

7  there's any technical issues, and we can certainly take a

8  break to work through those.

9        MR. CARTER:  Okay.

10     Q.   BY MS. SHILO:  Mr. Denver, do you have a cellphone

11 today?

12     A.   I do.

13     Q.   And where is your cellphone?

14     A.   Next to me on the table.

15     Q.   Okay.  Is it turned over or flipped off so that you

16 can't see any messages coming in or out?

17     A.   It's turned over, yes.

18     Q.   Okay.  And will you agree not to look at your

19 cellphone during the deposition, only on breaks?

20     A.   Yes.

21     Q.   Okay.  Can you state your name and your home

22 address for the record, please.

23     A.   Ryan Denver.  I reside in New Hampshire and --

1  (Clarification by court reporter.)  Reside in New Hampshire

2  and in Boston, Massachusetts.

3      Q.   And what are the addresses of your homes in

4  New Hampshire and Boston?

5      A.   15 Small Pox Road, Kingston, New Hampshire, and 50

6  Liberty Drive, Boston, Mass.

7      Q.   Have you ever been deposed before?

8      A.   No.

9      Q.   Okay.  I'm just going to go through some ground

10  rules for the deposition today.  Michele Allison, our court

11  reporter, is going to be taking down everything we say, and

12  in order to make a clear record, we just need to follow a

13  couple rules.

14      So number one, I'm going to be asking you a lot of

15  questions, and you're going to know where I'm going with my

16  question sometimes, and it'll be tempting to hop in and give

17  an answer.

18      Please let me put my answer [sic] on the record and

19  then wait to answer it after the question is completed,

20  because if we talk over each other, it gets very, very

21  difficult for Michele to take down everything we're saying.

22      Also, from time to time, Attorney Carter may put an

23  objection on the record.  If he does object, pause your

1 answer, let him put his objection on the record, and then

2 unless he instructs you not to answer, you can answer my

3 question.

4       Sometimes I'll ask you yes-or-no questions.  When I

5 ask those, please answer with a yes or a no, not an uh-huh or

6 an unh-unh or a head shake, because that makes for a very

7 unclear record too.

8       And finally, I may ask some questions that are

9 unclear or confusing.  If you're confused or unclear about

10 what I mean in a question, please ask me to rephrase it.  If

11 there's anything about it that you don't understand, please

12 let me know, and I'll try to ask it in a more clear way.  But

13 if you do answer, I will -- I will assume that you've

14 understood the question I'm asking.

15      Do you have any questions about the ground rules

16 for the deposition today?

17   A.   No.

18   Q.   Okay.  What did you do to prepare for your

19 deposition?

20   A.   I reviewed some documents with my attorney.

21   Q.   Okay.  When did you meet with your attorney?

22   A.   I don't recall the exact date.  Three weeks ago.

23 A month ago.

1    Q.   And how long did you -- or was that meeting?

2    A.   Hour and a half, two hours.

3    Q.   What documents did you review?

4    A.   I reviewed a text message, just questions.

5    Q.   And the text message that you reviewed, who was

6  that text message exchanged between?

7    A.   Myself and Mr. Lieber.

8    Q.   Okay.  Any other documents that you reviewed?

9    A.   Not that I recall.

10   Q.   Okay.  Have you discussed this case with anyone?

11   A.   No.

12   Q.   Okay.  So you never discussed it with Jon Marquis?

13   A.   No.

14   Q.   Chris Moore?

15   A.   No.

16   Q.   Scott Watkins?

17   A.   No.

18   Q.   Mike Fruhbeis?

19   A.   No.

20   Q.   Ryan Dogil?

21   A.   No.

22   Q.   Anyone else?

23   A.   No.

1     Q.   Have you ever made a recording related in any way

2  to this case?

3     A.   Recording?

4     Q.   Yeah, like an audio recording or video recording.

5     A.   No.

6     Q.   Do you text?

7     A.   Do I text?

8     Q.   Yes.

9     A.   Yes.

10     Q.   Do you text related to work?

11     A.   Yes.

12     Q.   Have you texted with anyone related to this case?

13     A.   No.

14     Q.   Do you -- did you text with Dan Lieber?

15     A.   Yes.

16     Q.   About how often would you text with Mr. Lieber?

17     A.   Not often.

18     Q.   Did you text with Ryan Dogil?

19     A.   Do I or did I?

20     Q.   Do you currently?

21     A.   Yes.

22     Q.   And did you text with Ryan Dogil during Dan

23  Lieber's employment?

1      A.    Yes.

2      Q.    Do you text with him about work-related matters?

3      A.    Yes.

4      Q.    And about how frequently do you text with

5  Mr. Dogil?

6      A.    It varies.

7      Q.    Okay.  When you are texting with him, about how

8  frequently do you text?

9      A.    Could be once a week.  It could be five times a

10  week or not at all for a couple weeks at a time.

11      Q.    Okay.  Have you ever texted with Mr. Dogil about

12  anything to do with Mr. Lieber?

13      A.    Not that I recall.

14      Q.    Have you ever texted with Ryan Dogil about anything

15  to do with Beth Anne Collopy?

16      A.    No.

17      Q.    Have you ever texted with Mr. Dogil about the 40

18  Lowell Road office renovation project?

19      A.    Not that I recall.

20      Q.    Have you ever texted with Mr. Dogil about the

21  Elkins Street office renovation project?

22      A.    Elkins Street.  Not that I recall.

23      Q.    Okay.  Did you look for texts related to this case?

1      A.   No.  I don't -- I didn't have any.  So actually,

2  yes.

3      Q.   You looked and you didn't find any?

4      A.   Right.

5      Q.   Did you ever text with Chris Moore about Dan

6  Lieber?

7      A.   Don't recall.

8      Q.   Did you ever text with Scott Watkins about

9  Mr. Lieber?

10     A.   Don't believe so.

11     Q.   Did you ever text with Jon Marquis about

12  Mr. Lieber?

13     A.   Don't believe so.

14     Q.   Did you ever text with Randy Scott about

15  Mr. Lieber?

16     A.   Not that I remember.

17     Q.   Did you ever text with Michael Fruhbeis about

18  Mr. Lieber?

19     A.   No.

20     Q.   Okay.  Have you ever used an email other than your

21  Marquis email to discuss work matters?

22     A.   Work matter -- no.

23     Q.   Okay.  So you've never used a personal, for

1  example, Gmail account to discuss anything related to work?

2      A.   No.

3      Q.   Have you ever used a personal email account to

4  discuss anything related to Mr. Lieber?

5      A.   No.

6      Q.   Do you have a Marquis email or a Select Demo email?

7      A.   Select Demo.

8      Q.   Was your email -- was your Select Demo email

9  collected as part of this case?

10     A.   Yes.

11     Q.   And is your Select Demo email the only work email

12 address you have?

13     A.   Yes.

14     Q.   What electronic devices do you own or use?

15     A.   I have a cellphone.  I have an iPad that I never

16 really used.  That's it.

17     Q.   Okay.  What kind of cellphone do you have?

18     A.   An iPhone.

19     Q.   And are your iPhone and your iPad associated with

20 the same Apple account?

21     A.   I don't even believe I've set the iPad up yet.

22     Q.   Okay.  Have you ever had any other electronic

23 devices from the time of Dan Lieber's employment to the

1  present?

2      A.   Say it one more time, please.

3      Q.   Have you had any other electronic devices from the

4  time of Dan Lieber's employment to the present?

5      A.   Yes.

6      Q.   What electronic devices were those?

7      A.   I have -- I had a computer in my office.

8      Q.   Anything else?

9      A.   Don't -- don't believe so.

10      Q.   Okay.  And the computer in your office, did that

11  have any email or messaging that was not associated with your

12  cellphone or your iPad?

13      A.   No.

14      Q.   Okay.  Have you ever deleted text messages from

15  your cellphone?

16      A.   Yes.

17      Q.   How often do you delete text messages?

18      A.   Daily.

19      Q.   Do you do that manually?

20      A.   Yes.

21      Q.   So can you describe your deletion process for me?

22      A.   I use my texts as a to-do list, and when that task

23  is done, I erase my text message.

1     Q.   Do you back up your text messages to the cloud?

2     A.   I don't know.

3     Q.   Do people at Marquis use Microsoft Teams?

4     A.   Yes.

5     Q.   Do you use Microsoft Teams?

6     A.   Yes.

7     Q.   What do you use Teams for?

8     A.   Team meetings.

9     Q.   Do you ever use a messaging function in Teams?

10    A.   No.

11    Q.   Are there any other messaging or communication

12 programs used by employees at Marquis or Select Demo?

13         MR. CARTER:  Objection to form.

14    A.   I can't speak for what Marquis uses.  I can only

15 speak for myself.

16    Q.   Okay.  So speaking for yourself, are there any

17 other messaging or communication services used by people at

18 Marquis or Select Demo?

19         MR. CARTER:  Objection to form.

20    A.   I know I use Zoom.

21    Q.   Okay.  Any other programs?

22    A.   I use WhatsApp, but not for work.

23    Q.   Okay.  Anything else?

1      A.    There's so many different clients that set up

2 meetings in different, you know, formats.  I -- the majority

3 are Teams and Zooms.

4      Q.    Okay.  And with regard to WhatsApp, have you ever

5 messaged about anything at all concerning Mr. Lieber in

6 WhatsApp?

7      A.    No.

8      Q.    Were you ever asked to look for text messages or

9 other messages related to this case?

10      A.    Yes.

11      Q.    And what -- when you were asked to look for that

12 data, what did you do?  Did you submit your phone?  Did you

13 submit your Apple ID password?

14      A.    I submitted my phone.

15      Q.    So you submitted your phone, but not your Apple ID

16 and password?

17      A.    I believe my Apple ID and password as well.  I

18 can't remember specifically.

19      Q.    Okay.  And who contacted you to coordinate

20 submitting your data?

21      A.    I believe it was counsel.

22      Q.    Can you describe your education?

23      A.    To the tenth grade.

1    Q.    Okay.  And what -- can you go through your

2  employment issue after you finished your education?

3    A.    Issue?

4    Q.    Sorry, can you describe your employment after you

5  finished your education.

6    A.    I was a laborer, and then joined the laborer's

7  union.

8    Q.    And when were -- when were the approximate years

9  you were a laborer?

10    A.    Summertime since I was maybe 14 or 15, full time at

11  16.  Joined the laborer's union, 18.  I've been working in

12  this capacity since.

13    Q.    So how long were you working as a member of the

14  laborer's union?

15    A.    Still currently today.

16    Q.    And when were you -- what type of work were you

17  doing when you were part of the union?

18    A.    I was doing demolition, carpenter tending,

19  equipment work.

20    Q.    And who was your employer when you worked for the

21  union?

22    A.    Modern Continental, Bond Brothers, Valley Crest,

23  Max Demolition, and Select Demo.

1    Q.   When did you join Select Demo?

2    A.   2006.

3    Q.   And what was your first position when you joined

4  Select Demo?

5    A.   Truck driver.

6    Q.   And how did you become employed at Select Demo?

7    A.   Through a carpenter that was on one of the projects

8  I was on offering me a job.

9    Q.   And how long did you serve as a truck driver at

10 Select Demo?

11   A.   One year.

12   Q.   Okay.  And what was your next position after truck

13 driver?

14   A.   Supervisor.

15   Q.   And what were you supervising?

16   A.   Manpower.

17   Q.   Was there a particular division or group you were

18 supervising?

19   A.   The demo workers.

20   Q.   Okay.  And how many demo workers were you

21 supervising?

22   A.   It varied.  Anywhere from, in 2007, ten to maybe

23 40.

1    Q.   And who was your supervisor in that position?

2    A.   I'd say at the time Greg Faria.

3    Q.   And what was his position?

4    A.   Project manager, estimator.

5    Q.   And then after your supervisor position, what was

6  your next position at Select Demo?

7    A.   Vice president of operations.

8    Q.   And who promoted you to that position?

9    A.   I'd say maybe Bob Salemi.

10   Q.   What was Bob Salemi's -- first of all, can you

11 spell Bob Salemi's last name for Michele?

12   A.   S-A-L-E-M-I.

13   Q.   What was Bob Salemi's position?

14   A.   His title was vice president.

15   Q.   Was he vice president of a certain -- certain

16 division or certain function?

17   A.   He worked for New England Finish.

18   Q.   So he was a vice president of New England Finish,

19 and he promoted you to be the vice president of operations

20 for Select Demo?

21   A.   He was vice president of Select Demo, but pretty

22 uninvolved.

23   Q.   Okay.  And he was more -- but he was more involved

1  with New England Finish?

2      A.    Correct.

3      Q.    Okay.  When were you promoted to the vice president

4  position?

5      A.    Maybe 2010, 2011.  I'm kind of guessing on that a

6  little bit.

7      Q.    What were your duties as vice president of

8  operations?

9      A.    Worked still with manpower.  You know, quality

10  control.  Estimating.  Project management.  Tracking down

11  leads.  Building relationships.

12      Q.    And when you say working with manpower, that means

13  that you're working with the demolition crews?

14      A.    Correct.

15      Q.    After your vice president of operations position,

16  what was the next position you held?

17      A.    President.

18      Q.    And when did you become president?

19      A.    Around '14 maybe, 2014 or so.

20      Q.    Who promoted you to the president position?

21      A.    Jon.

22      Q.    Jon Marquis?

23      A.    Yes.

1    Q.    What were your duties as president of Select Demo?

2    A.    Same as vice president.

3    Q.    As president of Select Demo -- first of all, is

4  that the position that you still hold today?

5    A.    Yes.

6    Q.    As president of Select Demo, do you report to

7  anyone?

8    A.    Jon, I would say.

9    Q.    Anyone else?

10   A.    No.

11   Q.    Okay.  Do you have an ownership interest in Select

12 Demo?

13   A.    I do.

14   Q.    What is your ownership interest?

15   A.    17 -- 17 and some change percent.

16   Q.    When did you acquire that ownership interest?

17   A.    I -- maybe around 2011, somewhere around then.

18   Q.    And who owns the other portion or portions of

19 Select Demo?

20   A.    Diane Marquis, I believe.

21   Q.    And who's Diane Marquis?

22   A.    Jon Marquis' wife.

23   Q.    And who awarded you the ownership interest in

1   Select Demo?

2       A.   Jon.

3       Q.   Do you have any ownership interest in any of the

4   other Marquis family companies?

5       A.   I do.

6       Q.   Which companies?

7       A.   Select Paint, Select Spray, K-Town, Select Marble

8   and Tile.   I think that's it.

9       Q.   Okay.   Does Jon Marquis have any ownership interest

10  in Select Demo?

11      A.   Don't believe so.

12      Q.   What is your ownership interest in Select Paint?

13      A.   I believe 45.

14      Q.   And who owns the other portion or portions of the

15  ownership interest?

16      A.   I believe it's split up between Jon's daughters.

17      Q.   Do Jon's daughters work for Select Paint?

18      A.   Do they work for Select Paint.   In what capacity?

19      Q.   Are they employees or officers of Select Paint?

20      A.   Officers, I'm not sure.

21      Q.   Okay.   Do they perform work for Select Paint?

22      A.   No.

23      Q.   Okay.   So their only involvement is their ownership

1  interest?

2      A.   That's it.

3      Q.   Okay.  Are there any other owners of Select Paint?

4      A.   Tom Higgins.

5      Q.   And approximately what percentage of Select Paint

6  does he own?

7      A.   10 percent.

8      Q.   And approximately what percentage do Jon's

9  daughters own?

10      A.   I believe they're split up equally in half, the

11  other 45 percent.

12      Q.   Okay.  And who is Tom Higgins?

13      A.   A 10 percent owner in Select Paint.

14      Q.   Is he an employee of Select Paint?

15      A.   Yes.

16      Q.   What is his title?

17      A.   Vice president.

18      Q.   Vice president of Select Paint?

19      A.   Yes.

20      Q.   And then I believe the next company you mentioned

21  was Select Spray?

22      A.   Yes.

23      Q.   How -- what is your ownership interest in Select

1  Spray?

2      A.   I believe 40 percent.

3      Q.   And who are the other owners of Select Spray?

4      A.   Again, I don't -- I'm not sure if it's his two

5  daughters are split owners as well.

6      Q.   Any other owners other than his two daughters?

7      A.   Randy Scott and Joe, Joseph Baker.

8      Q.   What is Randy Scott's ownership interest?

9      A.   10 percent.

10     Q.   And is he an employee of Select Spray?

11     A.   Yes.

12     Q.   What is his title?

13     A.   I believe vice president.

14     Q.   Okay.  And what is Joseph Baker's ownership

15  interest?

16     A.   10 percent.

17     Q.   Is he an employee of Select Spray?

18     A.   Yes.

19     Q.   What is his title?

20     A.   I believe vice president as well.

21     Q.   Do Randy Scott and Joseph Baker work for any other

22  Marquis family companies?

23     A.   Select Demo.

1    Q.   Okay.  And are they also vice presidents of Select

2 Demo?

3    A.   Yes.

4    Q.   Moving on to K-Town, what is the full name of

5 K-Town?

6    A.   K-Town Disposal, LLC, I believe.

7    Q.   Okay.  And what is your interest in K-Town

8 Disposal?

9    A.   50 percent.

10    Q.   Who are the other owners of K-Town Disposal?

11    A.   Again, I'm not sure how his -- how Jon's, you know,

12 equity is split up on that one.

13    Q.   Okay.  Do you know who holds Jon's equity in K-Town

14 Disposal?

15    A.   Again, I don't -- I'm not sure if it's him or his

16 two daughters.

17    Q.   Okay.  About approximately how -- what percentage

18 of K-Town Disposal does Jon and/or his two daughters hold?

19    A.   50.

20    Q.   So there are no other owners of K-Town Disposal?

21    A.   No.

22    Q.   Are his daughters employees of K-Town Disposal?

23    A.   No.

1      Q.    Are his daughters employees of Select Spray?

2      A.    No.

3      Q.    And finally, Select Marble and Tile, what is your

4  ownership interest in that entity?

5      A.    Somewhere in the 25 percent range, plus or minus.

6      Q.    And who are the other owners of Select Marble and

7  Tile?

8      A.    Tom Butler, I believe Jon's daughters, and Srdjan

9  Milicevic.

10      Q.    And can you spell Mr. Milicevic's name for Michele,

11  please?

12      A.    I'll give it a go.

13      Q.    Sure.

14      A.    S-R-D-J-I-N [sic].  Milicevic, M-I-L-L-I-C --

15  that's where -- V-I-C.  Something like that.

16      Q.    Okay.

17      A.    I can look it up for you.

18      Q.    Thank you.  What percentage of Select Marble and

19  Tile does Tom Butler own?

20      A.    Around the same as me.

21      Q.    And what percentage do Jon's daughters own?

22      A.    It's split up evenly between the three of us.

23      Q.    So you're all equal owners, you, Tom Butler, and

1  Jon's daughters, collectively?

2     A.   Serj owns 5 percent, and then the rest of the

3  shares is split up between the three of us.

