UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Daniel P. Lieber

     v.

                                   Civil No. 1:21-cv-968-JL
                                   Opinion No. 2023 DNH 112 P

Marquis Management, LLC, et al

## **MEMORANDUM ORDER**

The outcomes of the summary judgment motions in this employment case largely turn on the reasoning, timing, and source of an employer's decision to terminate the plaintiff—much of which is in dispute. The plaintiff, Daniel Lieber, alleges that he was retaliated against and wrongfully terminated from his position as Chief Information Officer at defendant Marquis Management, LLC because he reported concerns about safety issues and compliance with COVID-19 protocol, and because he requested accommodations for a disabled employee that he hired. Lieber brings suit against his former employer, Marquis Management, as well as co-defendant Select Demo Services, LLC, under the "single employer" theory. Lieber asserts seven claims against the defendants. He brings retaliation claims under the Americans with Disabilities Act and state law, associational discrimination claims under the ADA and state law, and additional state law claims for wrongful termination, violation of the New Hampshire Whistleblower Protection Act, and unpaid wages. The defendants move for summary judgment on each of Lieber's claims, and Lieber also moves for summary judgment on his unpaid wage claim.

This court has subject-matter jurisdiction over the case under 28 U.S.C. § 1331 (federal question). After reviewing the parties' submissions and hearing oral argument, the court concludes that Lieber's claims survive summary judgment—except for his associational discrimination claims, which fall outside of the ADA's association provision—because several, material disputes of fact remain as to each of them.  The court makes two additional rulings, however, that result in partial dismissal of the remaining claims.  First, Lieber's WPA claim is dismissed insofar as it is predicated on activities in which Lieber engaged after his termination, as such conduct is not protected under the WPA.  Finally, each of the remaining state law claims is dismissed as against Select Demo because the court does not find that New Hampshire law recognizes the "single employer" theory.

## I.      Applicable legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine issue is one that could be resolved in favor of either party, and a material fact is one that has the potential of affecting the outcome of the case." Vera v. McHugh, 622 F.3d 17, 26 (1st Cir. 2010) (internal quotation omitted).

At the summary judgment stage, the moving party must "assert the absence of a genuine issue of material fact and then support that assertion by affidavits, admissions, or other materials of evidentiary quality." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003) (citing Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992)).  Where the nonmovant bears the ultimate burden of proof, once the movant

has made the requisite showing, the nonmovant can no longer "rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." Torres-Martínez v. P.R. Dep't of Corr., 485 F.3d 19, 22 (1st Cir. 2007) (internal quotation omitted). "Mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact." August v. Offices Unlimited, Inc., 981 F.2d 576, 580 (1st Cir. 1992). In other words, if the nonmovant's evidence is "merely colorable" or "not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (internal citations omitted).

As it is obligated to do in the summary judgment context, the court "rehearse[s] the facts in the light most favorable to the nonmoving party . . . , consistent with record support[,] . . . giv[ing] the nonmovant the benefit of all reasonable inferences that those facts will bear." Noviello v. City of Boston, 398 F.3d 76, 81-82 (1st Cir. 2005) (internal citation omitted).

## II.    **Background**[1]

The following facts are undisputed, except where noted. For added context, the court also points out some broader areas of dispute.

---

[1] The court issued an Order on April 11, 2023 granting the defendants' motion to seal certain exhibits to their motion for summary judgment. See doc. no. 75. In the April 11 Order, the court noted that the public has a "presumptive right of access . . . to those materials 'which properly come before the court in the course of an adjudicatory proceeding and which are relevant to that adjudication.'" In re Providence Journal Co., Inc., 293 F.3d 1, 9 (1st Cir. 2002) (quoting FTC v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 412-13 (1st Cir. 1987)). In light of this principle, the April 11 Order further states, "at this time, the court has no intention of sealing any aspect of its orders on the [parties'] summary judgment motions. To the extent the court relies on or makes reference to any sealed exhibit or information therein—and it finds that, under the circumstances,

The defendant, Marquis Management (the company), provides HR, payroll, IT, employment benefits, and other services to various companies, including the co-defendant, Select Demo.  The company hired Lieber as its Chief Information Officer in September 2018.  In this role, Lieber managed the company's IT department and helped provide IT services to the company's clients.  The company has several offices, including at One Delaware Drive and 40 Lowell Road in Salem, New Hampshire.  Various IT employees and the IT "help desk" were located in the Delaware Drive office.  The company also maintained a shared IT office space on the first floor of the Lowell Road location.

Various management-level employees at the company and at Select Demo took part in events that are relevant to this case.  Jon Marquis owns Marquis Management and also holds an ownership interest in Select Demo.  Christopher Moore has been the Chief Financial Officer of the company since January 2021, and he became Lieber's supervisor at some point during Lieber's employment, including the time periods relevant to this litigation.  Scott Watkins is the Director of Human Resources at Marquis Management, and he provides human resources services to Select Demo, as well.  Finally, Ryan Denver is Select Demo's President.

---

the public's right to access that exhibit or information outweighs the defendants' reasons for sealing it—the court will unseal any such exhibit or information . . . contemporaneously with the issuance of its orders."  Doc. no. 75 at 1-2.  The court did rely on some of the sealed exhibits in reaching its ruling on the motions for summary judgment, and the court finds that the public's right to access those exhibits outweighs the defendants' reasons for sealing them.  Accordingly, any documents the court cites in this Order that were previously sealed are hereby unsealed.

Both Marquis and Moore received complaints about Lieber during his tenure as CIO.  Some company employees complained that Lieber would not provide them with the IT equipment that they needed for their jobs.  Certain managers reported that Lieber was difficult to work with, and they tried to avoid working with him and the IT Department.  While Lieber does not dispute these facts, he attributes the complaints, at least in part, to the defendants' requests that Lieber reduce the IT budget.  Also, both Marquis and Moore believed that Lieber had trouble "stay[ing] within his own lane," in that he got involved in company matters that were not within his realm of responsibility.[2]

Beginning around July 23, 2020, Marquis' sister, Melissa Marquis, initiated a review of the company's IT Department.  At that time, she was the Director of Technology at a private investment management firm, and she was not an employee at the company.  The parties disagree as to the impetus for this IT review, with the defendants asserting that Marquis gave Melissa this task due to concerns about Lieber's performance, and Lieber pointing to places in the record where other reasons were cited, including issues surrounding the IT budget.

On July 26, Moore and Melissa exchanged emails in which Melissa mentioned some "red flags" concerning Lieber, including "the poor relationships, lack of trust, misdirection[,] and his deliberate confusion over reporting lines."[3]  Melissa's email did

---

[2] Jon Marquis Deposition ("J. Marquis Dep.") (doc. no. 80-9) at 27:11-12; see also Christopher Moore Deposition ("Moore Dep.") (doc. no. 80-3) at 53:21-54:1.

[3] Doc. no. 62-26 at 2.

not detail the source or basis of these judgments.  Moore replied and asked, "[i]f we were to replace [Lieber], would you be able to help in the search for a new IT Director?"[4]  That same day, Melissa wrote that she "absolutely would be happy to help search for a new IT director."[5]

Moore and Watkins met with Lieber a few days later, on July 29, 2020.  The parties pose differing narratives regarding the content and purpose of the meeting, with Moore testifying that the meeting constituted an "undocumented verbal warning" to Lieber,[6] and Lieber claiming that the meeting was not of a disciplinary nature.[7]  The parties agree on two of the topics discussed at the meeting.  Lieber testified that they discussed complaints concerning "the [IT] equipment that was being distributed and a desire for it to be newer equipment instead of having reused equipment."[8]  Lieber also testified that, during the meeting, someone "restat[ed]" that Lieber "reported to Mr. Moore."[9]

---

[4] See id. at 2 (Moore writes to Melissa, "If we were to replace [Lieber], would you be able to help in the search for a new IT Director?").  In their Motion for Summary Judgment, the defendants cite this document as support for the fact that Moore "asked for Ms. Marquis' assistance if Marquis Management were to replace Plaintiff."  Defs.' Mot. for Summ. J. (doc. no. 62-1) at 10.  In his objection, Lieber disputes this fact, but he does not provide record support challenging it.  This fact accordingly forms part of the summary judgment record.