4     Q.   I see.  Does Tom Butler work for Select Marble and

5  Tile?

6     A.   Yes.

7     Q.   What is his title?

8     A.   Principal.

9     Q.   Does Mr. Milicevic work for Select Marble and Tile?

10    A.   In an advisory role.

11    Q.   Who is Mr. Milicevic's employer?

12    A.   Select Demo.

13    Q.   What is his title at Select Demo?

14    A.   Executive vice president.

15    Q.   And do either of Jon's daughters work for Select

16 Marble and Tile?

17    A.   No.

18    Q.   Does Diane Marquis work for Select Demo?

19    A.   No.

20    Q.   What is Jon Marquis' involvement in Select Demo?

21    A.   Advisory.

22    Q.   What is his role in Select Paint?

23    A.   Advisory.

1    Q.   What is his role in Select Spray?

2    A.   Advisory.

3    Q.   What is his role in K-Town Disposal?

4    A.   Advisory.

5    Q.   And what is his role in Select Marble and Tile?

6    A.   Advisory.

7    Q.   And what does -- what does "advisory" mean?

8    A.   You know, questions, concerns, advice.

9    Q.   Is he in charge of each of those entities?

10        MR. CARTER:   Objection to form.

11   A.   It's kind of a vague question to me.

12   Q.   Do the top-level people in each of those entities

13 report to Jon Marquis?

14   A.   Ultimately, I would.

15   Q.   Sorry, you broke up just a little bit there.

16   A.   Ultimately, I would.

17   Q.   Okay.   So the people in each of those entities

18 report to you?

19   A.   Correct.

20   Q.   And then you report to Jon Marquis?

21   A.   If needed.

22   Q.   Okay.   Do you have any ownership interest in

23 Marquis Management?

1     A.   No.

2     Q.   What is Marquis Management?

3     A.   It's a organization that provides shared services.

4     Q.   And to whom do they provide shared services?

5     A.   All the Marquis Companies.

6     Q.   Okay.  And who controls Marquis Management?

7     A.   A little more specific, please?

8     Q.   Who -- who leads Marquis Management?

9     A.   For Jon?

10    Q.   Yes.

11    A.   Chris Moore.

12    Q.   And does Chris Moore report to Jon Marquis?

13    A.   Yes.

14    Q.   How does Select Demo interact with Marquis

15 Management?

16         MR. CARTER:  Objection to form.

17    A.   More specific, please.

18    Q.   Sure.  Does Select Demo interact with Marquis

19 Management?

20    A.   Yes.

21    Q.   What does it do that makes you say it interacts

22 with Marquis Management?

23    A.   Payroll, safety, IT, HR.

1     Q.   And those things that you just listed, do you mean

2  that Marquis Management provides those services to Select

3  Demo?

4     A.   Correct.

5     Q.   Do they handle benefits for Select Demo employees?

6     A.   Depends.

7     Q.   When do they handle benefits for Select Demo

8  employees?

9     A.   I believe just for the nonunion employees.

10    Q.   Okay.  Does Marquis Management provide finance and

11 accounting services for Select Demo?

12    A.   Portions.

13    Q.   What portion of finance and accounting services

14 does Marquis Management provide?

15    A.   Payroll.  Chris Moore, the CFO level, and I believe

16 purchasing potentially now too.

17    Q.   So as the CFO of Marquis Management, Mr. Moore

18 serves also as the CFO of Select Demo?

19    A.   Yes.

20    Q.   Does Marquis Management provide legal services to

21 Select Demo?

22    A.   Don't believe so.

23    Q.   Does Marquis Management provide corporate

1 management services to Select Demo?

2     A.   I'm not sure.

3     Q.   Do -- does Marquis Management provide business

4 development services to Select Demo?

5     A.   No.

6     Q.   Does Marquis Management provide website and

7 marketing services to Marquis Management -- sorry, to Select

8 Demo?

9     A.   No, none.  Not that I'm aware of.

10     Q.   Okay.  Does Marquis Management provide social media

11 management to Select Demo?

12     A.   No.

13     Q.   Does Select Demo use the Marquis Management

14 personnel policies and handbooks?

15     A.   We have our own.

16     Q.   Okay.  And who writes and develops those personnel

17 policies and handbooks?

18     A.   They've been in place for a while.  I believe that

19 Scott Watkins has reviewed them and maybe updated them.

20     Q.   Okay.  And is Scott Watkins an employee of Marquis

21 Management?

22     A.   Yes.

23     Q.   Does Marquis Management provide similar services to

1 Select Paint?

2    A.   Yes.

3    Q.   To Select Spray?

4    A.   Yes.

5    Q.   To K-Town Disposal?

6    A.   Yes.

7    Q.   And to Select Marble and Tile?

8    A.   Yes.

9    Q.   Do you receive a W-2 from a Marquis company?

10    A.   Yes.

11    Q.   Which company or companies do you receive a W-2

12 from?

13    A.   Select Demo, Select Paint, Select Spray, and

14 Marquis Management.

15    Q.   What -- do you hold a title at Select Paint?

16    A.   My signature is president, and the companies are

17 listed below.

18    Q.   I see.  So you're president of Select Paint?

19    A.   Yes.

20    Q.   And are you president of Select Spray?

21    A.   Yes.

22    Q.   And I think you already said, do you hold a

23 position at Marquis Management?

1      A.    Advisory.

2      Q.    So the compensation you receive from Marquis

3  Management is for your advisory services?

4      A.    Correct.

5      Q.    Is there any other -- anything else you're paid for

6  by Marquis Management?

7      A.    Advisory role.

8      Q.    Okay.  Why do you get a W-2 from Marquis

9  Management?

10          MR. CARTER:  Objection to form.

11     A.    Because I perform work for them.

12     Q.    Okay.  Do you receive any other income from Marquis

13  Management?

14     A.    No, that I can think of.

15     Q.    Are you paid hourly for your work for Marquis

16  Management?

17     A.    No.

18     Q.    Are -- are you salaried for your work at Marquis

19  Management?

20     A.    Yes.

21     Q.    What is your salary from Marquis Management?

22     A.    250,000 a year.

23     Q.    Are you eligible for bonuses from Marquis

1    Management?

2        A.    No.

3        Q.    Do you receive any other compensation from Marquis

4    Management?

5        A.    No.

6        Q.    What does Select Demo do?

7        A.    Demolition, asbestos, final cleaning, small

8    concrete work.  General labor.

9        Q.    Are other Marquis family companies part of Select

10   Demo?

11       A.    I don't understand what you mean.

12       Q.    Are there -- are -- does Select Demo own any of the

13   other Marquis family companies?

14       A.    Own, no, that I know of.

15       Q.    Sure.  Does it control any of the other Marquis

16   family companies?

17       A.    No.

18       Q.    How many employees does Select Demo have?

19       A.    It varies.  Anywhere from 300 to 500.

20       Q.    What is Select Demo's revenue?

21       A.    What year?

22       Q.    Currently.

23       A.    So 2022?

1    Q.    2022.

2    A.    131 million, plus or minus.

3    Q.    And approximately what was its revenue in 2020?

4    A.    2020?  120, 125, somewhere in there, I believe.

5    Q.    And that's 120 or 125 million?

6    A.    Yes.

7    Q.    Does Select Demo have government contracts?

8          MR. CARTER:  Brooke, I realize that relevance isn't

9    a --

10         MS. SHILO:  Sure, I can rephrase that.

11         MR. CARTER:  I think we're going really far afield

12   here.

13         MS. SHILO:  I don't -- I don't think so.

14         MR. CARTER:  All right.  I'm going to let this go

15   on a little bit longer, but we've been at it now for an hour,

16   and we haven't heard Dan Marquis' [sic] name more than once

17   or twice.  You're now asking for revenues of the company and

18   what contracts they fulfill, so -- go ahead.

19   A.    Maybe a little more specific on government

20   contracts.

21   Q.    BY MS. SHILO:  Sure.  Are any of Select Demo's

22   projects funded directly or indirectly by the federal

23   government?

1    A.    I'm not -- I'm not totally sure.  I guess DCAM --

2  are you considering DCAM or Massport or Boston Public

3  Schools?

4    Q.    Yeah.  Do you have any projects funded directly or

5  indirectly by the U.S. Department of Transportation?

6    A.    Funded?

7    Q.    Yes.

8    A.    I'm just not sure whether we're subcontracted

9  through the GC.  I don't believe we have them directly, but

10  I'm not sure.

11    Q.    So -- but indirectly, do you know of any that are

12  funded by the federal government indirectly, perhaps through

13  a GC?

14    A.    I'm sure we do.  I --

15    Q.    Are -- sorry, go ahead.

16    A.    I don't know what's federal, what's state.  I

17  really don't.

18    Q.    Okay.  Do any of those contracts have -- or do any

19  of the contracts that are for governmental entities, either

20  state or federal, have any requirements for IT or security?

21    A.    I don't know.

22    Q.    Okay.  Who would know what the requirements are of

23  Select Demo's contracts with the government for IT and

1  security?

2        MR. CARTER:  Objection to form.

3     A.   Probably Srdjan, Serj.

4     Q.   And that was Serj -- I'm going to butcher his

5  name -- Milicevic?

6     A.   Correct.

7     Q.   Okay.

8        MR. CARTER:  You need a break?

9        THE WITNESS:  Sure.

10       MR. CARTER:  Why don't we take a few-minute break,

11  if that's all right with you.  Is that all right?

12       MS. SHILO:  Okay.  Yep.  We can do a five-minute

13  break.

14       MR. CARTER:  Thank you.

15       MS. SHILO:  Thank you.

16       (Recess taken.)

17    Q.   BY MS. SHILO:  Mr. Denver, before the break, you

18  testified that you got W-2s from Select Demo, Select Paint,

19  Select Spray, and Marquis Management; is that right?

20    A.   Yes.

21    Q.   Okay.  Are you a salary or an hourly employee of

22  Select Demo?

23    A.   Salary.

1    Q.    And what is your salary at Select Demo?

2    A.    A million.

3    Q.    And are you a hourly or salary employee at Select

4    Paint?

5    A.    Salary.

6    Q.    And what is your salary at Select Paint?

7    A.    250.

8    Q.    And are you a salary or hourly employee at Select

9    Spray?

10    A.    Salary.

11    Q.    And what is your salary at Select Paint?

12    A.    250.

13    Q.    Are you eligible for bonuses at Select Demo?

14    A.    Yes.

15    Q.    What was your bonus in 2022?

16    A.    I don't remember.

17    Q.    Do you know the general range?

18    A.    Between 250 and 500.

19    Q.    Are you eligible for bonus at Select Paint?

20    A.    Yes.

21    Q.    What -- did you get a bonus in 2020?

22    A.    2020?

23    Q.    Sorry, 2022.

1    A.    Yes.

2    Q.    What was your bonus in 2022?

3    A.    I don't remember.

4    Q.    Do you know the approximate range?

5    A.    Anywhere from 300 to 750.

6    Q.    And that's 300,000 to 750,000?

7    A.    Yes.

8    Q.    And were you eligible for a bonus at Select Spray?

9    A.    Yes.

10   Q.    And in 2022, what was your bonus from Select Spray?

11   A.    I don't remember.

12   Q.    Do you know the approximate range?

13   A.    One -- a hundred to 250.

14   Q.    Do you receive any other compensation other than

15   what we've talked about from Select Demo, Select Paint,

16   Select Spray, or Marquis Management?

17   A.    You need to be more specific, please.

18   Q.    Were you paid any money that was not captured when

19   we talked about salaries and bonuses with Select Demo, Select

20   Paint, Select Spray, or Marquis Management?

21   A.    I don't know.

22   Q.    You don't know whether you got any other

23   compensation?

1    A.    Everything is bonuses or pay.

2    Q.    Okay.  Do you have a car allowance?

3    A.    No.  I have a company car.

4    Q.    Okay.  Does the company pay for any of your

5  housing?

6          MR. CARTER:  Can I ask a proffer for relevance

7  here, Brooke?

8          MS. SHILO:  Chris, that's a speaking objection, and

9  unless --

10         MR. CARTER:  That's a question to you, because

11 rather than tell him not to answer these -- I'd rather not do

12 that, but on the other hand, whether he gets a housing

13 allowance or a company car in a discrimination case?

14         MS. SHILO:  I don't -- relevance is not an

15 objection at a deposition.  You can instruct the witness not

16 to answer --

17         MR. CARTER:  So you're not willing to provide some

18 link to this question to any issue in the case?

19         MS. SHILO:  I'm not -- I don't want to respond to a

20 speaking objection while the witness is present.  If we want

21 to take a break and you and I confer, we can talk about it,

22 but even relevance --

23         MR. CARTER:  Brooke, I'll have him step outside.

1          MS. SHILO:  -- during the deposition.

2          MR. CARTER:  Why don't we just go off the record.

3          (Discussion held off the record.)

4          MS. SHILO:  Thank you, Mr. Denver.  And I think

5     we're all back?  Great.  Michele, we can go back on the

6     record.

7          Q.   BY MS. SHILO:  Mr. Denver, how does Jon Marquis

8     communicate with you?

9          A.   Text, email, phone calls, in person.

10         Q.   How often do you see or meet with Jon Marquis in

11    person?

12         MR. CARTER:  Objection to form.

13         A.   It varies.

14         Q.   How often is Jon Marquis present in the Select Demo

15    offices?

16         A.   That varies widely.

17         Q.   Okay.  In 2020, how often was Jon Marquis in the

18    Select Demo offices?

19         A.   I don't remember.

20         Q.   In 2022, how often was Jon Marquis in the Select

21    Demo offices?

22         A.   I don't specifically remember.

23         Q.   When was the last time Jon Marquis was in the

1  Select Demo offices?

2     A.   A few weeks back.

3     Q.   And do you text with Jon Marquis about work-related

4  matters?

5     A.   Yes.

6     Q.   And when you email with Jon Marquis, do you use

7  your Select Demo email?

8     A.   Yes.

9     Q.   Have you ever used another email to communicate

10  with Jon Marquis?

11     A.   No.

12     Q.   How does Chris Moore communicate with you?

13     A.   Email, text, phone.

14     Q.   And when you communicate with Chris Moore via text,

15  is that for work-related matters?

16     A.   Work and personal.

17     Q.   Do you socialize with Jon Marquis?

18     A.   I do.

19     Q.   How often do you socialize with Jon Marquis?

20     A.   It varies.

21     Q.   In 2022, how often did you socialize with Jon

22  Marquis?

23     A.   I don't know.

1      Q.    Monthly, weekly?

2      A.    Some months, it might be one month -- once, and it

3  could be another month, two or three times.

4      Q.    And when you socialize with Jon Marquis, what do

5  you do?

6            MR. CARTER:  Objection to form.

7      A.    Could be dinner.  Could be lunch.  Could be golf.

8  Could be up at his house.  Birthday party.

9      Q.    And where is his house?

10     A.    Center Conway, New Hampshire.

11     Q.    And when you visit Mr. Marquis at his house in

12  Center Conway, do you go up and spend the weekend, or is it

13  just a day trip?

14            MR. CARTER:  Objection to form.

15     A.    I've done both.

16     Q.    Do you socialize with Chris Moore?

17     A.    I do.

18     Q.    How often do you socialize with Chris Moore?

19     A.    It varies.

20     Q.    In 2022, how often did you socialize with Chris

21  Moore?

22     A.    Can you be a little more specific when you say

23  "socialize"?

1    Q.   Sure.  Meeting or having communications with Chris

2  Moore that are not related to your work at Select Demo or

3  Marquis Management.

4    A.   I don't know.  I couldn't tell you how many times.

5    Q.   Would you say monthly?

6         MR. CARTER:  Objection to form.

7    A.   Nonworking?

8    Q.   Yes.

9    A.   Probably not.

10   Q.   Did you socialize at all unrelated to your work

11 with Chris Moore -- sorry.

12        Did you socialize with Chris Moore unrelated to

13 your work at all in 2022?

14   A.   I mean, I think everything ties back to work at one

15 point or the other, but...

16   Q.   Okay.  Did you have dinner or lunch with Chris

17 Moore in --

18   A.   Yes.

19   Q.   -- 2022?  And how often did you have dinner or

20 lunch with Chris Moore in 2022?

21   A.   Again, it varied.

22   Q.   Would you say weekly?

23   A.   No.

```
 1      Q.   Monthly?

 2      A.   At times.

 3      Q.   Are there regular meetings for all the leaders of

 4   Marquis family companies?

 5      A.   Scheduled?

 6      Q.   Yes.

 7      A.   Like in advance?

 8      Q.   Yes.

 9      A.   We have some at Select companies, but regular --

10   regular Marquis managers like, you know, this day of each

11   month, no.

12      Q.   Okay.  Do you have any regular meetings scheduled

13   that Jon Marquis attends?

14      A.   No.

15      Q.   Do you have any regular meetings scheduled that

16   Chris Moore attends?

17      A.   He doesn't really show up to all the meetings

18   that -- operational meetings that we have scheduled.

19      Q.   Do you have regular meetings scheduled that Chris

20   Moore is expected to attend but doesn't?

21           MR. CARTER:  When you say "you," are you referring

22   to Select Demo?

23           MS. SHILO:  I am referring to meetings that
```

 1  Mr. Denver attends that are regularly scheduled meetings that

 2  Mr. Moore is also expected to attend.

 3          MR. CARTER:  Object to form.

 4      A.   Can you say the question again, please?

 5      Q.   Sure.  Are there regularly scheduled meetings that

 6  you are expected to attend and also Chris Moore is expected

 7  to attend?

 8      A.   I'm not sure.

 9      Q.   Okay.  So there's not, for example, a monthly

10  meeting that you and Chris Moore and Jon Marquis are

11  scheduled to attend?

12      A.   No.

13      Q.   Is there a quarterly meeting that you and Jon

14  Marquis and Chris Moore are scheduled or expected to attend?

15      A.   Not that's like scheduled out on this day, but

16  we'll try to meet.  I would say quarterly is fair.

17      Q.   Okay.  At those quarterly meetings, who usually

18  attends those?

19      A.   Depends what meeting you're talking about.

20      Q.   Is there a quarterly meeting that you and Chris

21  Moore and Jon Marquis regularly attend?

22      A.   When -- again, when we decide that we want to meet,

23  but not scheduled.

1    Q.   Okay.  And who decides when those meetings will be

2  held?

3    A.   I'd say generally, Jon.

4    Q.   And when Jon decides that you're going to have a

5  meeting, how does he communicate that to you?

6    A.   Phone, email, text.

7    Q.   And where are those meetings held?

8    A.   Different -- different places.

9    Q.   So when Jon decides when the meeting's going to be

10  held, he tells you where it is too?

11    A.   A suggestion, I would say.

12    Q.   Do you have food brought into those meetings?

13    A.   Generally, no.

14    Q.   Who generally attends those meetings?

15    A.   Which meetings?

16    Q.   The roughly quarterly meetings that Jon decides

17  when they're going to be held.

18    A.   Well, you asked me about the meetings between

19  myself and Jon and Chris, so sometimes Chris will be at those

20  meetings.

21    Q.   Okay.  Are there any other meetings held regularly

22  or somewhat regularly that the leaders of the Marquis family

23  companies attend?

1          MR. CARTER:  Objection to form.

2     A.   It varies on what's going on.

3     Q.   So is it fair to say that meetings with the leaders

4 of the Marquis family companies are held when Jon Marquis

5 decides something warrants calling a meeting?

6     A.   Or somebody else that's in the group.

7     Q.   Okay.  But there's no standard quarterly meeting

8 that automatically happens absent someone requesting a

9 meeting?

10     A.   Correct.

11     Q.   Where is your physical office?

12     A.   We have three.

13     Q.   Okay.  And where are those three offices?

14     A.   Boston, Salem, and Connecticut.

15     Q.   And when you say "Salem," is that Salem,

16 New Hampshire?

17     A.   Yes.

18     Q.   Where is your office in Salem, New Hampshire?

19     A.   40 Lowell Road.

20     Q.   And where is your office in Boston?

21     A.   Elkins, Elkins Road in Boston.  Elkins Street.

22     Q.   At the 40 Lowell Road location, where within that

23 building is your office located?