[5] Doc. no. 62-26 at 3.

[6] Moore Dep. (doc. no. 80-3) at 146:23.

[7] See Daniel P. Lieber Deposition ("Lieber Dep.") (doc. no. 80-12) at 179:21-23.

[8] Id. at 179:4-6.

[9] Id. at 179:10-11.

Two days later, on July 31, as part of her review, Melissa met with eleven managers and staff members, not including Lieber.  Melissa also drafted an "IT Needs Assessment" reflecting her observations from the IT review, and she sent a draft of it to Moore on August 18.  The Assessment covered various topics, including feedback on IT support staff, IT equipment, and Lieber, as well as recommendations for tracking and reviewing the IT budget, managing IT equipment, and increasing "IT effectiveness."[10]

### A. Lieber raises ADA compliance concerns

Around August 28 or September 1, 2020, Lieber hired a Senior Technical Support & Network Specialist, Beth Anne Collopy,[11] for the IT department.  Collopy has "a disability; specifically, a severe mobility limitation."[12]

On the afternoon of November 19, Lieber sent an email to Moore and Ryan Dogil, Select Demo's Planning Director, regarding a proposal to remove the first-floor IT office space at Lowell Road.  The first-floor office was originally set up at Moore's request, and

---

[10] See doc. no. 62-28 at 6-10 (filed under seal).

[11] Collopy has a pending case against Marquis Management in this court, as well.  Collopy v. Marquis Management, LLC, 22-cv-00184-SE.

[12] This fact appears in the plaintiff's first amended complaint.  First Am. Compl. (doc. no. 18) at ¶ 21.  Though the defendants refer to Collopy's mobility limitation as an "alleged disability" in their motion for summary judgment, see, e.g., Defs.' Mot. for Summ. J. (doc. no. 62-1) at 19, the defendants admitted in their answer that Collopy "has a disability as alleged" in the complaint, and they did not respond to the legal conclusion that Collopy has "status under the ADA or any other state or federal law."  Am. Answer (doc. no. 42) at ¶ 21.  Accordingly, the fact that Collopy has a severe mobility limitation forms part of the summary judgment record.  See Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., 976 F.2d 58, 61 (1st Cir. 1992) ("admissions in the pleadings are binding on the parties and may support summary judgment against the party making such admissions" (quoting Missouri Housing Dev. Comm'n v. Brice, 919 F.2d 1306, 1315 (8th Cir. 1990))).

not as an accommodation for Collopy or someone else.  IT employees sometimes used the office to perform "help desk" services.

In his email, Lieber wrote that "the IT office can move, [but] it must remain on the first floor."[13]  Dogil responded that "IT will not be able to remain on the first floor," and Lieber replied, "[i]f IT is on the [second] floor, there will be a significant ADA compliance issue that will need to be addressed with an elevator and emergency evacuation plan . . . [and IT] need[s] a location where we can have reasonably private conversations with staff members."[14]  Dogil concluded that "we don't need help desk onsite at 40 Lowell."[15]  Following this email exchange, Lieber and Moore discussed the possibility of using a first-floor conference room in the Lowell Road office for private conversations, if needed.  Collopy first sought to use the first-floor office space at Lowell Road on January 14, 2021.  Lieber did not inform Collopy of the potential option of reserving the first-floor conference room, and she did not attempt to reserve the conference room at any time.

The parties disagree as to the source of Lieber's concerns regarding the removal of the first-floor office.  Lieber testified that he emailed Moore and Dogil after Collopy told him that she required access to a first-floor office space at Lowell Road.[16]  The

---

[13] Doc. no. 62-45 at 3 (filed under seal).

[14] Id. at 2-3.

[15] Id. at 2.

[16] See Lieber Dep. (doc. no. 80-12) at 205:16-206:1.

defendants, on the other hand, contend that Collopy "did not ask [Lieber] to complain on her behalf."[17]

Lieber did not raise concerns regarding ADA compliance with Marquis.  Also, Marquis did not know that Lieber discussed the first-floor office space, the first-floor conference room, and ADA-related issues with Moore or Dogil.  More generally, Marquis did not participate in Collopy's hiring, and he only met Collopy once.  The record lacks any evidence that Marquis knew that Collopy was disabled, or that she had an association or connection with Lieber.

### B.  Lieber reports issues related to COVID-19 and safety

Lieber reported concerns about compliance with COVID-19 guidelines at various points during his tenure.  On November 20, 2020, Lieber told Watkins that he saw employees gathered in the warehouse without masks on the night of November 19, in violation of the company's COVID-19 policies.  Watkins followed up with the employees' managers and thanked Lieber for the information.

On November 24, Lieber told Watkins that he had heard that a female employee in another office was sick and unmasked.  Watkins contacted the employee's manager, who disputed that the employee had COVID-19 and stated that she was wearing a mask. Watkins instructed the manager to send the employee home and, on November 25, issued a company-wide email regarding COVID-19 policies. The email stated, in part, that the Lowell Road office had two confirmed positive COVID-19 cases, and people who had

---

[17] Defs.' Mot. for Summ. J. (doc. no. 62-1) at 10.

contact with the infected individuals were notified and sent home.[18]  Prior to Lieber's

termination, Marquis was not aware of Lieber's complaints regarding COVID-19

guidelines.

Lieber also reported purported safety-related issues at various times.  Lieber

reported at least some of these issues to Sebastian Brooks, the company's Director of

Environmental Health & Safety.  Lieber testified that Brooks "seemed very amenable

when safety issues were brought up," thanked Lieber for notifying him when Lieber

almost tripped on an extension cord, and "was supportive of having fall prevention

components put in place" when Lieber raised that issue.[19]  The defendants call into

question the importance and validity of these safety concerns.  The parties agree that

Lieber did not report safety-related issues to Marquis, but they dispute whether Marquis

had knowledge of these reports.

### C.  November 2020 events leading up to Lieber's December 1 termination

A series of conversations occurred in November 2020 regarding Lieber's

termination.  On November 6, 2020, Melissa conducted a meeting with Lieber at Moore's

request.  In advance of the meeting, she sent an email to Lieber explaining that she

wanted to have "an initial intro[duction] of [one] hour," and that her "role is as an

informal IT advisor primarily to help forward some of the goals [Moore] has outlined by

understanding [Lieber's] thought process and some of the IT capabilities and

---

[18] See doc. no. 62-47 at 2.

[19] See Lieber Dep. (doc. no. 80-12) at 256:20-21, 256:22-257:5, 257:12-17.

constraints."[20]  Leither raised the topic of Marquis' "exit strategy" from the company

during the meeting.  This was not the first time Lieber broached this subject.  He also

asked Marquis about his exit strategy, or succession plan, in 2018.

Following the meeting, Lieber emailed Melissa, thanking her for the discussion

and adding that "[t]he idea of feedback is also reciprocal.  If there are issues or challenges

you are facing and you would like an outside perspective, I'm happy to assist."[21]  He

explained that he is "very familiar with financial compliance needs," and, "[g]iven the

nature of [Melissa's] business, . . . a reciprocal NDA would probably be appropriate" if

she sought his feedback.[22]

Melissa replied at 5:13 pm on November 11, blind copying Moore, stating that she

"can appreciate the offer" but "this is not a reciprocal arrangement."[23]  Moore texted

Melissa shortly thereafter, at 6:01 pm, acknowledging that he read her email exchange

with Lieber.  He wrote that "[i]t is clear [Lieber] doesn't get it at this point.  I have a

meeting scheduled with HR tomorrow to discuss options."[24]  At 6:15 pm, Moore sent an

email to Lieber asking for "any open contracts" that the company had with Innovative

Ideas Unlimited, Inc., Lieber's wholly-owned consulting company, which provides

---

[20] Doc. no. 81-7 at 1.

[21] Id. at 2.

[22] Id.

[23] Id. at 3.