1    A.    The front right-hand corner of --

2    Q.    On the first floor or the second floor?

3    A.    Second floor.

4    Q.    Is Ryan Dogil located -- or is Ryan Dogil's office

5    located in that same building?

6    A.    Yes.

7    Q.    Does Jon Marquis have an office in that building?

8    A.    No.

9    Q.    Does Jon Marquis have an office in Salem?

10    A.    No.

11    Q.    Where is Jon Marquis' office?

12    A.    I'm assuming his house, maybe.  I'm not sure.

13    (Clarification by court reporter.)  No, I'm not sure.

14        MS. SHILO:  I think he said, "I'm assuming his

15    house, maybe."

16    Q.    Is that correct?

17    A.    Yes, I'm not sure.

18    Q.    Is the 40 Lowell Road building accessible to the

19    public?

20    A.    No.

21    Q.    Do any other businesses other than Select Demo

22    operate out of 40 Lowell Road?

23    A.    Select Paint, K-Town; and Select Flooring, Marble

1  and Tile.

2      Q.   At the time Mr. Lieber worked for Marquis

3  Management, did any other businesses operate out of 40

4  Lowell?

5      A.   Maybe Prime Concrete.

6      Q.   Is Prime Concrete another Marquis family business?

7      A.   It was.  We've since been winding it down and

8  selling off our contracts.

9      Q.   Have you sold the business?

10     A.   No, it wasn't -- it wasn't that kind of a

11  transaction.

12     Q.   Okay.  So you sold the contracts, and you're

13  winding down the business?

14     A.   Correct.

15     Q.   Did an auto detailing business ever work out of 40

16  Lowell Road?

17     A.   I believe she was an employee.

18     Q.   She was an employee of Select Demo?

19     A.   I don't know.

20     Q.   Okay.  Are the outdoor doors to 40 Lowell, are

21  those kept locked or open?

22     A.   They were locked.

23     Q.   Just going back to Prime Concrete for a minute.

1   Did Marquis Management provide IT services to Prime Concrete

2   while it was operating?

3        A.   Yes.

4        Q.   Okay.  Is Ryan Dogil an employee of Select Demo?

5        A.   Yes.

6        Q.   Is he an employee of any other Marquis family

7   companies?

8        A.   No.

9        Q.   What is Ryan Dogil's role at Select Demo?

10       A.   I believe his role is planning director.

11       Q.   And what does he do in that role?

12       A.   He's a utility player through all this.  Some

13  estimating, some project management.  You know, some IT-style

14  stuff.  Helping the guys train them.  Works with the bid

15  board.  Things like that.

16       Q.   Okay.  Does he have any role in IT?

17       A.   For Select Demo or Marquis?

18       Q.   For Select Demo.

19       A.   You need to be more specific, I would say.

20       Q.   Does he provide any type of IT support services?

21       A.   I guess I'd have to know more of what you mean.

22  Like, hardware, software?

23       Q.   For hardware or software.

1    A.    I would say yes.

2    Q.    And what does he do?

3    A.    Training.  JDE.

4    Q.    Did you say JDE?

5    A.    Yes.

6    Q.    What is JDE?

7    A.    It's the software that we use.

8    Q.    And what is that used for?

9    A.    Accounting, payroll, extra work orders.

10   Q.    Does he do any management of IT?  So for example,

11   helping Select Demo select which software or hardware to buy?

12   A.    I don't know.

13   Q.    Who is Ryan Dogil's direct supervisor?

14   A.    I would say Serj.

15   Q.    Back in 2020 when Marquis Management was looking

16   for a new -- or sorry, back in 2018, when Marquis Management

17   was looking for a new CIO, did you consider suggesting

18   Mr. Dogil for that role?

19   A.    No.

20   Q.    Why not?

21   A.    I don't have the credentials to know who is

22   qualified or not.

23   Q.    Okay.  Were you involved in selecting Mr. Lieber

1  for that role?

2      A.   No.

3      Q.   In 2020 and early 2021, when Marquis Management was

4  replacing Mr. Lieber, did you consider Mr. Dogil for the

5  role?

6      A.   Not that I recall.

7      Q.   And why not?

8      A.   It's not my area of expertise.

9      Q.   Who was involved in filling that position,

10  considering the correct candidates, et cetera?

11      A.   I don't know.

12      Q.   Okay.  Were you aware that back in 2018,

13  approximately, Mr. Dogil developed an IT budget?

14      A.   No.

15      Q.   Would you have expected Mr. Lieber to accept an IT

16  budget that Mr. Dogil had written and proposed?

17          MR. CARTER:  Objection to form.

18      A.   I don't think that question's clear.

19      Q.   If Mr. Dogil had developed and presented an IT

20  budget, would you have expected Mr. Lieber to accept and

21  follow that budget?

22          MR. CARTER:  Objection to form.

23      A.   I don't think the -- I don't think the question is

1  stated correctly.

2     Q.   What about my question is confusing?

3     A.   Ryan Dogil wouldn't come up with a budget globally.

4     Q.   Okay.  Because that wasn't part of his role?

5     A.   It would come from IT first.

6     Q.   Okay.  And Mr. Dogil wasn't part of IT; is that

7  right?

8     A.   I'm not sure how you would consider him as far as

9  IT goes.

10     Q.   Okay.  But it wasn't Mr. Dogil's role to come up

11  with an IT budget for Marquis Management?

12     A.   I don't know.

13     Q.   Would you have expected Mr. Lieber to come up with

14  an IT budget for Marquis Management?

15          MR. CARTER:  Objection to form.

16     A.   What year is this?

17     Q.   When Mr. Lieber was CIO.  So approximately 2018 to

18  2020.

19     A.   I would think so.

20     Q.   Okay.  Do you know Melissa Marquis?

21     A.   I do.

22     Q.   Who is she?

23     A.   Jon Marquis' sister.

1    Q.    Does she have a role at Marquis Management or

2  Select Demo?

3    A.    Not at Select Demo.  I'm not sure what she does

4  with Marquis Management or with Jon.

5    Q.    Did you ever become aware of her providing informal

6  advisory services to either Select Demo or Marquis

7  Management?

8    A.    Yes.

9    Q.    And how did you come to understand that?

10   A.    There was -- I know there was concern around Dan's

11  abilities for the size of the company that it was.

12   Q.    And what were those concerns?

13   A.    I know the budget was one of them.  Equipment

14  getting sent out to the field that was not working.  Random

15  questions that were posed that really upset Jon.  Inability

16  to get along with others.

17   Q.    What were the concerns about the budget?

18   A.    It was way overstated.  It was buried with a bunch

19  of contingency money.

20   Q.    What were the concerns about the equipment being

21  sent to the field and not working?

22   A.    That guys couldn't perform payroll.  They couldn't

23  perform extra work orders.  Just equipment not working.

1       Q.    And what were the random questions that upset Jon?

2       A.    I know for sure it was around his succession plan.

3  Him not grasping that he wasn't going to be a direct report

4  to Jon.

5       Q.    And what were the -- what was the issue with the

6  succession plan?

7       A.    A little more specific?

8       Q.    Sure.  You mentioned that one of the concerns about

9  Mr. Lieber was random questions that upset Jon Marquis, and

10 then you mentioned that he had -- that Mr. Lieber had asked

11 questions about Jon Marquis' succession plan, and I'm asking

12 you, what do you know about those questions or discussions

13 about the succession plan that upset Jon?

14      A.    One, it's certainly none of his business.  And two,

15 it could be certainly devastating to the business, internally

16 and externally.

17      Q.    How did you learn that Mr. Lieber had asked those

18 questions?

19      A.    I believe it was Jon.

20      Q.    And when did Jon talk to you about that?

21      A.    The first time, I don't remember the date.  The

22 second time was shortly before Dan's departure.

23      Q.    And what were those conversations?

1     A.   That Jon was extremely upset that he asked not once

2  but twice.

3     Q.   And the time shortly before Dan Lieber's departure,

4  when was that?  When did Dan ask those questions?

5     A.   I don't know the exact date.

6     Q.   When did you learn about them?

7     A.   Shortly before Dan's departure.

8     Q.   And when you say, "shortly before," how long before

9  Dan's departure?

10     A.   I'm not sure.  A week, two weeks before we had the

11  meeting.  I don't know.

12     Q.   And what meeting are you referring to?

13     A.   The meeting that we had that Jon had said that he

14  was going to be letting go of Dan.

15     Q.   And who -- sorry.  When was that meeting?

16     A.   It was November 19th.

17     Q.   And how do you remember that date for the meeting?

18     A.   Because it's something that we have that this is

19  based around as well.  Had my calendar invite.

20     Q.   And who did that calendar invite come from?

21     A.   It was me.  I generated it.

22     Q.   And why did you generate that calendar invite?

23     A.   So I didn't forget about it.

1     Q.   How were you notified about that meeting?

2     A.   I believe it was a phone call.  I don't remember.

3     Q.   A phone call from Jon Marquis?

4     A.   I don't remember.

5     Q.   And the calendar invite, is that something that

6 you'd put on your own calendar, or was that sent to others as

7 well?

8     A.   I put it on my calendar.

9     Q.   Who else was at that meeting?

10    A.   It was a two-part meeting.

11    Q.   Who was at the first part?

12    A.   Myself, Jon, Chris Moore, Scott Watkins, Kevin

13 Philibotte, Ray Houle, I believe Lance Mazzariello, John

14 Kennedy.  That's who I can remember being there.

15    Q.   And what was discussed at the first part?

16    A.   COVID.

17    Q.   And where was that first part of the meeting held?

18    A.   40 Lowell Road.

19    Q.   Where in 40 Lowell was it held?

20    A.   It was up in the loft.

21    Q.   Was there any food or coffee at that meeting?

22    A.   Not that I recall.

23    Q.   What time was the meeting?

1       A.    I believe ten.  Nine, ten.

2       Q.    Nine a.m. or ten a.m.?

3       A.    I believe so.

4       Q.    Okay.  And the second part, who was present for the

5    second part?

6       A.    To the best of my recollection, myself, Jon, Chris,

7    Scott, Ray Houle, and Kevin Philibotte.

8       Q.    And what was discussed in that second part of the

9    meeting?

10      A.    That Jon had made up his mind to terminate Dan

11   Lieber.

12      Q.    What did he say about it?

13      A.    That he had had enough.  The -- again, the

14   succession plan really bothered him.  It was a combination

15   of, you know, him not staying, you know, underneath what

16   Chris was telling him to do.  You know, I believe there was

17   issues around Melissa's nonconfidence in what Dan was doing.

18   Jon had just -- it was not that long.  He had said he had

19   made up his mind, and that was that.

20      Q.    Did Jon say anything else?

21      A.    Not that I remember.

22      Q.    Did anyone else say anything?

23      A.    I remember myself saying that I didn't at the time

1 | have a -- have a problem with the IT.  It had been going

2 | okay, the IT portion of things, but I understood why -- his

3 | decision to let -- to terminate Dan Lieber made sense.

4 |     Q.   And why did his decision make sense to you?

5 |     A.   Dan had a hard time to be able to get along with

6 | others.  And also, I understood the gravity of it getting out

7 | that Jon was retiring, internally and externally.  I think it

8 | would -- that -- a rumor like that or that getting out would

9 | certainly be very harmful.

10 |     Q.   You just mentioned that Dan didn't get along with

11 | others.  What -- getting along -- sorry.

12 |     Who wasn't he getting along with?

13 |     A.   I know him and Dogil were constantly battling.  You

14 | know, I had some issues with my supervisors, same thing.  I

15 | got a friend's wife a job into IT.  She left because of him.

16 | Chris Moore had struggles.

17 |     He would -- the small amounts of time that I was

18 | dealing with him, he was frustrating.  I would say that's

19 | what I -- those are the people the most in my head that I

20 | remember.

21 |     Q.   And you said that you had some frustrations with

22 | Mr. Lieber.  What were those?

23 |     A.   Mine was less technical.  Mine was more of, you

1  know, a conversation that we'd have that would take two or

2  three minutes, should take two or three minutes, would take

3  an hour.  You know, if I saw him downstairs, you know, in the

4  lobby way of 40 Lowell and I had to leave, I would certainly

5  go out the back door.

6        You know, I was upset with the budget that he, you

7  know, presented.  I would get upset when enhancements or

8  updates would get pushed out without training and

9  notification to the guys in the field, because they would

10 express their frustration.

11      Q.   You mentioned you were upset with the budget.  What

12 were the concerns?  I'm assuming you're talking about the IT

13 budget?

14      A.   Correct.

15      Q.   What were your concerns with the IT budget?

16      A.   How it was massively overinflated.

17      Q.   And what made you think that?

18      A.   The number.

19      Q.   What was the number?

20      A.   It was over $6 million.

21      Q.   Was that for Select Demo only?

22      A.   No.

23      Q.   Was that for all of the Marquis family companies?

1    A.    I believe so.

2    Q.    What did -- what's your understanding of what

3  Mr. Lieber asked Jon Marquis about his retirement?

4    A.    Just that he was curious about what his succession

5  plan was in retirement, leaving -- exiting the company.

6    Q.    Did you ever learn why Mr. Lieber was asking those

7  questions?

8    A.    I did not.

9    Q.    Did you ever seek more information about that?

10   A.    No.

11   Q.    Who told you that Mr. Lieber was asking those

12 questions?

13   A.    Jon and Chris.

14   Q.    And when did they tell you that?

15   A.    You asked me that already.  I don't -- I told you,

16 it was shortly before the meeting that we had, and I don't

17 remember the first time.

18   Q.    Okay.  I believe that was for Jon.  What about

19 Chris?

20   A.    I believe I just spoke to Chris about it after Jon

21 telling me.  I don't remember exactly.

22   Q.    And what was your conversation with Chris about

23 that?

1    A.    How concerning it was.  That Jon was very upset.

2    Q.    And why was it concerning to ask those questions?

3          MR. CARTER:  Asked and answered.

4    A.    The -- a lot of our clients really have a

5    comfortability factor around Jon's financial strength,

6    bonding, insurance, payroll, and we perform really large

7    projects.

8          So if people were thinking that Jon was going to be

9    leaving, retiring, whatever, there would be a lot of concern

10   around the financial stability of the companies.

11         Also, maybe not the bonding, but internally.  A lot

12   of people have been working there a long time under him and

13   always felt comfortable that their benefits were going to

14   remain the same.  Their check was always going to cash on

15   Wednesday.  And just, you know, really, the culture would

16   remain the same in the company.

17   Q.    And why would disclosing information about

18   retirement or succession plans to a high-level employee like

19   a CIO, why would you assume that information would get out to

20   your customers and general employees?

21   A.    Because the construction business is like high

22   school.  A lot of rumors, a lot of -- everything seems to get

23   out.

1    Q.    Has Jon Marquis ever talked to you about his

2  retirement or succession plans?

3    A.    Specifically, no.

4    Q.    Generally?

5    A.    Not really.

6    Q.    Have you ever asked him?

7    A.    No.

8    Q.    So with your ownership interest in these various

9  companies, you've never asked Jon Marquis what his plans for

10  the future are?

11    A.    Not about his retirement, nope.

12    Q.    What about plans for the future?

13    A.    More specific, please.

14    Q.    Have you ever asked Jon Marquis what his plans are

15  ten years from now?

16    A.    No.

17    Q.    Have you ever asked him about plans 20 years from

18  now?

19    A.    No.  It's such a -- it's such a generic question.

20    Q.    Have you ever spoken with Mr. Marquis about the

21  future of Select Demo or any of the other Marquis family

22  companies in general?

23    A.    About his retirement, no.

1    Q.   I'm talking about the future of the companies.

2    A.   Future, what work, what geographic, what different

3  services we're going to expand into, that type of thing?

4    Q.   Right.  Or whether a company would be sold, or

5  whether he'd buy a company, whether he would merge them.

6    A.   We had talked about potentially a sale of a

7  company, yes.

8    Q.   And which company was that?

9    A.   Select Demo.

10   Q.   And generally, what time frame were you talking

11 about the sale of Select Demo?

12   A.   We were just kind of seeing what it was worth.

13   Q.   And did you have an appraisal done?

14   A.   We went through the process, but we never actually

15 got an official appraisal.

16   Q.   When you're planning for the future of the

17 companies, do you create any plans about how they're going to

18 be set up from an organizational standpoint?

19        MR. CARTER:  Objection to form.

20   A.   Elaborate a little bit more, please.

21   Q.   Sure.  For example, I understand from your earlier

22 testimony that Marquis Management provides a lot of services

23 to Select Demo.  When you're contemplating the future of

1  Select Demo, do you take into account that organizational

2  structure of shared services being provided by Marquis

3  Management?

4      A.   No.

5      Q.   Is that -- does that factor into how a company is

6  valued?

7           MR. CARTER:  Objection to form.

8      A.   Not -- I don't think so.

9      Q.   When you were engaging in this process to value

10  Select Demo, did you have to provide any information about

11  where the services -- about services being provided by

12  Marquis Management?

13      A.   A little bit.  It's been a little while now.  It

14  was more operation.  How the companies worked.  How the

15  company worked.  Jobs sizes, win ratios, how we estimate, how

16  we perform, underperforming, overperforming, geographic

17  expansion, revenue, profit.

18      Q.   Okay.

19           MR. CARTER:  Brooke, when you get a second, we

20  could take another quick break, please.

21           MS. SHILO:  We -- I'm just trying to time out

22  lunch.  Are you having lunch brought in at about noon?

23           MR. CARTER:  We don't have any plans in that

1  regard, so...

2          THE WITNESS:  I need to use the bathroom.

3          MR. CARTER:  Yeah, why don't we take a quick break.

4          MS. SHILO:  Okay.  Let's take a five-minute break.

5  We -- I mean, we'd really like to keep going until lunch, if

6  that's possible.  And we were talking about going until noon.

7  You know, it's going to make us go longer into the evening if

8  we break twice, once now and once a half hour from now.

9          MR. CARTER:  Mr. Denver needs to take a five-minute

10 break.  So we're going to take a five-minute break.

11         THE WITNESS:  I've been drinking water.  I need to

12 go to the bathroom.  I can go quickly.

13         MS. SHILO:  Okay.  Let's go as fast as we can, but

14 then we'll need to go -- do a shorter lunch.  Maybe

15 half-hour.

16         MR. CARTER:  Fine with us.

17         MS. SHILO:  Okay.  Great.  So we'll be back in

18 five.

19         (Recess taken.)

20    Q.  BY MS. SHILO:  And we're back on the record.

21 Mr. Denver, in preparation for this deposition, did you read

22 any other depositions of witnesses that were taken in this

23 case?

1     A.   No.

2     Q.   Did you look at any video testimony of witnesses

3  from this case?

4     A.   No.

5     Q.   Going back, you testified that there were two parts

6  to a meeting on 11/19.  Were both parts of that meeting held

7  in the same location?

8     A.   Yes.

9     Q.   And then we also talked briefly about an auto

10  detailing business that was operating out of 40 Lowell Road,

11  perhaps by an employee of Select Demo or another Marquis

12  Company.  What -- can you describe what that auto detailing

13  business was?

14     A.   I don't know when you say "business."  I had a

15  young woman that was keeping our vehicles clean.  Again, I'm

16  not sure if -- I'm not sure if she was Select Demo or her own

17  company.  I don't know.

18     Q.   So she would -- she would come and clean the

19  vehicles of employees who are working at 40 Lowell?