[24] Doc. no. 62-35 at 3 (filed under seal).

certain IT-related services.[25]  A few minutes later, Moore sent a text message to Marquis, informing him that Moore planned to meet with Watkins the following day "to come up with a contingency plan for [Lieber's] position."[26]  At 6:40 pm, Marquis responded "[o]k" to Moore's text message.[27]

A few hours later, Moore forwarded the November 11 email exchange between Melissa and Lieber to Watkins, writing that "[Lieber] does not get it.  We are going to have to come up with a contingency plan soon."[28]  Later that night, Moore sent Watkins the resume of an IT Director for a company in Massachusetts.[29]

The following day, on November 12, Watkins corresponded with an individual to obtain his resume for the CIO position.[30]  On November 13, Melissa sent Moore an email with a step-by-step plan for terminating Lieber and finding his replacement, with a "[t]arget" of "deliver[ing] [the] message" on the week of November 30, 2020.[31]  The email listed a number of tasks, including "develop[ing] [a] termination message . . . focus[ed] on 1-2 primary problematic areas that have the strongest history and clear to demonstrate below expectations performance"; "develop[ing] [a] job description";

---

[25] Doc. no. 62-32 at 2 (filed under seal).

[26] Doc. no. 62-34 at 2 (filed under seal).

[27] Id.

[28] Doc. no. 62-31 at 2 (filed under seal).

[29] See doc. no. 62-33 at 2-4.

[30] See doc. no. 62-36 (filed under seal).

[31] Doc. no. 62-39 at 2.

conducting "internal discussions" with "a limited set of managers that should receive a heads up"; and "[r]eview[ing] readiness for message delivery."[32]  A couple hours after Melissa sent this email, Moore sent a text message to Watkins stating that "[w]e need a plan to terminate [Lieber].  We are doing it the week of [November 30]."[33]

A couple of days later, on November 15, Marquis sent a text message to Moore, Watkins, Denver and other managers to set up a meeting for November 19 at 9 am. Marquis discussed Lieber's termination at this meeting, though the parties dispute whether the termination decision was final, and not subject to further influence or change, by that time.  Lieber was subsequently terminated on December 1.

### D. Post-termination events

On December 1, after Lieber's termination, Denver contacted Lieber and offered to give him an employment reference.  Following that, on December 11, Marquis asked Watkins to update the employee handbook to state that managers should not provide references.  Marquis also asked Watkins to send an email to staff with this information. In the email, Watkins wrote, in part, that "[a]ll reference requests regarding current or former employees must be referred to the [HR] Department[,] . . . [and] [m]anagers are advised not to provide references on behalf of the company without consulting [HR] beforehand."[34]  The parties dispute when this no-referral policy arose.  The defendants

---

[32] See id.

[33] Doc. no. 62-38 at 3 (filed under seal).

[34] Doc. no. 61-15 at 35.

assert that Watkins was merely formalizing an unwritten policy that had been in place for about ten years, while Lieber contends that no such policy previously existed. Denver did not ultimately receive a reference request or provide a reference for Lieber.

A month after Lieber's termination, on December 30, 2020, Lieber filed a whistleblower complaint with the Occupational and Safety Health Administration. In the complaint, Lieber alleges that he engaged in OSHA-protected activity by, for example, reporting concerns regarding safety and compliance with COVID-19 protocol. The company received the complaint on January 20, 2021.

Some weeks later, around March 2021, an employee of the defendants received a reference request for Lieber and directed it to Watkins. The parties disagree as to the content of Watkins' response to the request. According to Lieber, Watkins refused to provide a reference; according to the defendants, "pursuant to company policy, [Watkins] confirmed [Lieber's] position and dates of employment."[35]

## III.   Analysis

### A.   Retaliation claims (Counts 3 and 4)

Lieber asserts that the defendants retaliated against him for "reporting disability discrimination toward [Collopy]" and "advocating for appropriate reasonable accommodation," in violation of Title V of the ADA (Count 3) and New Hampshire's law against discrimination, NH RSA 354-A:7, I (Count 4).[36]  The parties agree that the

---

[35] Defs.' Mot. for Summ. J. (doc. no. 62-1) at 13.

[36] See First Am. Compl. (doc. no. 18) at ¶¶ 65-71.

same legal standards apply to both retaliation claims. These claims are subject to "the familiar burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-03" (1973). D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 41 (1st Cir. 2012).

First, to establish a prima facie case for retaliation, Lieber "must show that: (1) []he was engaged in protected conduct; (2) suffered an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse action." Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 36 (1st Cir. 2011) (internal citations omitted). "Once a prima facie case of retaliation is established, the burden shifts to the employer 'to articulate a legitimate, nondiscriminatory reason for its employment decision.'" Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991)). "The employer's burden is 'one of production, not persuasion.'" Carreras v. Sajo, García & Partners, 596 F.3d 25, 36 (1st Cir. 2010) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)). Finally, "if the employer provides a legitimate reason, the ultimate burden falls on the plaintiff to show that the employer's proffered reason is pretext masking retaliation." Wright, 352 F.3d at 478 (internal quotation omitted).

The defendants argue that Lieber's retaliation claims fail as a matter of law because he cannot establish a prima facie case. They then contend that, even if Lieber sets out a prima facie case, he cannot show that the defendants' legitimate reasons for terminating him are pretextual. The court considers each argument in turn and concludes

that material, factual disputes remain as to both issues, which preclude summary judgment on Counts 3 and 4.

***Prima facie case.***   First, the defendants assert that Lieber cannot satisfy the causation element of the retaliation claim because he engaged in allegedly protected activity only after the termination decision was made.   According to the defendants, Marquis announced his final decision to terminate Lieber at the November 19 morning meeting, and Lieber first engaged in purportedly protected activity later that afternoon, when he emailed Moore and Dogil regarding the floor plan change at the Lowell Road office.   Even if the termination decision was final as of the morning of November 19 (a point that Lieber does not concede, and the record does not resolve),[37] the defendants'

---

[37] See Pl.'s Objection (doc. no. 80-1) at 21 n.6 ("Lieber reserves the right to dispute that a final decision to terminate his employment was made by November 19, 2020, at trial").   In their statement of material facts, the defendants state that "Mr. Marquis announced he had decided to terminate Plaintiff" during the November 19 meeting, and they support this assertion with deposition testimony from Marquis and three meeting attendees, which reiterate that Marquis did discuss Lieber's termination at the meeting.   See Defs.' Mot. for Summ. J. (doc. no. 62-1) at 12-13.   This testimony does not definitively confirm that the decision to terminate Lieber was final at that time.   In his statement of additional facts, Lieber attempts to dispute that Marquis announced a final termination decision on November 19.   Lieber points to the deposition testimony of Marquis and five meeting attendees, but these excerpts do not directly address whether, or refute that, the termination decision was final.   Lieber also cites Watkins' deposition testimony, in which he asserted that "when [managers] come to [him]" regarding a termination decision, he "consult[s]" with them regarding whether "they followed necessary steps or if the termination reasoning is correct and legal."   Scott Watkins Deposition ("Watkins Dep.") (doc. no. 80-8) at 13:19-14:2.   Lieber then directs the court's attention to Moore's testimony, which confirms that Moore did not speak to Watkins prior to November 19 regarding whether Lieber's termination would be lawful.   See Moore Dep. (doc. no. 80-3) at 63:12-21.   Drawing all reasonable inferences in Lieber's favor, the record evidence Lieber cites, though not resounding, is sufficient to create a triable issue of fact for the jury as to whether the termination decision was final by November 19.

argument is defeated by record evidence indicating that Lieber requested at least one

accommodations for Collopy prior to that date.