20     A.   No.  The majority is our company trucks.

21     Q.   Oh, so she would clean the company trucks?

22     A.   (Witness nods head.)

23     Q.   Did she clean vehicles of any members of the

1  public?

2      A.   I don't know.

3      Q.   Did she have any office space or interior work

4  space at 40 Lowell?

5      A.   I don't know.

6      Q.   What was her name?

7      A.   Hillary.

8      Q.   Do you know her last name?

9      A.   I don't.

10      Q.   Did she ever clean your car?

11      A.   Yes.

12      Q.   Going back to Melissa Marquis.  Does she have an

13  ownership interest in any Marquis family company?

14      A.   No.

15      Q.   When was the first time you met Melissa Marquis?

16      A.   I don't remember.

17      Q.   Was it as part of your work at Marquis Management?

18      A.   No.

19      Q.   In what context did you meet her?

20      A.   I believe it was a fashion -- fashion event that

21  Jon's daughter had.

22      Q.   And approximately when was that fashion event?

23      A.   Eight, ten years ago.

1    Q.   Okay.  And since you first met Melissa Marquis, how

2  much contact have you had with her?

3    A.   Maybe three times.

4    Q.   And approximately when were those three times?

5    A.   It's spread out throughout the -- you know, from

6  when I first met her to when she was advising, if you will,

7  on IT.

8    Q.   And when was she advising on IT?

9    A.   I don't know the dates.

10    Q.   When did you first learn that she was advising with

11  respect to IT?

12    A.   Again, I don't know the -- I don't know the dates.

13    Q.   Approximately, do you know the time frame?

14    A.   2020.

15    Q.   And how did you learn that Melissa Marquis was

16  going to serve as an IT advisor?

17    A.   I don't remember.

18    Q.   Did anyone talk to you about what she would be

19  doing?

20    A.   At high level, yes.

21    Q.   And who explained that to you?

22    A.   Chris and Jon.

23    Q.   Together or separately?

1     A.   I don't remember.

2     Q.   What did Chris explain to you about her role?

3     A.   Just that they were having a -- you know, concerns

4 on the level of, you know -- Dan with IT, and Jon's sister

5 was in IT, and it was something that they wanted to do.

6     Q.   And what did Jon explain to you about Melissa

7 Marquis' role or involvement in IT?

8     A.   The same.

9     Q.   And what did you understand Melissa Marquis would

10 be doing?

11     A.   Running an audit, for lack of a better term, on IT.

12     Q.   And did you learn that she had done that at some

13 point?

14     A.   I know she was working on it.

15     Q.   Do you know whether she completed it?

16     A.   I don't -- I don't know if the whole thing was

17 finished or what the process was or...

18     Q.   Did you ever see any report or results of the work

19 Melissa Marquis was doing?

20     A.   Not that I remember.

21     Q.   Did you ever meet with Melissa Marquis or anyone

22 else to discuss the results of her work?

23     A.   I did not meet with Melissa, no.

1      Q.   Did you ever meet with Melissa, ever, to discuss

2  her IT project?

3      A.   Not that I remember.

4      Q.   Did you ever talk with Ryan Dogil about Melissa

5  Marquis?

6      A.   Not that I remember.

7      Q.   Did you ever become aware that Ryan Dogil met with

8  Jon Marquis at the Chateau restaurant?

9      A.   No.

10     Q.   So Ryan Dogil never talked to you about that?

11     A.   Not that I remember.

12     Q.   Did you ever attend a meeting with Melissa Marquis?

13     A.   No.

14     Q.   Did you ever speak to Melissa Marquis about

15  Mr. Lieber?

16     A.   No.

17     Q.   Did you ever provide any type of input whatsoever

18  to Melissa Marquis about Dan Lieber and his role in IT?

19     A.   I don't remember.

20     Q.   Did you ever provide any input about Dan Lieber at

21  all to Melissa Marquis?

22     A.   Not that I remember.

23     Q.   When did you first meet Dan Lieber?

1      A.    I would say shortly after he was hired.

2      Q.    And what was your understanding of what

3  Mr. Lieber's role was going to be?

4      A.    IT.

5      Q.    And what was his -- specifically, what was he going

6  to be doing with IT?

7      A.    Work on the enhancements of JD Edwards.  Ordering

8  phones and computers, laptops.  The help desk when people

9  were having issues.  Making sure we have the right licenses,

10 I believe.

11     Q.    Were you involved in planning or developing the CIO

12 role?

13     A.    No.

14     Q.    Who was involved in that process?

15     A.    I believe it was Chris Moore and Ray Houle.  I

16 don't -- I don't really remember anybody else.

17     Q.    Okay.  And what is Mr. Houle's position?

18     A.    He's the president of New England Finish.

19     Q.    Does he hold roles at any other Marquis family

20 company?

21     A.    I know he has ownership in some.

22     Q.    And what companies are those?

23     A.    Specialty Services, I believe AEG.

1    Q.   ADG?

2    A.   AEG.

3    Q.   AEG.  And what does AEG stand for?

4    A.   Advanced -- Advanced Exterior Glazing.  I'm not

5    sure.

6    Q.   Okay.  Did anyone serve as CIO for the Marquis

7    family of companies before Mr. Lieber?

8    A.   I don't know that anyone had that title.  I didn't

9    know he had that title.

10   Q.   What did you think Mr. Lieber's title was?

11   A.   IT.

12   Q.   IT director?  Manager?  Supervisor?

13   A.   I had very little to do with the IT.  Not my

14   specialty.

15   Q.   Were the goals of the CIO role communicated to you?

16   A.   I think I just kind of realized what they are.

17   Q.   And how did you do that?

18   A.   Knowing what we needed as far as to keep operating

19   as efficiently as possible.

20   Q.   So your understanding was that the CIO needed to do

21   whatever he needed to do to keep you operating as efficient

22   as possible?

23   A.   Yes.

1    Q.   Okay.  What was your impression of Mr. Lieber when

2 you first met him?

3    A.   I don't remember.

4    Q.   You don't remember?

5    A.   I don't remember the first time I met him, no.

6    Q.   What was your impression of Mr. Lieber about the

7 time he started his employment at Marquis Management?

8    A.   Nice enough guy.  A little quirky, like most IT

9 guys, people.  Long-winded.

10    Q.   Did your impression of Mr. Lieber ever change?

11    A.   I would say over time, I realized that he was

12 difficult in nature.

13    Q.   And what made you realize that?

14    A.   Just the bickering and bantering that would go on

15 with others.

16    Q.   And who would he bicker with?

17    A.   We went over this previously, but Ryan Dogil, Chris

18 Moore, my supervisors.  Some of the other people that worked

19 in his department.

20    Q.   Was this issue ever addressed with Mr. Lieber?

21    A.   I believe it was.

22    Q.   And what makes you say that?

23    A.   Me telling Chris that you need to make him

1  understand that he works for you, and his frustrations of not

2  listening to him.

3       Q.   And what was done to address that?

4       A.   I'm not sure what Chris did.

5       Q.   When was this issue discussed?

6       A.   Many times throughout his employment.

7       Q.   Was it ever discussed with Mr. Lieber directly?

8       A.   I don't know.

9       Q.   The many times this issue was discussed, who was it

10 discussed among?

11      A.   Kind of reframe that question, please?  Reframe it.

12 I'm not sure what you're asking.

13      Q.   Sure.  You just mentioned this issue was discussed

14 many times.  Who was discussing that issue?

15      A.   Chris, Dogil, Jon, my supervisors, staff that are

16 in the IT department.

17      Q.   And they were discussing the issue with you?

18      A.   In passing, yes, and -- (Clarification by court

19 reporter.)  Yes.

20      Q.   How was Mr. Lieber's performance as CIO?

21      A.   I think he did an okay job with the actual IT

22 portion of things.  I think the standard was set really low

23 from the guy before him, you know, but the performing work,

1  filling out time sheets, extra work orders were working and,

2  you know, the on-screen take-off, a software that my

3  estimators were using.  So we didn't have any, you know, real

4  problems with the function of -- you know, of those, other

5  than the things we've already spoken about.

6         Sending out, you know -- you know, the hardware

7  that doesn't work to the field and the personality conflicts,

8  but -- so I'd say some things he did okay, and others he did

9  not.

10     Q.   Did you inquire about why Mr. Lieber was sending

11  hardware out to the field that wasn't working?

12     A.   I don't remember.

13     Q.   Do you know why Mr. Lieber was reusing used

14  equipment?

15         MR. CARTER:  Objection to form.

16     A.   I don't.

17     Q.   Was Mr. Lieber available when you needed him?

18     A.   I didn't -- I didn't really go to him much.

19     Q.   Was there ever a time that you needed something and

20  Mr. Lieber didn't provide it in a timely manner?

21     A.   I don't remember.

22     Q.   Was Mr. Lieber professional?

23         MR. CARTER:  Objection to form.

1    A.    Well, I think it goes to the same denominator.

2  There was things that I think he did okay and others he did

3  not.

4    Q.    What did Mr. Lieber do that was not professional?

5    A.    Asking about Jon's succession plan, retirement.

6  Sending out hardware that was not working properly.  You

7  know, trying to have -- it's a busy day, busy company, trying

8  to get a quick answer, and it'd take an hour to get, you

9  know, something out of him.

10         I think he enjoyed to argue with others, get into

11  a debate.

12    Q.    Okay.  Anything else?

13    A.    I think that sums it up.

14    Q.    Okay.  Did Mr. Lieber have good business acumen?

15         MR. CARTER:  Objection to form.

16    A.    I'm not sure.  I never really discussed business

17  with him.

18    Q.    Did Mr. Lieber protect company assets?

19    A.    I don't know.

20    Q.    Can you ever remember a time when Mr. Lieber didn't

21  adequately protect company assets?

22    A.    Can you be more specific?

23    Q.    Was there ever a time when you thought Mr. Lieber

1 was not using company resources responsibly?  So for example,

2 spending extra money where it didn't need to be spent, paying

3 for licenses that weren't being used by employees, that kind

4 of stuff.

5     A.   I don't know.  I really don't know.

6     Q.   So you don't remember an instance where that

7 happened?

8     A.   I don't remember an instance that it didn't happen

9 or it did happen.

10     Q.   Okay.  Did Mr. Lieber have adequate knowledge of IT

11 security issues?

12     A.   Again, above my pay grade.

13     Q.   Okay.  So you just don't know whether he did or he

14 didn't?

15     A.   Correct.

16     Q.   Do you know if Mr. Lieber did or did not have

17 adequate knowledge of licensing requirements?

18     A.   I don't know.

19     Q.   So you don't have any memory of Mr. Lieber's

20 knowledge being deficient when it came to licensing

21 requirements?

22     A.   No.

23     Q.   Did Mr. Lieber have management abilities?

1     A.   No.

2     Q.   What makes you say that?

3     A.   The fighting and the bickering and bantering, and
4 my friend's wife writing me a long resignation letter.  Just
5 his interaction with other people.

6     Q.   Who is your friend's wife?

7     A.   Jacqueline Oleaga.

8     Q.   And what were her complaints?

9     A.   Have -- you know, not listening to her.  You know,
10 sending out -- she had an appreciation of sending out
11 equipment to the field in working condition.  She'd suggest
12 that we should just get a new piece of hardware, and she'd be
13 ignored, and work on fixing it and then send it out, and the
14 guys were upset.

15     He's a tough guy -- just a tough person to
16 communicate with.

17     Q.   Did you put that resignation letter from Ms. Oleaga
18 in Mr. Lieber's personnel file?

19     A.   I wouldn't have put it in his file.  I don't
20 remember if I sent it to Scott or not.  I don't know.

21     Q.   And why wouldn't you have put that in the file?

22     A.   I don't know if I did or I didn't.

23     Q.   Okay.  If it was important, would you have put it

1  in his file?

2      A.   Again, I don't -- I don't know.  I have a lot of

3  employees, and I don't know.

4      Q.   Did Ms. Oleaga's letter have any impact on

5  Mr. Lieber's termination?

6      A.   No.

7      Q.   Okay.  Did Dan Lieber ask you for approval of

8  Select company IT-related purchases?

9      A.   He did.

10     Q.   And was that a requirement?

11     A.   I believe it was.

12     Q.   Did Mr. Lieber make IT recommendations for Select

13  Demo?

14     A.   I'm sure he did.  It would have been through Dogil.

15     Q.   Okay.  Did Mr. Lieber sign leases and purchase

16  agreements for Select Demo for IT-related issues?

17     A.   I'm not sure.

18     Q.   Who would know that?

19     A.   I would say Chris Moore or Ryan Dogil.

20     Q.   Did Mr. Lieber ever travel to a place where your

21  father-in-law was living to make sure he had cable service,

22  internet service, and telephone service?

23     A.   I'm not sure.

1      Q.   Does Select Demo have a house in Portland,

2   Connecticut?

3      A.   We did.  We sold it.

4      Q.   Okay.  And did your father-in-law ever work there

5   as a caretaker or live there as a caretaker?

6      A.   He -- yes.

7      Q.   Do you know whether Dan ever provided any IT

8   services to him at that home in Portland, Connecticut?

9      A.   I do not.

10     Q.   Okay.

11          MS. SHILO:  All right.  I think this is a good

12   place for us to stop for lunch.  Is 30 minutes okay?

13          MS. IRWIN:  Actually, Brooke, as long as you think

14   you're going to answer -- I think we need to take a little

15   longer, because we have to get an agreement to the other

16   attorneys in this case.

17          MS. SHILO:  Oh, okay.

18          MS. IRWIN:  Yes.

19          MS. SHILO:  Okay.  So should we -- do you think we

20   need an hour to do that, Lauren?  I haven't been --

21          MS. IRWIN:  Should I stop the recording now?

22          (Discussion held off the record.)

23          (12:06-1:08 p.m., lunch break taken.)

1    Q.   BY MS. SHILO:  All right.  Mr. Denver, we're back

2  on the record, and you are still under oath.

3         Before lunch, you had mentioned some communication

4  problems with Mr. Lieber.  Did you ever experience those

5  problems personally?

6    A.   Yes.

7    Q.   Okay.  Can you describe the communication problems

8  you had with Mr. Lieber?

9    A.   Like I said, it was just pretty long-winded, you

10  know, responses of something that should only take a couple

11  minutes.  I didn't have a tremendous amount of interaction

12  with him.

13    Q.   Okay.  Did Dan Lieber send communications about

14  significant changes to IT?

15    A.   I'm sorry, say that again.

16    Q.   Sure.  When there was going to be a change in an IT

17  protocol or software or something, would Mr. Lieber be the

18  one to send those communications?

19    A.   I think it could be a variety of the IT team.

20    Q.   Okay.

21         MS. SHILO:  Michele, can we look at Exhibit No. 20,

22  please.

23         (Exhibit 20 marked and shared via Zoom.)

1      Q.   And if -- oh, okay.  I do have control.  So we're

2   looking at an email that's been marked as Exhibit 20, and

3   it's an email from Mr. Lieber, and it's to you, among others.

4   And it's about communication with facility changes.

5         Do you agree that it would be appropriate to

6   communicate with IT when there is going to be a proposed

7   significant facility change?  And I'll let you read this

8   email, and then let me know when you're ready to scroll down.

9   I believe there's just a tiny bit on the next page.

10      A.   (Witness peruses document.)

11           MR. CARTER:  What's the pending question, please?

12           MS. SHILO:  I'm asking him to review the email, and

13   I'm asking him whether he agrees that they needed to

14   communicate with Mr. Lieber when there was a proposed

15   significant facility change.

16           MR. CARTER:  Objection to form.

17      A.   So I don't know, it's -- I guess it's --

18           MR. CARTER:  Hang on.  Read the --

19           THE WITNESS:  I read it.  I've read it.

20           MR. CARTER:  There's more on the next -- is there

21   more on the second page?

22           THE WITNESS:  Oh.

23      Q.   BY MS. SHILO:  Here's the second page.

1     A.    (Witness peruses document.)  Okay.

2           MS. SHILO:  Michele, can you read my question back?

3           (The record was read as requested.)

4           MR. CARTER:  Objection to form.

5     A.    So go ahead and --

6           MR. CARTER:  If you understand the question, you

7 can answer.

8     A.    I -- it's kind of a two-part answer.  Because up

9 top he's saying that we don't need office -- doesn't need to

10 be included in office swaps.

11          Because my interpretation -- or my answer would be

12 if a user needs to be changed with the hardware that's in the

13 office, then I could see that needing to be part of it.

14          But as far as removing structures or better

15 efficiency and profitability, no.

16    Q.    BY MS. SHILO:  Okay.  So you thought that IT needed

17 to be involved when users were swapping offices, let's say if

18 they needed their phones reconfigured or something like that;

19 is that right?

20    A.    Or a computer.

21    Q.    Okay.  But if you were changing walls, adding

22 structures, removing structures, you didn't think IT needed

23 to be involved?

1    A.    I guess I don't really know.

2    Q.    Well, if you were moving walls, would IT need to --

3 moving walls in offices, would IT need to ensure that the

4 offices were set up for the equipment that the employee was

5 going to be using in that office?

6         MR. CARTER:  Objection to form.

7    A.    If there was a -- an IT plug, potentially.

8    Q.    So IT would need to make sure that in those

9 construction projects, the correct plugs, et cetera, were set

10 up for the equipment that was going to be used in that space?

11        MR. CARTER:  Objection to form.

12   A.    Not always, no.

13   Q.    Okay.  When -- can you explain when IT would need

14 to be involved with projects involving changing walls, adding

15 structures, removing structures?

16   A.    A lot of the -- a lot of the -- I didn't get

17 involved very much, especially towards the end, of what

18 offices were getting moved, but we used an electrician quite

19 often to install all that stuff.

20   Q.    And would IT need to be involved to ensure that the

21 electrician's work was compatible with the IT equipment that

22 was going to be used in the space?

23   A.    No.

1    Q.    Why not?

2    A.    Well, the electrician is aware of what he needs.

3    Q.    How is the electrician aware of what he needs?

4    A.    That's what he does for work.

5    Q.    Well, how does the electrician know what equipment

6    is going to be used in what space?

7          MR. CARTER:  Objection to form.

8    A.    Through whoever's making the office swap or

9    modification.

10   Q.    And who was responsible for that work at Select

11   Demo?

12   A.    Ryan Dogil, Serj.  Could have been -- could have

13   been others as well.  It depends on what company it was

14   affecting.

15   Q.    And would they need to coordinate with IT in order

16   to make sure that the building plans were compatible with the

17   IT systems that were going to be used in that space?

18   A.    I don't know.  Years back, I used to do it and did

19   not need to.

20   Q.    Okay.  So you were not involved in the office space

21   build-out projects being discussed in this email?

22   A.    No, not that I recall.

23   Q.    Okay.  Do you have any knowledge about an issue

1  with LogMeIn being discontinued?

2      A.    No.

3      Q.    Okay.  Did you ever hear of any issue where changes

4  were made to IT and employees were upset that they weren't

5  properly informed?

6      A.    Not that I recall.

7      Q.    Okay.

8            MS. SHILO:  Michele, we can take this exhibit down.

9      Q.    Did you ever experience Mr. Lieber being inflexible

10  in his dealings with managers?

11      A.    Yes.

12      Q.    And how -- what was your experience with that?

13      A.    That for -- him and Chris had a hard time getting

14  on, I guess, the chain of command, if you will, and who

15  was -- who was whose boss.