Indeed, Collopy testified that, when Lieber called to offer her a job, she asked if

railings could be added to "the step in the middle of [the] One Delaware [Drive office,]"

as "that's a difficult step for [her] to climb."[38]  On August 31, 2020, Lieber wrote an

email to Watkins and two other individuals noting that Collopy had mobility limitations

and would begin working at the company the following day.  In the email, Lieber

requested the installation of "a short railing on each side of the step in the center of [One]

Delaware . . . so [Collopy] w[ould] have an easier time navigating the step[,]" and could

avoid "tak[ing] the long way around the warehouses . . . ."[39]  The railing was ultimately

installed as requested.  The defendants do not dispute that this email constitutes a request

for an accommodation.  As such, it "is protected conduct for purposes of the ADA's

retaliation provision."  Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 106 (1st

Cir. 2007) (internal citation omitted).  Also, the fact that the railing was ultimately

installed is not fatal to the retaliation claim, as "[a]n ADA plaintiff may assert a claim for

retaliation even if she fails to succeed on a disability claim."  Id.

Next, the defendants argue that Lieber did not engage in protected conduct by

writing the November 19 email concerning the Lowell Road office.  According to the

---

[38] Beth Anne Collopy Deposition (doc. no. 80-18) at 70:14-19.

[39] Doc. no. 80-21; see also Lieber Dep. (doc. no. 80-12) at 194:13-15 ("I reached out – at
[Collopy's] request, I reached out to have handrails installed on either side of a stair in the
middle of One Delaware.").

defendants, Lieber's email did not constitute an accommodation request because he did not reference a particular disabled employee, and because the first-floor office space was never an accommodation.  At least two pieces of evidence in the record undercut the defendants' position.  First, as discussed above, Lieber mentioned Collopy's mobility limitations in his August 31 email to Watkins requesting a handrail.  Second, on September 2, Collopy informed Watkins of her mobility limitations in an email regarding "some paperwork" she needed to complete.[40]  Collopy asked if Watkins could bring the papers downstairs because "[s]tairs are a problem for [her]."[41]  Watkins replied within a few minutes and agreed to do so.[42]  Under these circumstances, a jury could reasonably conclude that Lieber did not need to specifically reference Collopy in the November 19 email in order for Watkins to link the ADA concerns to Collopy.  The fact that the first-floor office was not established as an accommodation is not compelling, either, since the record regardless does not foreclose the possibility that Collopy, as a member of the IT team, could seek access to the shared IT office to conduct her work, and her access would be thwarted if the office was moved to a higher floor.

The defendants also contend that no rational jury could find a causal link between Lieber's protected activity and his termination because the individual who made the termination decision, Marquis, was unaware of the protected activity.  Lieber does not

---

[40] Doc. no. 80-20.

[41] Id.

[42] Id.

dispute that Marquis lacked knowledge of these matters.  Instead, he asserts that Moore,

Watkins, and others who also knew of Collopy's disability and Lieber's accommodation

request(s), made or contributed to the termination decision.[43]

The summary judgment record reasonably supports the inference that Moore

and/or Watkins served as sole or joint decisionmakers.  For example, Moore and Melissa

discussed Lieber's purported "red flags" and the possibility of seeking a new CIO in an

email exchange in July 2020.  Melissa also reported negative feedback regarding Lieber

in her IT Needs Assessment, which she sent to Moore in August 2020.  Under the

heading "initial observation summary," Melissa wrote, in part: "[h]igh degree of

frustration and productivity impact with regard to equipment reliability and repair/replace

cycle"; "[f]eedback on IT support staff is largely positive"; and "[f]eedback for the

CIO . . . was largely negative[,] [and] CIO is not seen as an effective partner."[44]  Months

later, on November 11, Moore wrote to Melissa that "Lieber doesn't get it," and that he

had already scheduled a meeting with HR (presumably Watkins) for the next day "to

discuss options."[45]  Then, Moore contacted Lieber to request information about contracts

---

[43] As an example, the record contains evidence indicating that Moore and Watkins were aware of Lieber's August 31 request for handrails for Collopy.  In their amended answer, the defendants admitted that "Mr. Moore and Mr. Watkins were aware that Plaintiff had previously requested an accommodation for [Collopy], and that the requested accommodation, in the form of dual handrails on either side of a single step raised landing in the middle of the building, had been installed in October 2020."  Am. Answer (doc. no. 42) at ¶ 26.  Also, as discussed above, Watkins received Lieber's August 31 email requesting the handrails.

[44] Doc. no. 62-28 at 5 (filed under seal).

[45] Doc. no. 62-35 at 3 (filed under seal).

that the company maintained with Lieber's consulting company, ostensibly as a step towards determining how to unravel the employment and consulting relationship with Lieber.  None of these exchanges involved Marquis.  <u>After</u> those exchanges—later on November 11—Moore informed Marquis that he intended to speak with Watkins the next day "to come up with a contingency plan for [Lieber's] position," and Marquis replied, "ok."[46]

Following this, Watkins and Moore obtained the resumes of individuals who could potentially fill the CIO role.  Subsequently, on November 12, Melissa texted Moore that it was the "right decision to move forward with finding a replacement for [Lieber]," and she asked if her brother knew about the "'exit strategy' comment" that Lieber made to her, as well as "other red flags."[47]  Moore replied that he had not shared this information with Marquis.  Moore later wrote that he "spoke to [Marquis] to fill him in" and that they "definitely need a solid strategy to move on from [Lieber]."[48]

Viewing this evidence in the light most favorable to Lieber, the court finds that a reasonable jury could conclude that Moore and/or Watkins considered Lieber's actions

---

[46] Doc. no. 62-34 at 3 (filed under seal).  The defendants contend that, in this text message exchange, Moore sought and obtained Marquis's approval to pursue a contingency plan.  <u>See</u> Defs.' Reply (doc. no. 89) at 3.  The court finds that the language of the message is not inconsistent with Moore expressing his recommendation, or his determination, that Lieber should be terminated, and Marquis acknowledging the decision.  Thus, contrary to the defendants' contention, these text messages do not remove any dispute regarding whether Marquis made the termination decision.

[47] Doc. no. 81-12 at 2-3 (filed under seal).

[48] <u>Id.</u> at 3.

and/or performance, discussed Lieber's future at the company, individually or jointly came to a tentative or final decision to terminate Lieber, and <u>then</u> reported the decision and reasoning up to Marquis, who joined in the decision or merely announced and executed it. Under this theory, Marquis was not the sole and/or final decisionmaker, and, thus, his lack of knowledge about Lieber's protected activity is not fatal to the retaliation claims. In sum, the defendants do not merit summary judgment on the ground that Lieber cannot set out a prima facie case of retaliation.

**Pretext.** The defendants finally contend that Lieber cannot sustain his burden to show that the defendants' legitimate, non-discriminatory reasons for terminating him are pretextual. "In assessing pretext, a court's focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 246 (1st Cir. 2006) (internal quotation and citation omitted). In order to meet this burden, "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination.'" Id. (internal quotation and alterations omitted). The court also bears in mind that it must "exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000) (citing Hodgens v. General Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998)).

The defendants claim that Lieber was terminated based on "well-documented, longstanding performance issues, culminating in Plaintiff seeking information regarding Jon Marquis' succession plans or an 'exit strategy,' which for Mr. Marquis was 'the last straw.'"[49]  More specifically, during his deposition, Marquis testified that Lieber was fired because he asked about his succession plan and, relatedly, he was "not . . . able to stay within his own lane."[50]  Marquis also specified during his deposition that "[t]he last question [that Lieber asked] to [Marquis'] sister[,]" regarding his exit strategy, "was . . . literally[ ] the last straw."[51]

Lieber points to evidence that casts doubt on the credibility of both of these stated justifications.  For example, though the defendants claim that Lieber's performance issues were  "well-documented," his personnel file lacks any record of disciplinary measures or written or verbal warnings.[52]  When asked about this, Watkins testified that

---

[49] Defs.' Mot. for Summ. J. (doc. no. 62-1) at 16-17.

[50] See J. Marquis Dep. (doc. no. 80-9) at 27:8-12 ("Q. Okay.  And, sir, the only reason that Mr. Lieber was terminated was because he asked about your succession plan; is that right?  A. That, and not being able to stay within his own lane, which that fell into.").

[51] Id. at 27:17-18.