16      Q.    Any other issues with managers other than Chris

17  Moore?

18      A.    I suppose Jon.

19      Q.    Jon Marquis?

20      A.    Yes.

21      Q.    And what was the issue with Jon Marquis and Dan

22  being inflexible in his dealings with managers?

23      A.    The budget.  Well, the hardware.  I remember Kevin

1  having issues also about stuff going out that was not

2  working.  His succession plan.  And just be long in

3  conversations, wasting people's time and money.

4      Q.   How was Mr. Lieber inflexible in his dealings with

5  Jon Marquis with respect to the budget?

6      A.   Coming up with a ridiculous budget.

7      Q.   And was that communicated to Mr. Lieber, that the

8  budget that he proposed was ridiculous?

9      A.   Yes.

10     Q.   And what was Mr. Lieber's reaction?

11     A.   That he had -- he had a lot of contingency money.

12     Q.   And was there a discussion about the contingency

13  money?

14     A.   There was.

15     Q.   And what happened with that discussion?

16     A.   Ultimately, the budget ended up being reduced

17  significantly.

18     Q.   And did Mr. Lieber agree to reduce the budget?

19     A.   I don't remember exactly how it played out.

20     Q.   And who was working on that issue with Mr. Lieber?

21     A.   Ryan Dogil, Chris Moore.  I'm sure other managers

22  as well.

23     Q.   Why was Ryan Dogil working on that issue?

1      A.    Because he had a good -- better understanding, at

2  least for me, kind of my liaison to IT, because I didn't deal

3  with IT too often.  He had a much better understanding than

4  I did.

5      Q.    Okay.  Was Mr. Lieber inflexible in his dealings

6  with Mr. Dogil?

7      A.    Yes.

8      Q.    And with respect to what was he inflexible?

9      A.    Changes that needed to be made or lead times or

10 what needed to be ordered.  Really, I think almost anything

11 that they spoke about was -- seemed to be problematic.

12     Q.    Were there any licensing issues --

13     A.    I don't know.

14     Q.    -- that they discussed?

15     A.    I don't know.

16     Q.    Were there any security issues?

17     A.    I don't recall.

18     Q.    Do you know whether any of the changes or lead

19 times that Mr. Lieber was inflexible about were related to

20 licensing or security issues?

21     A.    I do not, no.

22     Q.    Did you ever hear that Jon Marquis was displeased

23 with Mr. Lieber?

```
 1        A.    Yes.

 2        Q.    When did you hear that?

 3        A.    Multiple times.  I can't -- I can't come down with

 4   exact dates of times.

 5        Q.    When was the first time you heard it?

 6        A.    I don't know a date and time.

 7        Q.    Approximate year, the first you heard that

 8   Mr. Marquis was displeased with Mr. Lieber?

 9        A.    I would say 2019.

10        Q.    And what was Mr. Marquis displeased about in 2019?

11        A.    Mostly around him not being able to get in line

12   with the chain of command that was being passed down.

13        Q.    And is that a reference to Mr. Lieber reporting to

14   Mr. Moore?

15        A.    Yes, and all the different -- I think there was a

16   lot of problems that were being raised in trying to go to Jon

17   or just any -- anything, communication.  And I think Chris

18   was having a hard time channeling with Dan, and would get

19   frustrated, and have me go tell Chris, you need to make sure

20   he understands he works for you.  And he just kept

21   circumventing around him.

22        Q.    So the issue was Mr. Lieber kept raising issues

23   directly with Jon Marquis?
```

1    A.    Well, just not so much -- just communication.  Jon

2  didn't want to be bothered by, you know, the nuances of IT.

3    Q.    And did Jon tell Mr. Lieber that he should be going

4  to Chris Moore instead of him?

5    A.    I believe he did.

6    Q.    And after that, did Mr. Lieber go to Chris Moore

7  instead of Jon?

8    A.    I know for a while, he just kept doing it.  I don't

9  know when it actually got rectified.

10    Q.    But at some point it got rectified?

11    A.    I don't know.

12    Q.    At some point you stopped hearing that there was a

13  problem with it?

14    A.    Not sure of the timeline.

15    Q.    Was it an issue at the time of Mr. Lieber's

16  termination?

17    A.    I don't know.

18    Q.    Did you hear anything about it as of the time of

19  Mr. Lieber's termination?

20    A.    At that time, I think it was more in Melissa's

21  court, and I know that Jon had a lot of concerns around the

22  whole -- his whole performance, you know, after Melissa's

23  findings.

1    Q.   What were Jon Marquis' concerns about Mr. Lieber's

2 performance after Melissa's findings?

3    A.   I don't know specifically.

4    Q.   You never learned of those?

5    A.   I told you what I learned about.

6    Q.   Were there any other concerns Jon Marquis had at

7 the time of Mr. Lieber's termination?

8    A.   Succession.  Again, the same things I just

9 repeated.  I don't know -- I don't know all the technical

10 terms and issues that were being raised.

11    Q.   We don't need technical terms, just your general

12 understanding of what your -- of what the issues were.

13    A.   General understanding was that he was not qualified

14 to be, you know, department head or whatever you want to call

15 it, for an organization our size.

16    Q.   And is that something that Jon determined, or is

17 that something that came from Melissa Marquis?

18    A.   I don't know exactly how it all -- how it all --

19 who the whole team was that came to that conclusion.

20    Q.   So someone just told you that they didn't feel

21 Mr. Lieber was qualified to be the department head of IT?

22    A.   I knew there was a process that was going on, and

23 that people had concerns.

1     Q.   And who are those people that had concerns?

2     A.   Who I know for sure was Melissa, Chris Moore, Ryan

3 Dogil, and Jon -- ultimately, Jon.

4     Q.   Can you describe Jon Marquis' knowledge of IT?

5     A.   I cannot.

6     Q.   Is he good with IT?

7     MR. CARTER:  Objection.

8     A.   I don't know.

9     Q.   Does he know a lot about IT?

10    MR. CARTER:  He just answered your question that he

11 doesn't know --

12    MS. SHILO:  This is a speaking objection, Chris.

13 It is a different question.

14    MR. CARTER:  It is, because you're harassing him --

15 I object to your harassing the witness.  He answered the

16 question.

17    MS. SHILO:  I am not harassing the witness.

18    MR. CARTER:  Objection.  Objection to form.

19    A.   I don't know.

20    Q.   BY MS. SHILO:  So you know nothing about

21 Mr. Marquis' IT knowledge?

22    MR. CARTER:  Objection to form.  Asked and

23 answered.

1          MS. SHILO:  That is a speaking objection, and it's

2    not permitted --

3          MR. CARTER:  I am permitted to state the basis of

4    my objection.

5          MS. SHILO:  -- in the District of New Hampshire.

6    No.  No.  No.  You may say --

7          MR. CARTER:  Brooke, don't lecture me.  Ask your

8    question.

9          MS. SHILO:  You may say objection, but you

10   cannot --

11         MR. CARTER:  Ask your -- ask your question.

12         MS. SHILO:  Melissa, can you read the -- sorry,

13   Michele, can you read the question again?

14         (The record was read as requested.)

15         MR. CARTER:  Objection.

16     A.   I know -- the one thing I know is he knows Excel

17   for estimating sheets.  I don't know his total, you know,

18   capabilities of IT, as mine are very little.

19     Q.   BY MS. SHILO:  Okay.  Thank you.  When was the

20   first time Mr. Marquis raised a concern to you about

21   Mr. Lieber asking about his succession plan?

22         MR. CARTER:  Objection.

23     A.   I don't know the date and time.

1    Q.    Do you know the approximate year and month?

2    A.    I would -- if I had to guess --

3          MR. CARTER:  Don't guess.

4    A.    I don't know.

5          MS. SHILO:  That -- Attorney Carter, that is a

6    speaking objection.  It's not allowed.

7          MR. CARTER:  The witness is not supposed to guess,

8    Brooke, right?

9          MS. SHILO:  It's not -- I'm sorry?

10         MR. CARTER:  It's not appropriate for a witness to

11   guess in any deposition.

12         MS. SHILO:  If he doesn't understand my question,

13   he can ask me for clarification.  Mr. Denver is very capable

14   of doing that.

15   A.    I don't -- I don't know.  I know it happened twice.

16   Q.    BY MS. SHILO:  Okay.  What year was the first time

17   he raised this issue to you?

18   A.    I don't know.

19   Q.    When was the second time?

20   A.    2020.

21   Q.    When in 2020 was the second time?

22         MR. CARTER:  Can we go off the record for a minute,

23   please?  Brooke, you've asked -- we covered these questions

1 twice before lunch.

2         MS. SHILO:  We have not.  We have not.

3         MR. CARTER:  You absolutely did.

4         MS. SHILO:  This is -- no, we did not.

5         MR. CARTER:  All right.  I'm going to let this --

6         MS. SHILO:  We have not covered this.

7         MR. CARTER:  -- go a little longer, but if you

8 continue to ask the same questions, I'm going to tell him not

9 to answer.

10         MS. SHILO:  I am -- these --

11         MR. CARTER:  I have -- Brooke, I have notes of it.

12 You've asked him this question at least three times.  Okay?

13         MS. SHILO:  I --

14         MR. CARTER:  Go ahead.

15         MS. SHILO:  I have -- we have talked generally

16 about this meeting.  But this is an inappropriate objection.

17 I get to ask the questions.  I am far, far from harassing

18 this witness.

19         MR. CARTER:  Don't --

20         MS. SHILO:  I'm asking appropriate questions --

21         MR. CARTER:  Why don't we go off the record.  Okay?

22         MS. SHILO:  -- and I get to ask them in order to

23 get the information that we are entitled to.

1        MS. BURNS:  No, Chris, we don't want to go off the

2  record.  We're not going to go off the record.

3        MR. CARTER:  You're not allowed to ask the same

4  question of a witness multiple times.

5        MS. BURNS:  Okay.  Why don't we --

6        MR. CARTER:  Wait, Heather, you're not defending

7  this deposition, so I'd appreciate it --

8        MS. BURNS:  And we are going to get the court

9  involved if you --

10        MR. CARTER:  You cannot -- you cannot ask the

11  witness multiple questions again and again.

12        MS. BURNS:  That's not true, and you know it.

13        MR. CARTER:  Go ahead, Brooke.

14        MS. BURNS:  Brooke, decide when you want to get the

15  court involved.  If he continues, we should get the court

16  involved.

17        MS. SHILO:  Yep.  All right.  Michele, we're back

18  on the record.

19        COURT REPORTER:  I thought we were on the record.

20        MS. SHILO:  Oh, okay.  No worries.  No worries.

21        COURT REPORTER:  I can take that out; that's fine.

22        MS. SHILO:  No, that's okay.  That's all right.

23  Don't worry about it.

1          Can you read back my last question, please?

2          (The record was read as requested.)

3          MR. CARTER:  Objection.

4     A.   I don't remember the exact date and time.

5     Q.   BY MS. SHILO:  Was it before the November 19th

6  meeting?

7     A.   Yes.

8     Q.   How long before that meeting was it?

9     A.   I don't know.

10    Q.   Was it weeks?  Months?

11    A.   I don't know.

12    Q.   So you have no memory of when that second time was?

13    A.   I have a memory that that's what got Jon extremely

14  upset.

15    Q.   Have you talked to anyone at Marquis Management

16  about the November 19th meeting?

17    A.   Can you be more specific, please?

18    Q.   Have you talked to anyone at Marquis Management

19  about the November 19th meeting since the date of that

20  meeting?

21    A.   Pertaining to?

22    Q.   About -- just about the meeting generally.

23    A.   Not that I recall.

1    Q.    Have you ever spoken with Chris Moore about that

2  meeting?

3    A.    Chris Moore was at the meeting.

4    Q.    Right.  But my question is, have you ever spoken

5  with him about that meeting since the time of the meeting?

6    A.    Just about a replacement for Dan and how he was

7  making out with that.

8    Q.    I'm sorry, you broke up a little bit there.  About

9  the?

10    A.    How he was making out on the replacement of Dan.

11    Q.    So you're referring to hiring Dan's replacement?

12    A.    Correct.

13    Q.    Okay.  Have you spoken with Scott Watkins about

14  that 11/19 meeting since the meeting?

15    A.    Not really.  Not that I recall.

16    Q.    Have you spoken with Jon Marquis about that meeting

17  since it?

18    A.    About the -- just not about the meeting

19  particularly, no.  About the replacement.  Just how we were

20  faring on the replacement.

21    Q.    Okay.  Did you participate in the discussion about

22  terminating Mr. Lieber at the 11/19 meeting?

23    A.    I answered that already.

1    Q.   What was your participation in the 11/19 meeting?

2         MR. CARTER:  Objection to form.

3    Q.   With regard to Mr. Lieber's termination.

4    A.   That I didn't have a problem at that time about the

5    actual IT functions.  My guys were able to do time.  My

6    guys were able to do extra work orders.  The estimating

7    software was working, but I understood that this was a major

8    problem and agreed on his termination.

9    Q.   Did you first object to Mr. Lieber's termination?

10   A.   No.  Object, no.

11   Q.   At that meeting, did you discuss the timeline for

12   Mr. Lieber's termination?

13   A.   I don't remember if that was discussed.

14   Q.   Was Scott Watkins present at that meeting?

15   A.   He was.

16   Q.   Did Mr. Watkins raise any objections or concerns

17   with terminating Mr. Lieber?

18   A.   I don't remember.

19   Q.   When did you learn that Mr. Lieber had been

20   terminated?

21   A.   I don't -- I don't remember the day or the time or

22   how I actually found out that he was actually terminated.

23   Q.   Did you know the date he was going to be terminated

1  before he was actually terminated?

2      A.   I remember a discussion around after Thanksgiving.

3      Q.   So you're saying you remember a discussion about

4  terminating Mr. Lieber that happened after Thanksgiving?

5      A.   No.  That was when it was -- it was going to

6  happen.

7      Q.   So there was a discussion that Mr. Lieber was going

8  to be terminated after Thanksgiving?

9      A.   I -- I'm telling you what I remember, that there

10  was discussion that there was going to be -- waited until

11  after Thanksgiving.

12      Q.   Okay.  And when did that discussion take place?

13      A.   I don't remember.

14      Q.   Was it at the 11/19 meeting?

15      A.   I don't remember.

16      Q.   Who was having that discussion?

17      A.   That I don't remember either.

18      Q.   So you have no recollection of when that discussion

19  was or who was having it?

20      A.   No.

21      Q.   Okay.  Were you aware of it while it was happening?

22      A.   I don't remember if it was talk of, you know, in --

23  with Chris or Scott or with Jon.  I don't remember.

1    Q.   Okay.  Was it by email?

2    A.   I don't think so, no.

3    Q.   Was it by text?

4    A.   I don't believe so.

5    Q.   So it was either on the phone or in person?

6    A.   I would think person, but I don't know.

7    Q.   Okay.  Did you text Mr. Lieber right after his

8 termination?

9    A.   I don't remember who spawned the conversation,

10 whether it was him or I.

11    Q.   But you remember texting with him right after his

12 termination?

13    A.   I remember texting with him after, yes.

14    Q.   Okay.

15    A.   I don't know if it was right after or...

16    Q.   All right.  And did you offer him a reference?

17    A.   I did.

18    Q.   Why did you do that?

19    A.   There's, obviously, a human element that goes into

20 everything.  I know he had, you know, younger kids.  It was

21 the holiday time.  And again, I don't think that he was

22 horrible as far as some of the IT components, you know, the

23 technical stuff.  It was really all the other behaviors.

1    Q.   Were you aware of any policy about references when

2    you offered Mr. Lieber a reference?

3    A.   I was.

4    Q.   What was that policy?

5    A.   That there was no upside ever to giving a

6    reference.  It was something that had been, you know,

7    discussed over the years verbally, and I made a mistake.

8    Q.   So you made a mistake by offering Mr. Lieber a

9    reference?

10    A.   By going outside of what the policy was.

11    Q.   Did you know you were violating the policy when you

12    offered Mr. Lieber a reference?

13    A.   It -- you know, looking back, potentially.  I just

14    didn't think of it at the time.

15    Q.   Have you ever offered a reference to any other

16    employees?

17    A.   Not that I remember.

18    Q.   Why didn't you ultimately give Mr. Lieber a

19    reference?

20    A.   I don't even think anybody ever followed up with me

21    on it.  There was also an email that was sent out reminding

22    about the policy.

23    Q.   So from that email, you were reminded that you

1  weren't supposed to give out references, and therefore, if

2  asked, you wouldn't have given one out?

3      A.   Correct.

4          MS. SHILO:  Michele, can we look at Exhibit 115.

5          (Exhibit 115 marked and shared via Zoom.)

6      Q.   Okay.  So I'm showing you a text message string

7  that I believe begins at the bottom with -- you'll see seven

8  p.m. here.

9          Is this true, that you were happy with Mr. Lieber's

10 efforts and his production?

11     A.   I was happy with the IT portion of my guys were

12 able to do time.  They were able to enter EWOs.  My

13 estimators were able to use the estimating software with

14 little trouble.

15     Q.   Okay.  And when you wrote, I also stated that, is

16 that indicating that you had stated the same thing to Jon

17 Marquis?

18     A.   What I stated was that I had no issue at the time

19 with my guys.  EWOs are working, that type of -- you know,

20 estimating software was working, but I understood why it

21 could be so devastating to the business of what he said.

22     Q.   Okay.

23         MS. SHILO:  Michele, we can take this down.

1    Q.    Mr. Denver, did you ever talk with Randy Scott

2  about providing Mr. Lieber with a reference?

3    A.    No.

4    Q.    Did you ever talk to Randy Scott about Mr. Lieber's

5  termination?

6    A.    Not that I remember.

7    Q.    Was the policy about references that you mentioned

8  earlier ever provided in written form?

9    A.    I don't -- I don't believe so.

10    Q.    How was it communicated to employees of the Marquis

11  family companies?

12    A.    Verbally.

13    Q.    And who was responsible for communicating it

14  verbally?

15    A.    Jon.

16    Q.    So Jon Marquis would just go around and tell

17  employees that you're not supposed to give references?

18        MR. CARTER:   Objection to form.

19    A.    Going around and ask, I think, is a little rude.

20  But no.  As we talked about many things as business partners

21  and his experience over the 37 years, yeah, it's one thing

22  that -- or one of many that he has told me.

23    Q.    But I'm talking about communicating the policy to

1   managers, you know, people who aren't presidents of one of

2   the Marquis family companies.

3       A.    That would be the -- that would be who would give a

4   reference if they were allowed to, right?

5       Q.    Well, potentially, managers or supervisors could

6   give references to their direct reports, right?

7       A.    I don't know that, no.

8       Q.    Okay.  But they were never told that they weren't

9   supposed to; is that right?

10      A.    I don't know.

11      Q.    Do you agree that it's important to get a reference

12  if you're trying to secure a new job?

13          MR. CARTER:  Objection to form.

14      A.    State that again.

15      Q.    Do you think it's important to have a good

16  reference if you're trying to get a new job?

17          MR. CARTER:  Objection to form.

18      A.    I'm sure it doesn't hurt.

19      Q.    Do you ask for references from employees that

20  you're hiring?

21      A.    The majority of my employees that we hire are union

22  employees.

23      Q.    So aside from the union employees, do you ask for

1 references when you're considering candidates for a position?

2     A.   I've never asked for a reference, no.

3     Q.   Okay.  Did you ever discount or view it as negative

4 if a candidate did not have a reference?

5     A.   I generally would look at their resume and see who

6 they worked for previously.