[52] See doc. no. 80-13 at 2, 20-42.  Though the defendants do not, and cannot, dispute that Lieber's personnel file lacks documentation of performance issues, the defendants insist that "reoccurring complaints concerning Plaintiff's performance are a matter of documented proof, as is the resulting review that Melissa Marquis conducted in July 2020 into Plaintiff's fitness to lead the company's IT Department."  Defs.' Mot. for Summ. J. (doc. no. 62-1) at 22.  Melissa's IT Needs Assessment did document negative feedback regarding Lieber, as previously discussed.  Though Lieber does not argue this at length, it bears noting that certain facts surrounding Melissa's IT review—including the relatively short time period between her meeting with Lieber and his termination, the factual disputes surrounding the impetus for the IT review, and Melissa's position as an unpaid, informal consultant who is also the sister of the owner of the company— may lead a trier of fact to infer that the IT review was directed at identifying or developing grounds for Lieber's termination.  Such inferences, if drawn, could limit the weight that the trier

the complaints concerning Lieber "did not rise to th[e] level" that required documentation under the company's discipline policy.[53]  Watkins' testimony points to an inconsistency or contradiction in the proffered reasons for termination, which "can give rise to an inference of pretext"—indeed, it is not necessarily credible that performance issues that do not merit documentation can warrant termination.  See Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 33 (1st Cir. 2012) ("'Weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffer' can give rise to an inference of pretext." (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997))).

With respect to the "last straw"—Lieber's November 2020 discussion of Marquis' exit strategy—Melissa testified that it would be "silly" to terminate Lieber based only on the fact that he discussed this topic.[54]  Further, Lieber testified that Marquis "seemed perfectly fine" when Lieber previously asked him about his succession plan in 2018.[55] Indeed, Lieber retained his position at the company after he broached this topic with Marquis.  And roughly one year later, in December 2019, Marquis and Moore approved

---

of fact places on the critiques of Lieber's performance documented in Melissa's IT Needs Assessment.  For this reason and others discussed in Section III.A, material disputes of fact remain as to whether the defendants' proffered reasons for terminating Lieber are pretextual.

[53] See Watkins Dep. (doc. no. 80-8) at 55:3-11.

[54] See Melissa Marquis Deposition (doc. no. 80-10) at 47:1-5 ("as I understood it, they had – had . . . concerns about [Lieber's] performance, and that this one ['exit strategy'] statement, . . . if this was mentioned or it was, you know, officially the last straw or not officially the last straw, whatever it was, seems a bit silly to me.").

[55] See Lieber Dep. (doc. no. 80-12) at 154:22-155:16.

Lieber's request for a $65,000 raise, which increased his base salary from $125,000 to $190,000.[56]  Moore testified that this was the biggest raise he had given someone at the company at that point.[57]  It can be perceived as inconsistent, or dubious, that Marquis and/or Moore would have a markedly different reaction to the "exit strategy" comment, and consider it a basis for termination, just one year later.

The sequence of events leading up to Lieber's termination further adds to the inference of pretext and discriminatory animus.  As discussed above, Lieber requested an accommodations for Collopy during the Fall of 2020 and again on November 19, 2020—close in time to the discussions regarding "contingency plans" for his position, which took place in early and mid-November, as well as his termination, which occurred on December 1.  See Hodgens, 144 F.3d at 168 ("protected conduct closely followed by adverse action may justify an inference of retaliatory motive" (internal quotation omitted)).  On top of that, as previously discussed, Marquis testified that Lieber was fired, in part, because he was "not . . . able to stay within his own lane," that is, "[h]e ha[d] a habit of appearing in places he shouldn't appear and talking about things that he ha[d] no expertise in, which is not helpful, and breeds a little bit of animosity."[58]  It is not unreasonable to infer from Marquis' wording and from Lieber's engagement in protected

---

[56] See doc. no. 80-13 at 23 (indicating that Lieber's base rate of pay was increased from $125,000 to $190,000 on December 11, 2019); Moore Dep. (doc. no. 80-3) at 71:4-17 (explaining the Lieber requested a pay increase, and that Moore "discussed it with [Marquis], and [Moore and Marquis] gave him the pay increase" in December 2019).

[57] See Moore Dep. (doc. no. 80-3) at 72:5-13.

[58] See J. Marquis Dep. (doc. no. 80-9) at 24:11-14, 27:8-12.

activity around the time of the adverse employment action that Lieber's termination was driven in part by discriminatory animus.

Based on the above, Lieber has shown "that a genuine issue of material fact exists about whether retaliation was the true motive for the adverse employment action in question." Posteraro v. RBS Citizens, N.A., 159 F. Supp. 3d 277, 290-91 (D.N.H. 2016). Accordingly, the court denies summary judgment as to the retaliation claims.

## B.    Associational discrimination claims  (Counts 1 and 2)

In addition to claiming that the defendants retaliated against him for advocating for Collopy, Lieber also claims that the defendants discriminated against him due to his association with Collopy, in violation of Title I of the ADA (Count 1) and New Hampshire's law against discrimination, RSA 354-A (Count 2).[59]  The parties agree, again, that the same standards apply to the ADA and state law claims.  To establish a prima facie case of associational discrimination, "a plaintiff must show that (1) he experienced an adverse employment action; (2) he was qualified to perform his job at the time; (3) the employer knew the employee associated with a disabled person; and (4) the circumstances of the adverse employment action give rise to a reasonable inference that this association was a determining factor in the employer's decision." Morin v. E. Bearings, Inc., No. 20-CV-615-PB, 2020 WL 7406391, at *5 (D.N.H. Dec. 16, 2020) (Barbadoro, J.) (internal citations omitted).

---

[59] See First Am. Compl. (doc. no. 18) at ¶¶ 54, 62.

The defendants argue that Counts 1 and 2 fail as a matter of law because Lieber's allegations do not fit within the framework of an associational discrimination claim.  In making this argument, the defendants point to Oliveras-Sifre v. Puerto Rico Dep't of Health, a case concerning "three [plaintiffs] who were hired by the Puerto Rico Department of Health to perform advocacy work for persons with AIDS."  214 F.3d 23, 24 (1st Cir. 2000).  The plaintiffs asserted retaliation and discrimination claims under the ADA after the Department refused to renew their contracts.  Though the plaintiffs did not bring an associational discrimination claim, the First Circuit Court of Appeals considered the history and scope of the association provision of the ADA in order to determine the viability of such a claim at the motion to dismiss stage.

First, and critically, the Oliveras-Sifre Court found that the association provision protects "qualified individuals from adverse job actions based on unfounded stereotypes and assumptions arising from the employees' relationships with particular disabled persons."  Id. at 26 (internal quotation omitted).  The Court then noted that "[t]he [Equal Employment Opportunity Commission] also has concluded that this was the intended scope of the provision, as indicated through the three examples of forbidden association discrimination" set forth in the EEOC's Interpretive Guidance:

> (1) refusal to hire where the employer makes an unfounded assumption that the employee will miss work in order to care for a disabled relative; (2) discharging an employee who does volunteer work with AIDS victims, due to fear that the employee may contract the disease; and (3) denying health benefits to a disabled dependent of an employee but not to other dependents, even where the provision of benefits to the disabled dependent would result in increased health insurance costs for the employer.

Id. (quoting Den Hartog v. Wasatch Academy, 129 F.3d 1076, 1084 n.6 (10th Cir.1997)).