7     Q.   Would you ever contact those previous employers?

8     A.   Generally, I know them.  It's a small industry.

9     Q.   Yeah.  And would you contact them and ask them?

10     A.   Directly to a company, no.

11     Q.   But if you knew the person in the industry, would

12 you call them up and say, hey, so-and-so applied to us; what

13 do you think?

14     A.   I've done that.

15     Q.   Okay.  Did you tell Scott Watkins that Mr. Lieber

16 was seeking a reference?

17     A.   I don't think so.  Not that I recall.

18     Q.   Did you speak to Scott Watkins about Randy Scott

19 being contacted for a reference on behalf of Dan Lieber?

20     A.   Not that I remember.

21     Q.   Did Scott Watkins tell you anything about giving a

22 reference to Mr. Lieber?

23     A.   I remember getting an email, company-wide email.

1    Q.   So that's the only communication you remember about

2 references --

3    A.   Yes.

4    Q.   -- was that email?

5    A.   That's what I remember.

6    Q.   Okay.  Did you ever speak with Jon Marquis about

7 giving Mr. Lieber a reference?

8    A.   After the email went out, I -- you know, I had said

9 that I, you know, offered it.  He said, do you remember our

10 policy?

11    Q.   And when was that conversation with Mr. Marquis?

12    A.   I don't remember the date and time.

13    Q.   How did you have that conversation with

14 Mr. Marquis?

15    A.   I don't remember.

16    Q.   Was it an email?

17    A.   I don't remember.

18    Q.   Was it a text?

19    A.   I don't remember.

20    Q.   Did Ryan Dogil complain to you about Mr. Lieber?

21    A.   When?

22    Q.   During Mr. Lieber's employment.

23    A.   Yes.

1      Q.   And when was the first time Mr. Dogil complained to

2  you about Mr. Lieber?

3      A.   I don't remember.  Very early on.

4      Q.   And what was the nature of Mr. Dogil's complaint?

5      A.   The same things that we've gone over.

6      Q.   Okay.  Did he ever complain to you about an issue

7  with LogMeIn?

8      A.   Not that I recall.

9      Q.   Okay.  Did you ever get a complaint from Kevin

10  Philibotte about Mr. Lieber?

11      A.   Not that I recall.

12      Q.   Okay.  Did you ever hear him complaining about

13  Mr. Lieber?

14      A.   Yes, but I can't specifically remember what it was.

15      Q.   Okay.  Was it more than one time?

16      A.   I don't remember.

17      Q.   Okay.  Did you hear any complaints from Srdjan --

18  I'm going to butcher his last name again -- Milicevic, about

19  Mr. Lieber?

20      A.   I think, if anything, just the banter and bickering

21  back and forth between Dogil and Dan.

22      Q.   So Srdjan would complain about Mr. Lieber's

23  relationship with Mr. Dogil?

1      A.    Yes.

2      Q.    Okay.  Was there any other concerns that

3   Mr. Milicevic had himself --

4      A.    I don't know.

5      Q.    -- about Mr. Lieber?

6      A.    I don't know.

7      Q.    But there were none that you became aware of?

8      A.    I don't remember.

9      Q.    Okay.  Did Mr. Lieber require your approval to

10  spend money from the Select Demo budget on IT-related

11  matters?

12     A.    He would -- he would contact me if we were buying

13  something, yes.

14     Q.    Okay.  Did you ever have any concerns about

15  Mr. Lieber spending Select Demo money without your

16  authorization?

17     A.    Not that I can remember, no.

18     Q.    Do you recall an issue -- do you recall an issue

19  where Mr. Lieber was involved with getting a laptop for

20  Srdjan?

21     A.    I don't believe so.  Not that I remember.

22     Q.    Okay.

23            MS. SHILO:  Michele, can we look at Exhibit No. 65,

1  please.

2  (Exhibit 65 marked and shared via Zoom.)

3  MS. SHILO:  And if you can give Mr. Denver control.

4  Q.  Mr. Denver, if you can just review this email, and

5  then I'm going to ask you a few questions about it.

6  A.  Is it just this page?  Am I supposed to scroll

7  down?

8  Q.  Yeah, you can scroll down.  It is -- it is only one

9  page, but this is only the top portion of that page.

10  A.  (Witness peruses document.)  You're seeing my fine

11  IT skills at its best right now because I can't scroll down.

12  MS. SHILO:  All right.  I -- Michele, if you give

13  me control.

14  Q.  And Mr. Denver, if you'd just let me know when

15  you're ready to scroll down, I can scroll for you.

16  A.  (Witness peruses document.)  Okay.

17  MS. SHILO:  And Michele, I don't think I have

18  control -- oh, there we go.  Okay.

19  A.  It wasn't me.

20  Q.  Okay.  So I will scroll down, and this is the end

21  of the exhibit.

22  A.  (Witness peruses document.)  Okay.

23  Q.  And it looks like you reply:  Whatever he needs at

1 this point.

2          Is this an example of you authorizing Mr. Lieber

3 to spend Select Demo funds on IT equipment?

4     A.   I would say it is.

5     Q.   And was there any issue with the way Mr. Lieber

6 handled this issue from your perspective?

7     A.   I don't know what led up to this, but this

8 correspondence pertaining to just this email, no.

9     Q.   Okay.

10          MS. SHILO:  Michele, we can take this down.  And

11 Michele, can we look at Exhibit No. 66, please.

12          (Exhibit 66 marked and shared via Zoom.)

13     Q.   BY MS. SHILO:  All right.  And I can do the

14 scrolling on this one again, and I'm going to start at the

15 bottom, because that's where the email chain starts.  I'm

16 going to let you review this.  Let me know if I need to

17 scroll when it's ready to scroll up.

18          And my question is going to be the same.  Were

19 there any issues with the way Mr. Lieber handled this issue?

20     A.   (Witness peruses document.)  Okay.  (Witness

21 peruses document.)  Okay.  (Witness peruses document.)  Okay.

22 (Witness peruses document.)  Okay.  (Witness peruses

23 document.)  Can you scroll back down to the bottom again,

1  please?

2       Q.   Sure.  Just tell me when to stop scrolling.  I

3  think that is -- yeah.  This is the first email.

4       A.   Well, what's strange to me is where -- where is the

5  rest of the people that Chris Woods wrote the email to?

6       Q.   I am not sure.  This is a document that was

7  produced by Marquis, so we're showing you what we were given

8  by Marquis.

9       A.   Because I feel like there's -- there's things that

10 I'm missing here.

11      Q.   With what you have here, is there anything wrong

12 with the way Mr. Lieber handled this situation?

13      A.   I think there's missing pieces here.

14      Q.   I'm sorry, Mr. Denver, this is what we were given

15 by Marquis Management.

16           Given the information that you have here, is there

17 anything that strikes you as something that Mr. Lieber didn't

18 handle appropriately?

19      A.   Go back up to him.  I mean, all he's stating is

20 he's going to look into it, right?

21      Q.   Yep.  And then there's a response from you.

22      A.   It's a pretty generic answer.  I don't have much of

23 an opinion on it either way.

1    Q.   Okay.  So was it true -- was it true when you

2    wrote, I always appreciate your help and attention?

3    A.   What do you mean?

4    Q.   Was that statement in your email true?

5    A.   I appreciate everyone's help and attention.

6    Q.   Okay.  What do you think is missing from this

7    email?

8    A.   The potential previous chain -- I don't remember

9    the specifics of this.  I just remember the guys getting very

10   frustrated, and that's why somebody added me onto this

11   thread.

12   Q.   So do you think there are other related emails that

13   aren't showing up here?

14   A.   I don't know.  I just -- it's like -- you see like

15   even the top here, it says everybody that's on there, and I

16   don't see who was the email from Chris originally to.

17        MS. SHILO:  Okay.  Melissa [sic], we can take this

18   exhibit down.

19   Q.   Does Ryan Dogil report to you?

20   A.   On a daily or weekly basis, no.

21   Q.   Okay.  Is he in your chain of command?

22   A.   Yeah.  I mean, everybody is.

23   Q.   Okay.  So who -- does Mr. Dogil have an interim

1 supervisor between you and him?

2     A.   So I'm just curious, and maybe I have no rights,

3 but I do feel like you're asking the same questions over and

4 over again, because we did discuss this.

5         No.  If that's just the way it is, then I'm glad to

6 answer it, but I do feel as though I'm answering the same

7 questions as you've asked me.

8     Q.   I'm trying to be as efficient as possible, but

9 sometimes I do have to ask a question again, because I don't

10 know as much about the situation as you do, and so it's

11 unclear for me coming at it from different perspectives.

12     A.   I would say probably Serj, Srdjan.

13     Q.   How is Mr. Dogil's performance?

14     A.   It's good.

15     Q.   Does Dogil do work directly for Jon Marquis?

16     A.   Not that I'm aware of.

17     Q.   Does Mr. Dogil know Jon Marquis?

18     A.   He knows who he is, yes.

19     Q.   In your experience, how often does Mr. Dogil

20 interact with Jon Marquis?

21     A.   I don't know.  I don't -- I really don't know.

22     Q.   Okay.  Were you involved in the build-out of 40

23 Lowell Road?

1      A.   Originally?

2      Q.   I'm talking about the renovation that was in

3  progress and/or being planned in 2020.

4      A.   I believe there was -- there was multiple, but no,

5  I was not specifically involved in it.

6      Q.   Were you generally involved in it?

7      A.   Not at -- not at that time, no.

8      Q.   When did you become involved in that project?

9      A.   I didn't become involved in that project.

10     Q.   Okay.  Who was leading that project?

11     A.   I'm not even sure.

12     Q.   Was your office affected by that renovation

13  project?

14     A.   No.

15     Q.   Was it a project that was being done by Select

16  Demo?

17     A.   I don't know.

18     Q.   You don't know whether Select Demo was renovating

19  its offices at 40 Lowell?

20     A.   I don't know if it was Select Paint or if it was

21  Select Fireproofing or K-Town or whoever.

22          So back to your earlier comment where -- outside

23  information that you're not privy to.

1    Q.   Yes.

2    A.   I was very heavily involved in COVID, building

3 hospitals, and cleaning and trying to keep my workers busy.

4 I was very little at the office.

5    Q.   I see.  Okay.  So you didn't have a role in the 40

6 Lowell build-out project?

7    A.   I did not.

8    Q.   Are you aware of Mr. Lieber having any role in the

9 project?

10    A.   I am not.

11    Q.   Did you ever talk to Mr. Lieber about the project?

12    A.   Not that I recall, no.

13    Q.   Did you ever talk to Mr. Dogil about the project?

14    A.   Not that I can remember.

15    Q.   Okay.  Did Mr. Dogil ever raise any complaints to

16 you about Mr. Lieber and the 40 Lowell project?

17    A.   Not that I specifically remember.

18    Q.   Do you have any general recollection of any

19 complaints?

20    A.   I don't.  They were always -- they were always

21 fighting, bickering, bantering.  I couldn't keep up with it.

22    Q.   Okay.  Were you involved in a decision about where

23 the IT office at 40 Lowell would be located?

1      A.    No.

2            MS. SHILO:  Michele, can we look at Exhibit No. 17,

3  please.

4            (Exhibit 17 marked and shown via Zoom.)

5      Q.    And I'm going to start at the bottom, and

6  Mr. Denver, if you could just let me know -- oops -- when

7  you're done reading and I'll scroll, and after you've

8  reviewed this document, I'm going to ask you some questions

9  about it.

10     A.    Where am I starting?  Can you just --

11     Q.    Oh, sorry.  I didn't realize it started with a long

12  email.  So we'll start with this email and work back up the

13  chain.

14     A.    I saw something below that, wasn't there?

15     Q.    Yeah.  I'll scroll down.  You'll have to read

16  this --

17     A.    Right there.

18     Q.    -- single email backwards.  Yeah.

19     A.    Wait a minute.  Now, I'm not understanding.  I see

20  one down below, and then you're saying to read it backwards.

21     Q.    I believe -- so this email here is an email from

22  December 26th --

23     A.    12 --

1    Q.   -- and it continues all the way down here, so I'll

2  let you read --

3    A.   Oh, it's the same email.  Yeah.

4    Q.   -- that first.  Yeah.

5    A.   Okay.  (Witness peruses document.)  Okay.  (Witness

6  peruses document.)  Where is -- where is this for?  What is

7  the -- what is the subject line?

8    Q.   Yeah, let me go back up for you.

9    A.   Okay.  Oh, so -- okay.  So this was for the loft.

10  This is not -- this has nothing to do with the -- about

11  the -- okay.  All right.  So go down.  (Witness peruses

12  document.)  Okay.

13    Q.   All right.  And so this is the first -- hold on.

14  This is the follow-up email.

15    A.   This is part of why I wouldn't even read any of

16  this stuff.

17    Q.   Yeah.

18    A.   (Witness peruses document.)  Glad I don't get these

19  anymore.  I'm still -- I'm still reading.

20    Q.   Oh, sorry.

21    A.   Okay.  (Witness peruses document.)  Okay.  I'm at

22  "I'm aware."  (Witness peruses document.)  You're actually

23  reminding me of how frustrating he was.  (Witness peruses

1  document.)  There you go right there.

2      Q.   Okay.  So this email here that was sent on December

3  27th, 2018, at 2:09 p.m., you would say this is an example of

4  the communication issues with Mr. Lieber?

5      A.   I don't know.  Just me personally, I would see --

6  look at it and just -- it was too much.  Too much for me to

7  get involved with.

8      Q.   Okay.  And so this is the next email from Ryan

9  Dogil.

10     A.   (Witness peruses document.)  Okay.  (Witness

11 peruses document.)  Okay.  (Witness peruses document.)  Okay.

12 (Witness peruses document.)  Okay.  (Witness peruses

13 document.)  Okay.

14     Q.   So you reply:  Please get him what he needs.

15          Can you identify who you're talking about in this

16 email?

17     A.   I don't remember.  I assume -- I won't assume.  I

18 don't remember.

19     Q.   Are you telling Ryan Dogil to get Dan what he

20 needs, or are you telling Dan to get Ryan Dogil what he

21 needs?

22     A.   I don't remember.  I would be guessing.

23     Q.   So you just have no idea whether it's Dan -- you're

1  instructing Dan or you're instructing Mr. Dogil?

2      A.   Back to your comment about context.  With the

3  amount of employees and things that I'm involved with and an

4  email from, you know, two and a half years ago or two years

5  ago -- no, longer than that, I do not recall.

6      Q.   Does it help refresh your memory to see that the

7  email is from you to Mr. Dogil?

8      A.   What was the last email that was sent?  It was from

9  Ryan Dogil, right?

10     Q.   This is the last email.

11     A.   Oh, I hit reply all, right?  Doesn't he pop up

12  there, if he's the last -- he's the last one to send the

13  email?

14     Q.   I'm not sure.

15     A.   Neither am I.

16     Q.   Okay.  And then this -- this is the next email.

17     A.   (Witness peruses document.)  Okay.  (Witness

18  peruses document.)

19     Q.   And this is the final email in the string.

20     A.   (Witness peruses document.)  Okay.

21     Q.   Did you -- was it true that you thought Dan was

22  doing a good job?

23     A.   What is true is I wanted them to -- as a

1  management, I wanted them to just get this done, get me off

2  of these crazy emails that I have no idea what you guys are

3  talking about and going back and forth, and a management

4  style of, you know, a little bit of honey rather than

5  vinegar, a little positive reinforcement, just to get things

6  done.  That's what that reads to me.

7      Q.   Okay.

8          MS. SHILO:  Michele, we can take this down.

9      Q.   Were there times when you thought Mr. Lieber didn't

10 get things done in a timely manner?

11     A.   I'm not -- I'm not really sure.  I'm trying to

12 convey to you that I was not heavily involved with -- or not

13 involved with IT very much at all.

14     Q.   Okay.

15     A.   So I don't know --

16     Q.   So you can't remember an instance where Mr. Lieber

17 didn't get things done in a timely manner?

18     A.   I remember, you know, a time -- me writing, time is

19 of the essence.  So I remember, you know, people saying that

20 it wasn't, but I don't know.

21     Q.   Okay.

22     A.   I don't know what's a reference to time frame

23 either.

1     Q.   Okay.  Did you ever hear a complaint that

2  Mr. Lieber was not staying in his lane?

3     A.   I did.

4     Q.   Who did you hear that from?

5     A.   The same people that I've -- that I generally had

6  conversations with about him.

7     Q.   So that would be Mr. Moore?

8     A.   Yeah.

9     Q.   Mr. Marquis?

10    A.   Yes.

11    Q.   Anyone else?

12    A.   Ryan Dogil.  I know myself, I had thought it many

13  times.

14    Q.   And what does that mean, not staying in your lane?

15    A.   Just, you know, stick with -- stick with what you

16  do.  I think asking Jon his succession plan is a perfect

17  example.  Why would you even be thinking about that?  Or

18  wanting to get involved with an architect.  Or just many

19  different things that he would bring up that I thought

20  there's no need to.

21    Q.   Do you recall an issue with sprinklers?

22    A.   I do not.

23    Q.   Do you think dealing with an issue with sprinklers

1   would be in Mr. Lieber's lane?

2        A.    If there was, what, a shortage of them?

3        Q.    Sprinkler placement in buildings.

4        A.    That's what I'm asking you.  Like, shortage of

5   them?

6        Q.    Where they're placed.

7        A.    Like, in other words, there's a shortage in

8   coverage?

9        Q.    I don't know shortage in coverage.  I'm talking

10  about like where in the ceiling the sprinklers are placed.

11       A.    Oh, like architecturally?  I think you need to be

12  more clear.  Now this type of stuff, I do know.

13       Q.    Okay.  So if there was -- if Mr. Lieber was

14  providing input in where sprinklers needed to be placed

15  within a building, for example, in which offices they needed

16  to be put, do you think that would be outside of his lane?

17       A.    So are we talking in architectural, like it would

18  look better in this ceiling tile or that there was a shortage

19  in coverage for fire?

20       Q.    A shortage in coverage, not an aesthetic question.

21       A.    That's the question.  And that's up to everybody,

22  absolutely.

23       Q.    Okay.  So everyone has a responsibility to raise

1  issues like that when it's a coverage issue for sprinklers?

2      A.   Right.  It's a safety issue in general, yes.

3      Q.   Okay.  Do you remember Mr. Lieber getting involved

4  in any HR issues?

5      A.   Specifically me, not that I can think of.  Well, I

6  mean, I guess, be more specific.

7      Q.   If Mr. Lieber got involved in HR issues, would that

8  be out of his lane?

9      A.   What type of HR issues?

10      Q.   Involved in issues of employee disability

11  accommodation.

12      A.   I wouldn't think that would be inappropriate at

13  all.

14      Q.   You think that would be appropriate for him to do?

15      A.   Yes, I do.

16      Q.   How about fall prevention concerns?

17      A.   Any safety-related incidence is everybody's

18  responsibility.

19      Q.   Okay.  How about access to a second floor office

20  for disabled people?

21      A.   If he was concerned about that, is he able to bring

22  that up?  Is that the question?  I guess ask me --

23      Q.   Would it be appropriate for him to raise concerns

1  about that --

2      A.    Yes.

3      Q.    -- if there wasn't, for example, an elevator to

4  reach a second floor office?

5      A.    He certainly could bring that up, yes.

6      Q.    Okay.  Who was responsible for safety during

7  Mr. Lieber's employment?

8      A.    Sebastien Brooks would be the -- I guess, the head,

9  environmental and director of health and safety, but we

10 certainly have a culture of everybody's responsible for

11 safety.