The <u>Oliveras-Sifre</u> Court reasoned that the plaintiffs' claims "d[id] not fit within this framework" because, rather than "alleg[ing] a specific association with a disabled individual[,]" the plaintiffs alleged that "they were punished for their advocacy on behalf of individuals with AIDS."  <u>Id.</u>  The Court concluded that the plaintiffs' claims "implicate[d] the prohibition against retaliation contained in Title V of the ADA, . . . not the association provision."  <u>Id.</u>

Other courts have drawn a similar distinction between association and retaliation claims and accordingly dismissed association claims that are premised on the plaintiff's advocacy on behalf of a disabled person, as opposed to improper assumptions or stereotypes related to the plaintiff's association with the disabled individual.  <u>See</u> <u>Leavitt v. SW & B Const. Co., LLC,</u> 766 F. Supp. 2d 263, 283-85 (D. Me. 2011) (granting summary judgment to the defendant as to an associational discrimination claim that alleged adverse employment action due to the plaintiff's "advocacy for his disabled wife at a workers' hearing," reasoning that the claim did not "fit within the recognized categories for an associational discrimination claim" and was instead a retaliation claim); <u>Barker v. Int'l Paper Co.,</u> 993 F. Supp. 10, 15 (D. Me. 1998) (dismissing an associational discrimination claim on summary judgment after finding that the "Plaintiff alleges that he was terminated because of his advocacy on behalf of his wife," and the "Plaintiff has not alleged that Defendant held or acted upon any unfounded assumptions about Plaintiff on account of his wife's disability"); <u>see</u> <u>also</u> <u>Larimer v. Int'l Bus. Machines Corp.,</u> 370 F.3d 698, 700 (7th Cir. 2004) (opining that the "rarely litigated . . . association section" of the ADA is triggered by "three types of situation[s]," namely, when an employee "suffers . . .

adverse personnel action" because the employer believes that the employee's association with a disabled individual would cause "expense, disability by association, [or] distraction").

During oral argument, counsel for Lieber insisted that the associational discrimination claim survives summary judgment because, unlike in Oliveras-Sifre, Lieber alleged that he has an association with a specific, disabled person, Collopy.  Even if Lieber adequately demonstrates an association with Collopy, this is not sufficient to place his claim within the framework of the ADA's associational discrimination provision, as the crux of his claim is that he faced discrimination due to his advocacy on Collopy's behalf.  Indeed, in attempting to save his association claim, Lieber argues in his objection that there is evidence in the record from which the jury can conclude that the defendants' actions towards him were influenced by their "belie[f] that Lieber would continue to advocate for Collopy's accommodations so long as his and Collopy's employment continued."[60]  Also, Lieber does not point to an unfounded assumption or stereotype that the defendants held regarding Collopy's disability, aside from "the unfounded assumption that [Collopy's] disability would require additional accommodations."[61]  This assumption is unrelated to those listed in the EEOC's Interpretive Guidance, as discussed in Oliveras-Sifre, and it does not distinguish this

---

[60] Pl.'s Objection (doc. no. 80-1) at 32 (emphasis added).

[61] Id.

claim from one for retaliation.  The court accordingly grants the defendants' summary judgment motion as to Counts 1 and 2.

### C.     Wrongful termination claim (Count 5)

In Count 5, Lieber asserts a wrongful termination claim, alleging that he was terminated for "reporting concerns of unsafe and/or illegal practices."[62]  "Under New Hampshire law, a plaintiff claiming wrongful termination must establish that (1) her termination was motivated by bad faith, retaliation or malice; and (2) that she was terminated for performing an act that public policy would encourage or for refusing to do something that public policy would condemn."  Posteraro, 159 F. Supp. 3d at 293 (internal citation omitted).  The defendants argue that Lieber provides no evidence, beyond speculation, supporting either element of the claim.  The court disagrees.

First, contrary to the defendants' contention, the record contains evidence supporting an inference that Lieber's termination was motivated by bad faith.  Bad faith "may be established under New Hampshire law where (i) an employee is discharged for pursuing policies condoned by the employer, (ii) the record does not support the stated reason for the discharge, or (iii) disparate treatment was administered to a similarly situated employee."  Straughn v. Delta Airlines, 250 F.3d 23, 44 (1st Cir. 2001) (citing Cloutier v. A & P Tea Co., Inc., 121 N.H. 915, 921-22 (1981)).  As detailed supra Section III.A, certain evidence in the record casts doubt on the credibility of the defendants'

---

[62] First Am. Compl. (doc. no. 18) at ¶ 73.

stated reasons for terminating Lieber.  This evidence creates a factual dispute going to the second bad faith category.

Turning to the second element of the wrongful termination claim, the defendants contend that the undisputed facts are that Lieber reported safety concerns only after the termination decision was made on November 19, and Marquis was unaware of any such reports.  The second contention is not determinative because, as discussed <u>supra</u> Section III.A, the record supports the inference that Moore and/or Watkins (if not others, as well) made the decision to terminate Lieber, either independently or with Marquis.  And the first contention is contradicted by evidence that Lieber made an accommodation request on Collopy's behalf in the Fall of 2020 and raised safety complaints to Moore prior to November 19.[63]

The court cites two examples of these safety complaints, in order to illustrate both that the complaints were asserted before November 19, and that there are material factual disputes as to the reasonableness or validity of Lieber's concerns.  First, on March 30, 2020, Dogil emailed Lieber asking if there were any IT-related issues that needed to be addressed in connection with the company's Boston office.  Lieber responded a few days later and copied Moore.  Lieber asked for "the back wall" in a particular room to be "lined with ¾[-inch] plywood and painted so [a server] rack [could] be properly

---

[63] For present purposes, the court assumes, for the sake of argument, that Marquis and any other decisionmakers made a final decision to terminate Lieber as of the November 19 morning meeting.  As stated <u>supra</u> Section III.A., the court does not find that the record resolves this issue.

positioned and secured in the room."[64]  Dogil replied only to Moore, writing that "there is

no need for what [Lieber] is asking," and "[i]t's just a server rack."[65]  In his affidavit,

however, Lieber states that the request stemmed from a "safety concern," as he was

trying to avoid fall risk from "insufficient wall strength to hold the weight of the rack and

equipment" and employees getting "injured" by "run[ning] into the rack and

equipment."[66]  Moore also testified that Lieber attended a meeting in June or July 2020,

in which the attendees discussed moving the payroll office at the Delaware Drive office,

which required the construction of walls within the building.  According to Moore's

testimony, during the meeting, Lieber "consistently [told] the [V]ice [P]resident of

[O]perations where sprinkler heads needed to be" and where walls could or could not be

placed.[67]  Both Moore and Denver testified that the location of sprinkler heads is a matter

of safety, though Moore also insisted that opining on this matter was "not part of

[Lieber's] job."[68]

　　　　Finally, "ordinarily the issue of whether a public policy exists is a question for the

jury, [but] at times the presence or absence of such a public policy is so clear that a court

may rule on its existence as a matter of law."  Short v. Sch. Admin. Unit No. 16, 136

---

[64] Doc. no. 80-16 at 1 (filed under seal).

[65] Id.

[66] Affidavit of Daniel P. Lieber (doc. no. 80-11) at ¶ 6.

[67] See Moore Dep. (doc. no. 80-3) at 56:4-8.

[68] See id. at 57:3-58:1; Ryan Denver Deposition ("Denver Dep.") (doc. no. 80-2) at 124:21-126:2.

N.H. 76, 84 (1992).  Though the record suggests that the validity of Lieber's safety concerns is debatable, the court cannot find on this record, as a matter of law, that Lieber's reporting of safety issues is not an act that public policy would encourage.  Nor do the defendants ask the court to make such a finding.[69]  The court accordingly denies the motion for summary judgment as to Count 5.

### D.  Whistleblower Protection Act claim (Count 6)

In Count 6, Lieber asserts a claim under the New Hampshire Whistleblower Protection Act, RSA 275-E:2.  Lieber's allegations implicate the portion of the WPA that protects employees who, "in good faith, report[ ] . . . what the employee has reasonable cause to believe is a violation of any law or rule adopted under the laws of this state, a political subdivision of this state, or the United States."  RSA 275-E:2, I(a).  Specifically, Lieber claims that the defendants retaliated against him for reporting violations of laws and rules related "to the COVID-19 pandemic and other safety matters," and refused to provide him with an employment reference after his termination, "when they learned that he planned to bring and/or had brought legal claims against" them.[70]  The WPA claim

---

[69] During oral argument, counsel for the defendants asserted, with little elaboration, that there was no evidence that Lieber's statements about the location of sprinkler heads or the acquisition of building permits "equate[d] to . . . an act of public policy . . . ."  See August 14, 2023 Oral Argument Transcript (doc. no. 92) at 13:3-8.  The defendants also conceded that they did not advance this public policy argument in their briefs.  See id. at 14:11-19.  As a general rule, "except in extraordinary circumstances, arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived."  Conduragis v. Prospect Chartercare, LLC, 909 F.3d 516, 518 n.2 (1st Cir. 2018) (quoting United States v. Pulido, 566 F.3d 52, 60 n.4 (1st Cir. 2009)).  The defendants have not identified extraordinary circumstances warranting an exception to this rule.  The public policy argument is thereby waived.