12     Q.    Okay.  Was Mr. Brooks responsible for safety of all

13 Marquis family companies employees, so union, nonunion,

14 field, office?

15     A.    Yes.

16     Q.    Okay.

17           THE WITNESS:  Just curious how much longer you

18 think, just because I'm going to take a quick bathroom break,

19 unless we're almost done; I can hold it in.

20           MS. SHILO:  Sure.  I think probably we'll go for a

21 bit longer, so take your bathroom break.  This is a good

22 time.  So five minutes, ten minutes?  What's your --

23           THE WITNESS:  Five minutes is fine.

```
 1              MS. SHILO:  Five minutes.

 2              THE WITNESS:  Five minutes.

 3              MS. SHILO:  Okay.  We will be back at 2:26.

 4              THE WITNESS:  Thank you.

 5              (Recess taken.)

 6              MS. SHILO:  All right, Michele, we're back on the

 7    record.  Can we look at Exhibit No. 31, please.

 8              (Exhibit 31 marked and shown via Zoom.)

 9       Q.   BY MS. SHILO:  Mr. Denver, I'm going to ask you to

10    read this email from Chris Moore -- oh, I think we're getting

11    some feedback.

12              MR. CARTER:  I'm on mute, so I don't believe it's

13    on our end.

14              MS. SHILO:  Okay.  Michele, let me know if you're

15    having trouble understanding, and we can take a break and try

16    to figure it out.  It seems to be better now.

17              COURT REPORTER:  It does.

18       Q.   BY MS. SHILO:  Okay.  Mr. Denver, if you could just

19    take a look at this email from Chris Moore, and let me know

20    when you need me to scroll, and then I'm going to ask you

21    some questions about it.

22       A.   (Witness peruses document.)  Okay.  I just finished

23    "head."
```

1    Q.    Okay.

2    A.    Can you scroll up a little bit, please --

3    Q.    Sure.

4    A.    -- just to make sure I didn't miss anything.

5  Yeah, see, I didn't see this part.

6    Q.    Okay.

7    A.    Oh, wait.  Oh, I'm sorry.  Yes, I did.  I'm sorry.

8    Q.    Do you want me to scroll down more?

9    A.    No, I think this is good.

10    Q.    Okay.

11    A.    (Witness peruses document.)  Okay.  Is that the

12  end?

13    Q.    Yeah.  That's the end of this email.

14    A.    Okay.

15    Q.    Were you -- were you aware that Dan Lieber was told

16  that IT spending must come down?

17    A.    I remember conversations happening about IT

18  spending -- IT costs, you know, being an issue.

19    Q.    Okay.  Were you ever in a meeting where the IT

20  budget was discussed?

21    A.    You need to be more specific, please.

22    Q.    Were you ever at a meeting where it was discussed

23  that the IT budget was too high and that Mr. Lieber needed to

1 cut costs?

2     A.   Pre his budget or after the budget proposal he came

3 out with?

4     Q.   I'm not talking about budgets; I'm talking about

5 actual spending.

6     A.   I -- I believe so.

7     Q.   And what was the discussion about IT spending?

8     A.   My -- my big thing was also like recurring costs

9 with guys in the field. You would have a guy that had a

10 cellphone with a monthly plan on it. You'd have a tablet

11 with a -- you know, a V card, if you will, with a -- you

12 know, a monthly subscription, and then also an iPad with a

13 monthly subscription.

14     So I wanted to, you know, bring that in. I didn't

15 need to have three different devices, three monthly plans.

16 That was one major one.

17     I know a pet peeve of Jon's also was whenever there

18 was a new iPhone that came out, I think there was a

19 perception with some -- with the new organization, mostly in

20 the office, that some people would break their phone just to

21 get a new one.

22     Q.   Okay. Was there also an issue with fieldworkers

23 not having repercussions when they broke their phone or

1 tablet and just wanting a new one?

2     A.   So it was so hard to prove.  Doing demolition,

3 break an iPhone.

4     Q.   Yeah.  And was Mr. Lieber reissuing old equipment

5 to try and bring down this equipment cost of -- that was

6 caused by people breaking their phones?

7     A.   I would assume that was why.

8     Q.   Okay.  And then there's a mention in this second

9 bullet point from Mr. Moore that says:  The companies

10 operated like ten companies.

11          Is that -- is that accurate?

12     A.   That's way too broad of a question.

13     Q.   Well, do you agree with Mr. Moore's statement in

14 his email?

15     A.   It's way too vague for me to comment on what he was

16 referring to.

17     Q.   So in some context, the companies act as one shared

18 company?

19     A.   No, I'm not -- I'm not saying that either.

20     Q.   Okay.  Were there issues with Marquis Management

21 shared services keeping up with the differences between all

22 ten companies?

23     A.   I'm not sure.

1    Q.   In your work for Marquis Management, was that a

2  challenge that the company was facing?

3    A.   My work with Marquis Management has nothing to do

4  with this.

5    Q.   It has nothing to do with shared services?

6    A.   Not -- handling shared services for Marquis, no.

7    Q.   What do you do in your advisory role for Marquis

8  Management?

9    A.   So I have a lot of relationships.  I do a lot of

10  job interviews, job prep.  I have a really good network of

11  what jobs are coming up.  When there's issues over extra work

12  or final negotiations, you know, bidding work.  ED.

13    Q.   Does Marquis Management have any jobs?

14    A.   Jobs as far as?

15    Q.   Construction jobs, any jobs that require bidding.

16    A.   I'm not sure.

17    Q.   Well, what -- what bidding work needs to be done

18  for Marquis Management?

19    A.   Marquis Management, you would have to really talk

20  to Chris about that.

21    Q.   To who?

22    A.   Chris.

23    Q.   But I'm talking about your work for Marquis

1  Management.

2      A.   My work for Marquis Management is help with all of

3  the companies.

4      Q.   So you help all of the Marquis family companies

5  with job interviews, networking, bidding, et cetera, through

6  Marquis Management?

7      A.   Job issues.

8      Q.   So for example, even though you're not a direct

9  employee of New England Finish Systems, if you help them with

10 an issue, that's work that's flowing from you through Marquis

11 Management to New England Finish?

12     A.   I don't understand that.  Please state that again,

13 your question.

14     Q.   So if New England Finish Systems needed help with,

15 let's say, a bidding project and you were going to help them,

16 would that be a service that you'd provide through Marquis

17 Management?

18     A.   I would say if they have an issue on a drywall job

19 or whatever, that would be where I would go out, if I had the

20 relationship with the client and go out and help mitigate it.

21     Q.   And so from your perspective, that's work that

22 you're doing for Marquis Management?

23     A.   I believe that time gets allocated out for it.

1    Q.    Okay.  So you're not involved in sort of the

2  business management of HR, IT, finance, shared services that

3  are being provided through Marquis Management?

4    A.    For the other companies?

5    Q.    Right, aside from Select Demo.

6    A.    I might get asked my opinion.

7    Q.    Okay.  So if there's an issue with shared services,

8  they might seek your guidance on a particular issue?

9    A.    Shared services, no.

10    Q.    What are shared services?

11    A.    We went through this.  IT, payroll, HR, potentially

12  purchasing.

13    Q.    But you just said that -- that you weren't involved

14  in issues with shared services, but that sometimes they would

15  seek your advice on HR or IT issues?

16    A.    I didn't say that.

17    Q.    Okay.

18        MS. SHILO:  Michele, could you read that back?  I'm

19  just -- I'm sorry, I may be getting a little turned around.

20        THE WITNESS:  I feel like you're turning me around

21  too.

22        MS. SHILO:  Okay.  Sorry about that.

23        (Off the record discussion with reporter.)

1          (The record was read as requested.)

2     Q.   BY MS. SHILO:  So I believe, Mr. Denver, you just

3  said that you might be consulted on HR and IT issues?

4     A.   I think -- it's like too vague of a question for me

5  to fully understand what you're saying, to understand.

6     Q.   Okay.  Were there issues with the ten companies

7  coming together to share HR services under Marquis

8  Management?

9          MR. CARTER:  Objection to form.

10    A.   I don't -- I don't believe so.

11    Q.   Okay.  Were there any issues with bringing the ten

12 companies together and having shared IT services under

13 Marquis Management?

14    A.   I don't know.

15    Q.   So you're not aware of whether there were issues or

16 not; you just weren't involved in that?

17    A.   I just don't know, pertaining to your question, ten

18 different companies, if that was creating an issue or not.

19 That I -- I feel like it's almost like a trick question,

20 meaning I don't fully understand it.

21    Q.   Okay.  Were there issues with implementing shared

22 services from Marquis Management with various companies doing

23 various things their own way?

1      A.   I don't -- I don't know.  You're talking safety,

2   payroll, IT?

3      Q.   Right.  For example, were there issues bringing

4   Select Demo's payroll under the Marquis Management management

5   services?

6      A.   Not that I'm aware of.

7      Q.   Okay.  If you look down a little bit, it says that

8   Mr. Moore has told Dan to stay in his lane and focus on IT

9   only.

10          Is that consistent with your understanding of what

11   the phrase, "stay in his lane," means?

12      A.   I can't speculate to what exactly he meant.

13      Q.   I'm not asking you what Mr. Moore meant.  I'm

14   asking you if that is consistent with your understanding of

15   what "stay in your lane" means.

16          MR. CARTER:  Objection to form.

17      A.   I don't understand.  What is -- what are you asking

18   me?

19      Q.   Sure.  Let me highlight it here.  Mr. Moore writes

20   that he told Dan to stay in his lane and focus on IT only.

21          Is that consistent with your understanding of what

22   "staying in his lane" means?

23      A.   I don't know.

1      Q.   You don't know whether that is consistent or not

2  consistent with your understanding of "stay in your lane"?

3      A.   I would think IT does IT.

4      Q.   Okay.  And then I want you to take a look at this

5  paragraph, the next one, that says:  I would love to talk to

6  you at some point about [sic] Ryan Dogil.

7           Do you agree or disagree with Mr. Moore's concerns

8  about Mr. Dogil?

9      A.   I think I -- you know, I don't know -- I -- I don't

10  know.  I know there was a lot of bickering going back and

11  forth between the two.  I'm sure there was culpability on

12  both parts.

13      Q.   In your experience with Mr. Dogil, have you

14  encountered any of these same issues that Mr. Moore is

15  describing here?

16      A.   Never the -- never the amount of infighting going

17  on with anybody, no.

18      Q.   Okay.  But how about that Ryan does get people what

19  they need, but he ignores cost?

20      A.   I think there's a different perception from

21  different areas on cost, where somebody may think that, hey,

22  you're going to buy a new phone or a new tablet, and that

23  there is that up-front cost, and somebody more on the

1 operational end will take a look at it, just, you know, like

2 you guys here, time is money, and it's billable hours, right?

3 The same thing with our union workforce who -- some are

4 earning $20 an hour.

5       So you might have thought you were saving money by,

6 you know, giving a refurbished piece of hardware that doesn't

7 work well, and it's costing you.  It's that saying, you know,

8 step over a dollar to pick up a nickle.

9     Q.   Yeah.

10     A.   So I think it's where, at times, it could have been

11 some of this.

12     Q.   Okay.  Do you agree with Mr. Moore that Ryan Dogil

13 is a people-pleaser with very little business acumen?

14     A.   I would say Ryan Dogil is a people-pleaser, yes.

15     Q.   How about Mr. Moore's assessment of his business

16 acumen?

17     A.   I really don't know what he meant by that.

18     Q.   Do you think Ryan Dogil is good at business?  Does

19 he have a good business sense?

20     A.   I'm not sure.

21     Q.   Okay.  Do you think it's appropriate for Mr. -- or

22 do you think it was appropriate for Mr. Dogil to call out

23 Mr. Lieber on emails with field personnel?

1     A.   I would have to see the context.

2     Q.   Okay.  If Mr. Dogil called Mr. Lieber a liar in an

3  email with fieldworkers on it, would that have been

4  appropriate?

5     A.   I would need to see the context.

6     Q.   So there's a certain context where it would have

7  been appropriate to call Mr. Lieber a liar with fieldworkers?

8     A.   I'm not -- I don't understand what the fieldworkers

9  have to do with it.  I would say it's not appropriate at all,

10 depending on what is going on.

11         I don't know what Dan said to him.  I don't know

12 what you're referring to.

13    Q.   Well, would it be appropriate for one manager to

14 call another manager a liar in front of fieldworkers?

15    A.   I don't -- I don't know what transpired.

16    Q.   Okay.  And at the very bottom it says that:  Dan is

17 not perfect, but he does keep a very close eye on company

18 assets.

19         Do you agree or disagree that Mr. Lieber kept a

20 very close eye on company assets?

21    A.   I think that he kept his eye on assets.  I think

22 the concern was -- is what I just explained previously about

23 cost of downtime.

1    Q.   Okay.

2         MS. SHILO:  And Michele, we can take this exhibit

3    down.

4    Q.   Mr. Denver, were you involved in the build-out of

5    the Elkins building in Boston?

6    A.   A little bit.

7    Q.   What was your role in that project?

8    A.   Original design.

9    Q.   And who was leading that project?

10   A.   Leading that project... different people had their

11   hands in it.

12   Q.   Was there one person that was responsible for the

13   project?

14   A.   Not per se.

15   Q.   Did Dan Lieber have a role in the project?

16   A.   I don't remember.

17   Q.   Did Ryan Dogil have a role in the project?

18   A.   I don't remember that either.

19   Q.   Did you ever hear about any issues between

20   Mr. Lieber and Mr. Dogil concerning the Elkins building in

21   Boston?

22   A.   Not that I remember.

23   Q.   I believe earlier you testified that you were

1  involved in responding to COVID and developing protocols.

2      A.   Yes.

3      Q.   What was your involvement in that project?

4      A.   In what project?

5      Q.   In responding to COVID and developing COVID

6  protocols.

7      A.   My involvement was coming up with, you know, what

8  the insurance would look like, the indemnification paperwork,

9  the marketing, and then, you know, the business development

10  of it.  That was what I did.

11      Q.   Did Mr. Lieber suggest to you at any point a

12  business opportunity concerning COVID?

13      A.   I don't remember.

14      Q.   Did he ever suggest that there was a business

15  opportunity related to cleaning or decontamination related to

16  COVID?

17      A.   I don't remember where it spawned from or if Dan

18  brought that up.

19      Q.   Okay.  Was Dan involved -- sorry.  First of all, at

20  some point did you or Select Demo become involved in cleaning

21  and decontamination related to COVID?

22      A.   Yes.

23      Q.   Okay.  And was Dan involved in that business

1  venture?

2      A.   Not that I remember.

3      Q.   Okay.  Were you involved in developing COVID safety

4  protocols?

5      A.   The majority of that was Sebastien.

6      Q.   Did you provide any input to those COVID protocols?

7      A.   Not that I remember.

8      Q.   And once those protocols were developed and

9  disseminated to employees, were they optional or were they

10 required?

11     A.   I think they were required.

12     Q.   So for example, if your protocol said employees are

13 required to wear masks, the employees -- it wasn't an option

14 whether they wore a mask or not; is that right?

15     A.   Correct.

16     Q.   Okay.  Were you aware of a cyberattack on Marquis

17 in or around December 2020?

18     A.   I remember it, yes.

19     Q.   What -- can you describe the nature of that attack?

20     A.   I believe it was somebody that opened up a PDF that

21 they weren't supposed to, and they got into our network.

22 That's about the extent of what I know.  I think there was a

23 ransom.

1    Q.    Who opened that PDF?

2    A.    I don't know.

3    Q.    When did you learn about the attack?

4    A.    Shortly after it happened.

5    Q.    And how did you learn about it?

6    A.    I believe Chris Moore.

7    Q.    Did he send an email or speak to you in person?

8    A.    I don't remember.

9    Q.    Do you know who was responsible for that attack?

10   A.    I do not.

11   Q.    Did you need to take any actions as a result of the

12   attack?

13   A.    Not that I remember.

14   Q.    Was there ever any suggestion that Mr. Lieber may

15   be responsible for the attack?

16   A.    I don't remember that.

17   Q.    Was there any suggestion that an employee named

18   Beth Anne Collopy was involved in the attack?

19   A.    No, I don't remember anything about that.

20   Q.    Do you know of an employee, a former employee,

21   named Beth Anne Collopy?

22   A.    I know the name.  I don't believe I ever met her.

23   Q.    So you never met Ms. Collopy while she was an

1  employee of --

2      A.    Not that I -- not that I recall.

3      Q.    Did you ever observe Ms. Collopy while she was in

4  the workplace?

5      A.    Not that I recall.

6      Q.    Did you ever become aware that Ms. Collopy raised

7  a complaint of gender discrimination?

8      A.    No.

9      Q.    Were you ever aware that Ms. Collopy had a

10  disability -- or has a disability?

11      A.    No.

12      Q.    Were you ever aware that Mr. Lieber requested

13  accommodations for Ms. Collopy?

14      A.    Not that I remember.

15      Q.    Are you aware that Beth Anne Collopy's employment

16  was terminated?

17      A.    I honestly don't know if she left or she was

18  terminated.

19      Q.    Were you involved with her leaving the company in

20  any way?

21      A.    No.

22      Q.    Did you ever become aware of an issue with

23  Ms. Collopy either accessing an IT office at 40 Lowell Road

1    or attending meetings at 40 Lowell Road?

2         A.    No.

3         Q.    Has anyone ever spoken to you about a relationship

4    between Mr. Lieber and Ms. Collopy?

5         A.    As far as?

6         Q.    Any type of relationship.

7         A.    I believe they worked together.

8         Q.    Any other type of relationship?

9         A.    No, not that I remember.

10        Q.    When did you become aware that Marquis was looking

11   for someone to replace Mr. Lieber?

12        A.    I don't remember.  I don't remember if it was

13   before or after.

14        Q.    Before or after what?

15        A.    It was determined that Dan was no longer going to

16   be employed.

17        Q.    Were you involved in the process of hiring someone

18   for Mr. Lieber's replacement?

19        A.    I remember meeting with -- with two candidates.

20        Q.    And when did you meet with those candidates?

21        A.    I don't remember the date and time.

22        Q.    Approximately, when did you meet with them?

23        A.    I don't know.

1      Q.   Was it after Mr. Lieber's termination?

2      A.   I don't know.

3      Q.   Who else was at those meetings?

4      A.   I can tell you who was there.  I don't know if it's

5  a full list:  Myself, Chris Moore, Ray Houle, Kevin

6  Philibotte, John Kennedy, I think Allen Marquis.  That's who

7  I can remember.

8      Q.   Okay.  Was Jon Marquis at the interviews?

9      A.   I don't believe so.

10     Q.   Was Melissa Marquis at the interviews?

11     A.   No.

12     Q.   Was Melissa Marquis involved in the process of

13 hiring Mr. Lieber's replacement?

14     A.   I don't know.

15     Q.   Did you have any discussions about the goals for

16 Mr. Lieber's replacement?

17     A.   Goals.  If anything, it would have been around

18 personality.

19          You know, I think it's important for you to

20 understand if there's one part of this business that I do not

21 put any of my -- much of my time is IT, so...

22     Q.   So the discussions about personality, do you

23 remember who those discussions were among?

1      A.    Yeah, the -- when we interviewed the candidate.

2      Q.    So it's the group that you just mentioned that was

3  present at the interview?

4      A.    Yes.

5      Q.    Were you at Michael Fruhbeis's interview?

6      A.    I was.

7      Q.    Were you aware that he is Scott Watkins'

8  brother-in-law?