[70] First Am. Compl. (doc. no. 18) at ¶¶ 77-78.

requires similar proof as the retaliation claim, and is also subject to the McDonell Douglas burden-shifting framework, as outlined supra Section III.A.

According to the defendants, no rational jury could find that Lieber reported what he had reasonable cause to believe was a violation of law when he raised ADA concerns in connection with the Lowell Road floor plan change. To be clear, the WPA "does not require an actual violation of a law or rule but only that an employee reasonably believe that such a violation has occurred." Cluff-Landry v. Roman Cath. Bishop of Manchester, 169 N.H. 670, 674 (2017) (internal quotation omitted). "Whether an employee had reasonable cause to believe is an objective question; namely, whether a reasonable person might have believed that the employer was acting unlawfully." Appeal of Osram Sylvania, Inc., 142 N.H. 612, 618 (1998) (internal quotation omitted). As discussed supra Section III.A., the court cannot conclude as a matter of law that Lieber did not reasonably believe that the company would violate the ADA by removing the first-floor office space, given that Collopy had mobility limitations; the placement of the office on another floor would impede her access to it; and Collopy was part of the IT team, which used that office space for "help desk" matters.

With respect to Lieber's reporting of purported violations of the company's COVID-19 rules, the defendants contend that this is not protected activity because an employer's "internal policies and procedures do not constitute a 'law or rule' under the [WPA]."[71] Lieber counters this argument with citations to the deposition of Brooks—the

---

[71] Defs.' Mot. for Summ. J. (doc. no. 62-1) at 30 (quoting Cluff-Landry, 169 N.H. at 674).

company's Director of Environmental Health & Safety.  Brooks testified that, around

March 2020, he "reviewed all the [Center for Disease Control] and other pertinent

guidelines[,] . . . [and] developed a plan . . . to help comply with the guidelines."[72]

Brooks also agreed that the company's masking policy followed CDC guidance.[73]  The

record does not contain further evidence on the substance of the company's COVID-19

policies, from which an overlap with CDC guidelines or related laws or rules can be

confirmed or refuted.  This evidence, viewed in the light most favorable to Lieber, is

sufficient to create a triable issue as to whether Lieber and the defendants reasonably

understood his complaints as reports of violations of CDC guidelines and related laws

and rules, thereby bringing Lieber's actions within the protection of the WPA.  See In re

Fred Fuller Oil Co., Inc., 144 N.H. 607, 610-11 (2000) (the WPA "does not expressly

require a reporting employee to cite to the alleged violation . . . [or] include . . . a

reference to a violation of law," and "the better approach is to . . . consider a report to

have been made if a reasonable employer would have understood from an employee's

complaint that the employee was reciting a violation of law").

        The defendants also move for summary judgment on the ground that Lieber did

not engage in protected activity prior to the November 19 termination decision.  As a

result, the defendants argue, Lieber cannot establish a causal link between the protected

activity and his termination.  Again, this argument cannot prevail here because, at the

---

[72] See Sebastian Brooks Deposition (doc. no. 80-17) at 40:7-12.

[73] Id. at 51:10-12.

very least, material disputes of fact remain as to whether a final termination decision was made by November 19, as discussed more fully supra Section III.A.

Finally, the defendants contend that they are entitled to summary judgment as to the WPA claim, given that it rests, in part, on Lieber's filing of an OSHA complaint when he was no longer working at the company.  Here, the undisputed evidence reflects that Lieber filed the OSHA complaint after he was terminated, and Lieber does not point to any record evidence indicating that the defendants learned of his intention to file the complaint during his employment.  Since the WPA "protects only persons who are employed by the employer at the time they report a violation of law or rule," Lieber's WPA claim fails as a matter of law, but only insofar as it relies on Lieber's post-termination filing of an OSHA complaint as protected activity.  In re Ne. Rehab. Hosp., 149 N.H. 83, 86 (2003).

Lieber argues against this result by insisting that it fails to "effectuate[ ] the manifest purposes of the [WPA], namely, to encourage employees to come forward and report violations without fear of losing their jobs and to ensure that as many alleged violations as possible are resolved informally within the workplace." Rumrill v. Monro Muffler Brake, Civ. No. 10-cv-292-LM, 2011 WL 6101178, at *1 (D.N.H. Dec 7, 2011) (McCafferty, M.J.) (quoting Ne. Rehab., 149 N.H. at 86).  Assuming, arguendo, that a court's application of the WPA, or any statute, based on ideas about its purpose (as opposed to the textual meaning of its provisions) is permissible or appropriate, the court does not find that the WPA's purpose is undermined in any significant way by the partial dismissal of the WPA claim as outlined herein.  Lieber himself states that "the content of

35

his OSHA complaint was regarding safety concerns he raised during his employment and

his resulting termination in retaliation for raising those concerns"—the same protected

activity and retaliation that underlie the remainder of the WPA claim and some of the

other claims in this case, which survive summary judgment and will continue to be

litigated to resolution.[74]  In other words, with this partial dismissal of the WPA claim, the

court does not curtail Lieber's ability to challenge the defendants' conduct in response to

his protected activity—including the defendants' purported refusal to provide him with a

reference after his termination, to the extent this is found to be retaliation for protected

activity that Lieber engaged in during his employment.[75]  As such, this ruling does not

---

[74] Pl.'s Objection (doc. no. 80-1) at 40-41.

[75] Lieber argues that the WPA's protections extend to post-employment retaliation, such as the
defendants' alleged denial of Lieber's request for an employment reference.  Lieber also
correctly identifies that the New Hampshire Supreme Court has not decided this issue regarding
the WPA's scope.  Where, as here, "the highest [state] court has not spoken directly on the
question at issue, [federal courts] predict how that court likely would decide the issue."  Barton
v. Clancy, 632 F.3d 9, 17 (1st Cir. 2011) (internal quotation omitted).  As part of this exercise,
the court may "look to federal cases . . . under federal law for guidance."  Wilson v. Calamar
Mgmt. Grp., LLC, No. 18-CV-551-JD, 2019 WL 4542770, at *3 (D.N.H. Sept. 19, 2019)
(DiClerico, J.) (explaining that the court "would look to federal cases addressing discrimination
claims under federal law for guidance" on "the standard applicable to the employer's
motivation" in an age discrimination claim asserted under the state's discrimination statute, since
the New Hampshire Supreme Court had not determined the standard).  Lieber directs the court's
attention to Robinson v. Shell Oil Co., in which the Supreme Court concluded that claims against
employers for post-employment retaliation are cognizable under Title VII of the Civil Rights Act
of 1964.  519 U.S. 337, 339 (1997).  Lieber also cites an OSHA regulation that, according to
Lieber, "recognizes post-employment retaliation as actionable."  See Pl.'s Objection (doc. no.
80-1) at 42 (citing 29 C.F.R. §1977.5(b)).  The defendants do not challenge Lieber's position in
their briefs.  At most, the defendants cite In re Northeast Rehab. Hosp. in their Motion for
Summary Judgment, but this case is not on point.  In Northeast, the New Hampshire Supreme
Court held that the WPA "protects only persons who are employed by the employer at the time
they report a violation of law or rule," but the Court did not squarely address the issue of post-
employment retaliation.  149 N.H. at 86.  The court accordingly credits Lieber's essentially
unopposed argument, at least for the purposes of this case and under the specific circumstances
at issue, where the post-employment retaliation that Lieber alleges is closely associated with the

meaningfully flout Lieber's or any court's ideas about the purported purpose of the WPA.

Accordingly, the court grants the summary judgment motion as to the parts of Lieber's

WPA claim predicated on retaliation for his post-termination filing of an OSHA

complaint, but otherwise denies the motion as to Count 6.