9      A.    I was not.

10     Q.    When -- did you ever become aware of that?

11     A.    Right now.

12     Q.    Oh, so you didn't know until now?

13     A.    Correct.

14     Q.    Okay.  Did you ever see a needs assessment document

15  that was prepared by Melissa Marquis?

16     A.    I don't remember.  I don't recall.

17     Q.    Was there any discussion, when you were considering

18  a replacement for Mr. Lieber, about suggestions or

19  requirements for the position that were developed by Melissa

20  Marquis?

21     A.    I don't know.

22     Q.    So you don't remember any recollection about a

23  discussion about Melissa Marquis' input into how the

1 candidate should -- or what qualifications the candidate

2 should have?

3     A.   I think generally that she -- she would, but I

4 never dug into it.

5     Q.   Were her thoughts about the -- the characteristics

6 of the candidate communicated to you?

7     A.   Say that again.

8     Q.   Were her thoughts about the desirable

9 characteristics of the candidate communicated to you?

10     A.   Not that I recall.

11     Q.   Do you think that you should have been told that

12 Michael Fruhbeis was Scott Watkins' brother-in-law during the

13 interview process --

14     A.   No.

15     Q.   -- or the hiring process?

16     A.   No.

17     Q.   Why not?

18     A.   Both my brother-in-laws work for me.  It's just --

19 I have no issue with that.  As long as they're held

20 accountable the same way, I have no issue with that at all.

21     Q.   Did you -- when you were hiring your

22 brother-in-laws, did you say, you know, hey, these are my

23 brother-in-laws; consider them as candidates?

1    A.    For what?

2    Q.    For the positions that they now hold working for

3  you.

4    A.    Who would I say that to?

5    Q.    So you didn't -- you didn't think that you needed

6  to disclose that these two gentlemen were your

7  brother-in-laws during the hiring process?

8    A.    Disclose to who?

9    Q.    To anyone hiring them, to managers, to Jon Marquis.

10  Anyone at Marquis or Select Demo.

11    A.    They're union employees.

12    Q.    I see.  Did you ever see a set of goals for the IT

13  lead position?

14    A.    Didn't you just ask me that twice?

15    Q.    I asked about a needs assessment document prepared

16  by Melissa Marquis.  Now I'm asking you more generally if

17  anyone ever developed any goals, and did you see them for the

18  IT lead position.

19         MR. CARTER:  Objection.

20    A.    I do not recall.  I don't believe.

21    Q.    Okay.  Did you ever see a job description for the

22  IT lead position?

23    A.    I don't think so.

1     Q.   Did you ever meet with Mr. Fruhbeis after he was

2  hired to discuss goals for the IT position?

3     A.   My -- my interactions with Mike Fruhbeis have been

4  very -- very limited.

5     Q.   What is your opinion of Mr. Fruhbeis's performance?

6     A.   I think he's -- as far as I know, he's done a good

7  job.

8     Q.   Have you had any concerns with Mr. Fruhbeis?

9     A.   I have not.

10     Q.   Have you heard anything from Mr. Dogil about

11  Mr. Fruhbeis?

12     A.   I have not.

13     Q.   Are you aware that Mr. Lieber filed an -- made a

14  complaint to OSHA?

15     A.   I am now, yeah.

16     Q.   Before just now, were you aware that Mr. Lieber

17  complained to OSHA?

18     A.   When the -- we got the complaint.

19     Q.   I see.  So at the time Mr. Lieber made the

20  complaint to OSHA, you did not -- you were not made aware of

21  it?

22     A.   No.

23     Q.   Did you have any involvement with responding to

1  Mr. Lieber's complaint to OSHA?

2      A.   No.

3      Q.   Did you ever talk to anyone about Mr. Lieber's OSHA

4  complaint?

5      A.   No.

6      Q.   Are you aware of any other employees who made OSHA

7  complaints?

8      A.   I've had -- yes.

9      Q.   How many complaints by employees are you aware of?

10     A.   I am aware of one that comes to mind.

11     Q.   And is that employee still employed?

12     A.   No.

13     Q.   Was the OSHA complaint made while that employee was

14  still an employee or after that employee's employment ended?

15     A.   After.

16     Q.   So the employee's employment ended, and then they

17  made the OSHA complaint?

18     A.   Correct.

19     Q.   Did the employee complain of retaliation in any

20  way?

21     A.   No.

22     Q.   How are these OSHA complaints handled?

23     A.   With Sebastien Brooks.

1    Q.   Did you have any involvement with that other

2  employee's OSHA complaint?

3    A.   Just on -- with the hiring legal representation.

4  I didn't have any real involvement.  This was a field-related

5  issue.

6    Q.   Okay.  How do you know Jacqueline Oleaga?

7    A.   Her husband is a friend of mine.

8    Q.   Her husband is -- sorry, I didn't catch that.

9    A.   A friend of mine.

10    Q.   Okay.  Did you recommend that Dan Lieber hire her?

11    A.   I set the two of them up, yes.

12    Q.   And how long did she work for Marquis Management?

13    A.   I'm not sure.  Maybe, if I had to guess, a year.

14    Q.   Are you aware of any personnel issues with her?

15    A.   I do remember there was a issue with Dan and

16  Jackie, and I want to say it was around her concerns about

17  her being pregnant and diabetes and something to do with --

18  in that effect.

19    Q.   And what was the nature of the concern?

20    A.   I think it was around doctors' appointments or

21  something like that.

22    Q.   Did Dan ask for your assistance when he was doing a

23  performance review of Ms. Oleaga?

1    A.   It wasn't a performance review.

2    Q.   Or a performance appraisal?

3    A.   I think it was an issue that was brewing that we

4  met together.

5    Q.   Okay.  And what was your involvement in that

6  meeting?

7    A.   Listening to both sides.  I don't actually remember

8  the exact particulars.

9    Q.   So you helped mediate the issue between Mr. Lieber

10 and Ms. Oleaga?

11   A.   Tried.

12   Q.   Were you successful?

13   A.   Ultimately, I guess not.

14   Q.   What makes you say that?

15   A.   She left.

16   Q.   And where did that meeting take place?

17   A.   That was 40 Lowell Road.

18   Q.   Okay.  Have you ever had any antidiscrimination

19 training?

20   A.   I have.

21   Q.   When did you have that training?

22   A.   I've had it just about every year up until COVID.

23   Q.   And who provides that training?

```
 1      A.    Attorney Andrea Chapman -- Chat --

 2      Q.    Chatfield?

 3      A.    Chatfield, yeah.

 4      Q.    And did you receive that training as part of a

 5 group?

 6      A.    Yes.

 7      Q.    What group was that?

 8      A.    It's just a group that we would bring in -- bring

 9 her in to address all the employees every year.

10      Q.    And --

11      A.    Not all employees.  We would rotate -- rotate

12 people.

13      Q.    And which employees would attend?

14      A.    A wide variety.  Hundreds of them.

15      Q.    Is it mostly fieldworkers?

16      A.    A combination of all.

17      Q.    And can you describe the training that you received

18 from Attorney Chatfield?

19      A.     It was about, you know, diversity, minorities,

20 inclusion, women; you know, medical, safety.  You know,

21 safety training outside, not with her.  It was a two-part

22 thing.  Some people would go in for all of the harassment,

23 discrimination, reporting, everything I just stated, while
```

1  the other group was outside with vendors looking at new

2  harnesses and lanyards, fall protection; equipment with, you

3  know, shrouds on it, to not have things go in your eye, and

4  different glasses, all that type of stuff.

5      Q.   Okay.  Do you remember any training about

6  disability discrimination?

7      A.   Yes.

8      Q.   What do you remember about disability

9  discrimination?

10     A.   Just about the different forms of disability.

11 Could be -- whether it be mental or physical and, you know,

12 how we -- how -- religion as well.  Just being sensitive to

13 that.

14     Q.   Did the training include anything about reasonable

15 accommodations of a disability?

16     A.   Yes, especially if a worker got hurt, yes.

17     Q.   And what do you remember about that?

18     A.   I remember, especially somebody coming back to

19 work, trying to find them a -- you know, a job that suited

20 and fits what they were either physically or mentally able to

21 do at that time.  You know, just, you know, being sympathetic

22 and accommodating as we could, where we could.

23     Q.   Do you remember any training about retaliation?

1    A.    Yes.

2    Q.    And what was that training?

3    A.    Not to retaliate.

4    Q.    For doing what?

5    A.    For somebody bringing a complaint or another worker

6  bringing it up, and making sure that they weren't retaliated

7  on in more than ways than just, you know, a -- you know, a

8  termination.  You know, making sure people aren't alienating

9  them.  They're still part of the group.  Making sure

10  everybody feels like they have a voice, whether it's safety

11  or whatever it is.

12    Q.    And how about retaliation for requesting reasonable

13  accommodations?  Was that covered in the training?

14    A.    I'm sure it was.

15    Q.    And what do you remember about that?

16    A.    To make any accommodations that we were able to, to

17  help comfort our teammate.

18    Q.    Can someone be retaliated against for requesting an

19  accommodation of their disability?

20    A.    Certainly not.

21    Q.    Did the employees you supervise attend this

22  training by Attorney Chatfield?

23    A.    Yes.

1      Q.   Did Attorney Chatfield's training address

2   whistleblower protection?

3      A.   That's basically retaliation, right?

4      Q.   Retaliation for raising concerns that something

5   could be unethical or unlawful?

6      A.   Yeah, that's what we just discussed.

7      Q.   Okay.  So for example, raising safety issues would

8   be protected from retaliation; is that right?

9      A.   So recently, I just stuck in everybody's paycheck a

10   card that has my name and my number on it, to all employees,

11   that they can call me any time of the day or night for any

12   safety concerns whatsoever with zero retaliation.

13      Q.   Okay.  So was the training that Attorney Chatfield

14   provided, did she cover no retaliation for raising safety

15   issues?

16      A.   Yes.

17      Q.   Okay.  Have you ever been involved in handling a

18   claim of discrimination or retaliation?

19      A.   Not that I can remember off the top of my head

20   right now.

21      Q.   Okay.  Have you ever been accused of discrimination

22   or retaliation?

23      A.   Not that I can remember.  I would think I would

1  remember that.

2       Q.   And has any --

3       A.   I --

4       Q.   Sorry, go ahead.

5       A.   No, I don't ever recollect any of that.

6       Q.   Okay.  Has any employee ever raised a claim of

7  discrimination or retaliation to you?

8       A.   I mean, I've had thousands of employees.  I

9  remember -- I do remember that some of the girls were

10 feeling -- the cleaning girls were feeling uncomfortable

11 around one of the -- the head final cleaning woman's husband.

12      Q.   Okay.  And what did you do with that complaint?

13      A.   He was ultimately terminated.

14      Q.   Did you bring the issue to HR?

15      A.   We didn't have HR at that point.

16      Q.   Okay.  And did you think it was appropriate for the

17 cleaning employees to raise that issue to you?

18      A.   Very much so.

19      Q.   Okay.

20      A.   Some of them came to my house to tell me about it

21 so they felt safe.

22      Q.   Okay.

23           MS. SHILO:  All right.  I think this is a good time

1  for a break.  So why don't we take ten minutes, and we'll be

2  back at 3:32.

3          MR. CARTER:  How much more are you anticipating,

4  Brooke?

5          MS. SHILO:  I'm hoping not too, too much longer,

6  but I do have a couple of other sections of questions to go

7  through.

8          MR. CARTER:  Can you quantify what "not too much

9  longer" means?  Ballpark.  I mean --

10          MS. SHILO:  I can't.  You know, I don't think I'll

11  go until five at this point, but --

12          MR. CARTER:  All right.

13          MS. SHILO:  -- I'm not sure.  All right.  Thank

14  you.

15          (Recess taken.)

16      Q.   BY MS. SHILO:  Mr. Denver, I know we've talked

17  today about the meeting on November 19th.  Before that

18  date -- before the date of that meeting, were you ever

19  critical to Jon Marquis about Mr. Lieber?

20      A.   Nothing really -- nothing really jumps out too much

21  at me.

22      Q.   So you have no recollection of raising concerns

23  about Mr. Lieber to Jon Marquis before that November 19th

1  meeting?

2      A.   I guess just the budget, when that came out, I

3  remember that.  Just that he was probably painful to talk to.

4      Q.   Okay.  And do you remember when you would have

5  raised those concerns to Mr. Marquis?

6      A.   No.

7      Q.   Were you involved in a disposition agreement with

8  the Massachusetts Office of Campaign and Political Finance?

9      A.   I was.

10     Q.   What happened that led to the entry of that

11 disagreement -- disposition agreement?

12     A.   I made a campaign finance donation, and some of the

13 employees, and refunded them the money.

14     Q.   Okay.  So it was an issue where employees made

15 campaign finance donations, and you refunded them the money?

16     A.   Yes.

17     Q.   And that refunded money, was that your personal

18 money, or was that Select Demo money?

19     A.   It was Select Demo money.

20     Q.   Was it your idea to reimburse employees for their

21 campaign donations?

22     A.   Yes.

23     Q.   Why did you -- sorry.  Which candidates were those

1 donations made to?

2     A.   Marty Walsh and -- oh, what's his name?  Flaherty,

3 Michael Flaherty.

4     Q.   Okay.  And why did you choose those candidates?

5     A.   Those candidates, you know, platforms in support of

6 union labor and, you know, everything that we stand for.

7     Q.   And how much in company funds were used for these

8 donations?

9     A.   20 -- between 20 or 22,000.

10     Q.   And did you need any approval to spend the

11 company's money for those donations?

12     A.   No.

13     Q.   Was that in the Select Demo budget anywhere?

14     A.   I'm not sure.

15     Q.   Was Jon Marquis involved in this at all?

16     A.   No.

17     Q.   Was Chris Moore involved in this at all?

18     A.   No.

19     Q.   Did Select Demo pay a fine --

20     A.   Yes.

21     Q.   -- for this incident?  How much was that fine?

22     A.   75,000.

23     Q.   Did you receive any discipline for this matter?

1    A.    Discipline, like from who?

2    Q.    Were you disciplined at work at all in relation to

3  this matter?

4    A.    I mean, Jon was not happy with it.

5    Q.    Other than expressing his displeasure, did you

6  receive any other repercussions at work?

7    A.    No.

8    Q.    Okay.  And when was this?

9    A.    I don't remember the date.  I don't -- 2019, 2020,

10  something like that.

11    Q.    Okay.  Have you ever been involved in a civil

12  lawsuit?

13    A.    Civil lawsuit, me personally.  Yes.

14    Q.    What -- how many lawsuits have you been involved

15  in?

16    A.    One I know when I was a kid, just got my license.

17  And then one now recently.

18    Q.    And when you were a kid and you had just got your

19  license, what was the general nature of that lawsuit?

20    A.    It was like a fender-bender.

21    Q.    And were you the plaintiff or were you the

22  defendant?

23    A.    I was the -- you know, they -- it was my friend's

1  car.  They actually sued his insurance company, so I don't

2  even know if I was.  I was like 16 years old.  It was 23

3  years ago.

4      Q.  Okay.  So you were driving your friend's car.  You

5  got into a fender-bender.  There was a lawsuit that resulted

6  from that.

7      A.  Yeah.  I think it settled, like $5,000 or

8  something.

9      Q.  Okay.  And you mentioned a second lawsuit?

10     A.  Yes.  I was -- I'm being sued currently.

11     Q.  And what is the general nature of that suit?

12     A.  It was a boat accident.

13     Q.  And are you the plaintiff or the defendant in that

14 suit?

15     A.  I am the defendant.

16     Q.  And is that lawsuit currently pending, or has it

17 been resolved?

18     A.  Pending.

19     Q.  What court is that civil case pending in?

20     A.  The federal courthouse in Boston.

21     Q.  Do you think that the plaintiff in that lawsuit is

22 acting in a reasonable manner?

23         MR. CARTER:  I'm going to instruct you not to

1    answer.

2              MS. SHILO:  On what basis?

3              MR. CARTER:  There's a criminal proceeding going

4    on.  So I'm going to have you ask him questions about some of

5    the basic facts, but I am going to instruct him not to answer

6    anything that could implicate his Fifth Amendment rights.

7         Q.   BY MS. SHILO:  Okay.  And are you personally named

8    as a defendant in that case?

9         A.   Yes.

10        Q.   Do you have insurance coverage for the claims in

11   that case?

12        A.   I was -- I really don't know how to answer that.

13        Q.   If there's a judgment in that case, will you be

14   paying it personally, or would your insurance provide

15   coverage?

16        A.   That's yet to be determined.

17        Q.   Okay.  Going back to the lawsuit, the fender-bender

18   when you were a kid.  Did you think that the plaintiff acted

19   reasonably in that lawsuit?

20        A.   I don't -- I don't know.  I don't remember.

21        Q.   With regard to the lawsuit that involves the

22   boating accident, what -- what is the amount of the claim

23   against you?

         A.    It hasn't -- it hasn't -- there's been no number

yet.

              MS. SHILO:  Okay.  I think I might be able to

finish up.  If we could just take a very brief break.  I'm

hoping I can finish up in the next 15 minutes or so.

              MR. CARTER:  Okay.

              MS. SHILO:  Thank you.

              (Recess taken.)

         Q.    BY MS. SHILO:  All right.  I just have a few more

questions, and then we'll be done.

              Mr. Denver, Attorney Carter just mentioned a

criminal matter related to that boating matter.  Where is

that criminal matter pending?

         A.    Suffolk Superior.

         Q.    And when is the trial in that matter scheduled?

         A.    It was originally going to be in April, but now

it's undetermined.

              MS. SHILO:  Okay.  Those are all the questions I

have for you.  Thank you very much for your time today.

              MR. CARTER:  Thank you.

              (At 3:50 p.m. the deposition concluded.)

                              * * *

# CERTIFICATE OF WITNESS

1

2       I, RYAN DENVER, do hereby swear/affirm that I have

3  read the foregoing transcript of my testimony held on January

4  30, 2023, in the matter of Lieber v. Marquis Management, et

5  al., and further certify that it is a true and accurate

6  record of my testimony (with the exception of corrections

7  listed below):

8  Page      Line           Correction

9  ____      ____      _____

10 ____      ____      _____

11 ____      ____      _____

12 ____      ____      _____

13 ____      ____      _____

14 ____      ____      _____

15 ____      ____      _____

16                     _____

17                            RYAN DENVER

18 Subscribed and sworn to before me this ___6th___ day

19 of _March_, 2023.

20 _____

21          Notary Public/Justice of the Peace

22       My commission expires _____

23

```
1                         CERTIFICATE

2

3          I, Michele M. Allison, a Licensed Court Reporter,

4  Registered Professional Reporter and Certified Realtime

5  Reporter, do hereby certify that the foregoing is a true and

6  accurate transcript of my stenotype notes of the deposition

7  of RYAN DENVER, who was duly sworn, taken place on the date

8  hereinbefore set forth.

9          I further certify that I am neither attorney nor

10 counsel for, nor related to or employed by any of the parties

11 in the action to which this deposition was taken, and further

12 that I am not a relative or employee of any attorney or

13 counsel employed in this case, nor am I financially

14 interested in this action.

15         THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES

16 NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS

17 UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING

18 REPORTER.

19

20              Michele M. Allison, LCR, RPR, CRR
                N.H. Licensed Court Reporter
21              No. 93 (RSA 310-A:161-181)

22

23
```

*Michele Allison*

(Seal: LICENSED COURT REPORTER / MICHELE M. ALLISON No. 93 / SHORTHAND / STATE OF NEW HAMPSHIRE)