### E. Unpaid wages claim (Count 7)

In this final claim, Lieber alleges that the defendants did not compensate him for

all of his accrued and unused Paid Time Off upon his termination, and he is owed an

additional $8,437.98 as a result.  Lieber also asserts that he is entitled to liquidated

damages under RSA 275:44, IV, which provides that "[i]f an employer willfully and

without good cause fails to pay an employee wages as required under paragraphs I, II or

III of this section, such employer shall be additionally liable to the employee for

liquidated damages . . . ."  Finally, Lieber seeks attorney's fees and costs as an additional

remedy for unpaid wages provided under RSA 275:53, III.

Lieber and the defendants both move for summary judgment on this Count, and

their dispute centers on the PTO accrual policy, as outlined in the company's Employee

Handbook.  For cross-motions, the court views "each motion, separately, in the light most

favorable to the non-moving party, and draw[s] all reasonable inferences in that party's

favor."  Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus.

_____

employer-employee relationship, and particularly the end of the relationship.  The court also
finds it important, though not dispositive, that the threat of reprisal following employment, in the
form of poor or reluctant references, may reasonably deter an employee from reporting unlawful
activity while employed.

Pension Fund, 943 F.3d 49, 55 (1st Cir. 2019) (quoting OneBeacon Am. Ins. Co. v.

Commercial Union Assurance Co. of Can., 684 F.3d 237, 241 (1st Cir. 2012)).

 The parties agree to the following facts.  The company's 2017 Employee

Handbook set a maximum of 80 hours of accrued vacation time in each year.  It also

stated that "[a]ll accrued vacation time has to be used in the year it is accrued.  Your

accrued unused vacation time will not be carried over from one year to the next."[76]  The

company revised its employee handbook in June 2020.  The June 2020 Employee

Handbook applied at the time of Lieber's separation from the company.  The new

Handbook removed the previous distinction between vacation, personal, and sick time

and created a single category of PTO.[77]  It set forth an annual cap of 120 hours of PTO

for full-time employees, with additional accrual beginning in the fifth year of

employment.[78]  Both versions of the Handbook provided that accrued but unused

vacation time or PTO, respectively, would be paid out at the end of an individual's

employment.  But the June 2020 Handbook, unlike the 2017 Handbook, was silent on

whether unused PTO expired or rolled over at the end of the year.

 The defendants argue that the company never permitted employees to roll over

unused PTO, and the June 2020 Handbook did not change that pre-existing policy.  For

support, they point to Watkins' deposition, in which he testified that "we did not allow

---

[76] 2017 Employee Handbook (doc. no. 61-8) at 32.

[77] See 2020 Employee Handbook (doc. no. 61-9) at 21 ("PTO includes both vacation and
personal/sick time.").

[78] Id.

carry over."[79]  The defendants also provide a June 18, 2020 email exchange between

Lieber and Watkins.  In the email, Lieber asked for confirmation of his observation that

the June 2020 Handbook presented "a material change in practice to PTO from 2 weeks

vacation . . . and 5 personal days to 15 PTO days," and Watkins confirmed Lieber's

understanding of the change.[80]  According to the defendants, since the email concerned

material changes to PTO policy and Watkins did not mention any change to the PTO

accrual policy, he conveyed to Lieber that the accrual policy remained the same under the

June 2020 Handbook.  In response to the defendants' arguments, and in support of his

summary judgment motion, Lieber rests on the June 2020 Handbook itself, and its failure

to explicitly state that accrued, unused PTO expired at the end of each year.

 The evidence on both sides is too meager to merit summary judgment as to

Lieber's claim for unpaid wages and related claims for liquidated damages and attorney's

fees and costs.  Even viewing the evidence in the light most favorable to Lieber, the court

cannot determine, as a matter of law, that the June 2020 Handbook permits Lieber to roll

over unused PTO hours merely based on the absence of language prohibiting this

practice—particularly in light of Watkins' testimony that carryover was not permitted.

On the other hand, though it is a close call, the defendants have not provided sufficient

evidence to remove any doubt as to whether the June 2020 Handbook permits employees

to roll over unused PTO.  In particular, the court is not convinced that Watkins' email to

---

[79] Watkins Dep. (doc. no. 80-8) at 145:4.

[80] Doc. no. 83-4 at 2.

Lieber clarifies the status of the PTO accrual policy.  Further, the defendants fail to summon competent evidence explaining or bolstering the notion that the omission of express language barring the carryover of unused PTO in the June 2020 Handbook was inadvertent, as opposed to purposeful.  The court accordingly denies both parties' summary judgment motions as to Count 7.

## F.  Single employer or enterprise theory

The final argument in the defendants' summary judgment motion concerns the inclusion of Select Demo as a co-defendant.  The defendants contend that all of Lieber's claims against Select Demo fail because Lieber was not Select Demo's employee, and he does not base his claims on Select Demo's conduct.

Lieber names Select Demo as a defendant in this case under the "single enterprise" or "single employer" theory.  This theory, recognized "under the ADA and several other federal employment statutes," extends liability to "companies that are not technically the complainant's employer," if the companies "are so sufficiently interrelated that they effectively operate as a single employer."  DiIorio-Sterling v. Capstone Mgmt., LLC, 596 F. Supp. 3d 306, 321 (D.N.H. 2022) (McCafferty, C.J.) (citing Burnett v. Ocean Props., Ltd., 987 F.3d 57, 65 (1st Cir. 2021)).  Courts consider "four factors to determine whether two or more entities count as a single employer under the ADA . . . : (i) centralized control over labor relations; (ii) interrelation between operations; (iii) common management; and (iv) common ownership."  Burnett, 987 F.3d at 65 (internal quotations omitted).  The "test should be applied flexibly," and "[n]ot all four factors are

necessary to establish a single employer relationship."  Id. (quoting Torres-Negrón v.

Merck & Co., Inc., 488 F.3d 34, 43 (1st Cir. 2007)).

The record contains evidence that supports at least three of the four factors in the

single employer test.  For example, it is undisputed that Marquis holds an ownership

interest in Select Demo and owns Marquis Management, and that Watkins provides HR

services to both Select Demo and Marquis Management.  Also, Denver, Select Demo's

President, testified that Moore serves as the CFO of both Marquis Management and

Select Demo.[81]  These facts are relevant to the first, third, and fourth factors of the test.

Further, it is undisputed that Marquis invited Denver to the November 19 meeting at

which Lieber's termination was discussed, and Denver attended the meeting.  Marquis

testified that he sought opinions from the meeting attendees regarding Lieber's

termination.  Specifically, he stated that he "asked" the attendees "if they had any

particular problems with letting [Lieber] go."[82]  These facts support the first factor, as

well.  Altogether, this evidence creates a reasonable dispute of fact as to whether Select

Demo and Marquis Management can be considered a single employer, thereby precluding

summary judgment in Select Demo's favor on this ground.

This conclusion is subject to one important caveat.  The single employer theory is

recognized under the ADA, but the court does not find a basis for applying the theory to

---

[81] See Denver Dep. (doc. no. 80-2) at 30:17-19 ("Q.  So as the CFO of Marquis Management,
Mr. Moore serves also as the CFO of Select Demo?  A.  Yes.").

[82] J. Marquis Dep. (doc. no. 80-9) at 75:13-14.

the state law claims.  Tellingly, the defendants raised this point in their motion for summary judgment, and Lieber did not set forth case law or argumentation refuting it in his objection.  Thus, the court dismisses each of the state law claims asserted against Select Demo.

## IV.   **Conclusion**

For the reasons stated above, the defendants' motion for summary judgment[83] is GRANTED-IN-PART, with respect to Counts 1 and 2 in their entirety and Count 6 in part, as outlined supra Section III.D, and DENIED-IN-PART, with respect to the remaining claims.  Further, each of the remaining state law claims (Counts 4-7) is dismissed as against Select Demo.  Finally, Lieber's partial motion for summary judgment[84] is DENIED.

SO ORDERED.

Joseph N. Laplante
United States District Judge

Dated: August 31, 2023

cc:  Counsel of Record.

---

[83] Doc. no. 62.

[84] Doc. no. 61.